```
1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF MAINE

3       _____

4       UNITED STATES OF AMERICA,              CRIMINAL ACTION

5                 Plaintiff          Docket No:  2:21-00149-JDL

6

7            -versus-

8

9       BRIAN DENNISON,

10                Defendant
        _____

11                      Transcript of Proceedings

12

13      Pursuant to notice, the above-entitled matter came on for Zoom
        Preliminary Hearing and Detention Hearing held before THE
14      HONORABLE JOHN H. RICH III, United States Magistrate Judge, in
        the United States District Court, Edward T. Gignoux
15      Courthouse, 156 Federal Street, Portland, Maine, on the 16th
        day of September 2021 at 11:00 a.m. as follows:

16

17      Appearances:

18      For the Government:   Craig M. Wolff, Esquire
                              Assistant United States Attorney
19
        For the Defendant:  Thomas F. Hallett, Esquire
20
        Also Present:  Stacy Laflin, U.S. Probation
21
                      Lori D. Dunbar, RMR, CRR
22                    Official Court Reporter

23                 (Prepared from manual stenography and
                        computer aided transcription)
24

25
```

```
 1              (All participants via Zoom.  Defendant present.)
 2              THE COURT:  All right.  Good morning, everyone.
 3    This is a hearing scheduled in a criminal matter.  The case is
 4    the case of the United States of America versus Brian
 5    Dennison, which is this Court's Magistrate No. 21-MJ-237-P-R.
 6    The matters scheduled for this morning are Mr. Dennison's
 7    combined hearing, both on a preliminary hearing on the issue
 8    of probable cause and, if necessary, a hearing on the
 9    Government's motion for detention, Mr. Dennison having already
10    had his initial appearance before the Court on the 14th of
11    this month.
12              The record should reflect that the Government is present
13    by videoconference through Assistant United States Attorney
14    Craig Wolff.  Good morning, Mr. Wolff.
15              MR. WOLFF:  Good morning, Your Honor.
16              THE COURT:  That Mr. Dennison is also present by
17    videoconference.  Good morning, Mr. Dennison.  Can you see me
18    and hear me okay, sir?  I see you nodding.  Your mic I think
19    might be muted at the moment.
20              THE DEFENDANT:  Yes.
21              THE COURT:  All right.  Thank you, sir.  Also
22    present is Mr. Dennison's retained counsel.  I'll get
23    confirmation of that in a moment, Mr. Hallett.  I see that you
24    entered your appearance early this morning.  Thomas Hallett
25    Esquire, good morning, Mr. Hallett.
```

```
 1            MR. HALLETT:  Good morning, Your Honor, and I have
 2    been retained.
 3            THE COURT:  Okay, very well.  Thank you, the record
 4    will so reflect.  Also present is the United States Probation
 5    and Pretrial Services Office through U.S. Probation Officer
 6    Stacy Laflin.  Good morning, Officer Laflin.
 7            PROBATION OFFICER:  Good morning, Your Honor.
 8            THE COURT:  We are on the record with the benefit
 9    and as always the Court's thanks for a court reporter and a
10    courtroom deputy.
11        Mr. Hallett, have you had an opportunity in advance of
12    this morning's combined hearing to ask Mr. Dennison whether,
13    as was true for his initial appearance, for purposes of today
14    he intends once again to give up his right to be present in
15    person and agree to proceed by video?
16            MR. HALLETT:  I have had that conversation.
17            THE COURT:  All right.  And what is your
18    understanding of Mr. Dennison's position?
19            MR. HALLETT:  I understand that he would waive any
20    right to appear in person.
21            THE COURT:  All right.  So, Mr. Dennison, I'll
22    confirm that with you in just a moment with a couple of
23    questions.  Before I ask you those questions I'll just address
24    as a preliminary matter the following:
25            To the extent, then, that we do proceed this morning in
```

1    these combined hearings by way of videoconference with

2    Mr. Dennison's consent, that will be pursuant to the

3    authorization that is provided for doing so in the federal

4    CARES Act and also in this court's applicable general orders.

5    And anyone who has been granted remote access to this

6    morning's combined hearings is advised of this Court's

7    prohibition against any recording or photographing or

8    rebroadcasting of any court proceeding and further advised

9    that any violation of that prohibition may result in the

10   imposition of sanctions upon them as this Court deems

11   necessary and appropriate.

12        Mr. Dennison, as you heard Mr. Hallett just tell me, I

13   understand from him that after speaking with him for purposes

14   of today you have once again decided to give up your right to

15   be present in person and have agreed to proceed by video.  Is

16   that true?

17             THE DEFENDANT:  Yes.

18             THE COURT:  All right, thank you.  And do you feel

19   that you had enough time to make that decision?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Is there anything or anybody who is

22   either rushing you or pressuring or in any way forcing you

23   against your will either to give up your right to be present

24   in person or forcing you against your will to agree to proceed

25   by video?

1          THE DEFENDANT:  No.

2          THE COURT:  And, finally, do you understand,

3     Mr. Dennison, that the fact that we will then be proceeding by

4     video this morning with your consent does not diminish the

5     legal significance of whatever is decided today by video and

6     that you will be bound legally by whatever is decided by video

7     today, just as you would be if you were appearing before me in

8     person in a courtroom?

9          THE DEFENDANT:  Yes.

10          THE COURT:  All right.  Thank you, sir.  Let me get

11     the position of counsel.  First for the Government, Mr. Wolff,

12     what's the Government's position --

13          MR. WOLFF:  Your Honor, the Government --

14          THE COURT:  Excuse me -- on proceeding by video?

15          MR. WOLFF:  Your Honor, the Government has no

16     objection to proceeding by video.

17          THE COURT:  Thank you.  And, Mr. Hallett, based on

18     my colloquy with your client, as defense counsel what is your

19     position on proceeding by video?

20          MR. HALLETT:  No objection, Your Honor.

21          THE COURT:  Thank you.  And just to make sure that

22     the audio -- I'm getting a little bit of feedback, Mr. Hallett

23     and Mr. Dennison, if you wouldn't mind muting your mics, that

24     would be great.  Thanks very much, everybody.

25          I do find, then, once again at this time that the

1    defendant Brian Dennison's waiver of his right to be

2    physically present this morning is knowing and voluntary

3    because, as the CARES Act contemplates, after consultation

4    with counsel Mr. Dennison has consented to proceeding by

5    video.  I also find once again that proceeding by video is

6    appropriate in order to minimize what would otherwise be a

7    health risk to all concerned were we to proceed in the

8    confines of a courtroom in person during the pandemic.  And I

9    find that proceeding by video serves the ends of justice

10   because through counsel Mr. Dennison is reasonably requesting

11   that this morning's combined hearings go forward.  And I do

12   find that they cannot be delayed without serious harm to the

13   interests of justice.

14        Accordingly, I authorize the defendant Brian Dennison to

15   appear and to participate by video this morning as a narrowly

16   tailored remedy to protect a compelling state interest in

17   health and safety and to serve the ends of justice.

18        All right.  Let me then begin first with the preliminary

19   hearing which is scheduled for this morning, the issue of

20   probable cause.  Mr. Hallett, what is Mr. Dennison's position

21   with regard to his right to a preliminary hearing?

22        MR. HALLETT:  Your Honor, we wish to exercise that

23   right to a preliminary hearing.  It is limited, though, to --

24   or I would argue that it should be limited to the belief on

25   the defendant's part that there is insufficient -- it's

1    insufficient as a matter of law that the threat that is

2    alleged in the complaint rises to the level of a true threat

3    as required under First Amendment law.  So the -- the

4    complaint itself, as it's set forth in the complaint, is

5    insufficient to meet the probable cause standard.

6            THE COURT:  All right, very well.  It is the

7    Government's burden to establish probable cause.  So if

8    counsel are ready, Mr. Wolff, I'll be happy to hear first from

9    the Government and then of course, Mr. Hallett, I'll give you

10    an opportunity to present first any additional evidence,

11    although it sounds like this may be primarily argument

12    thereafter.  Mr. Wolff?

13            MR. HALLETT:  Thank you.

14            MR. WOLFF:  Yes, Your Honor.

15    Your Honor, the Court obviously has reviewed the

16    criminal complaint and the three supporting affidavits that

17    were filed in support of the complaint.  The Government is

18    resting on the complaint and the affidavits.  Task Force

19    Officer Duquette is present for the hearing today and is

20    available for cross-examination should Mr. Hallett wish to do

21    so, although it sounds like this is more of a legal argument

22    than a factual one.  But there's no additional evidence that

23    the Government plans to present in support of its probable

24    cause.

25            THE COURT:  And when you indicate the complaint and

```
 1        the affidavit, I -- I take it, of course, that you're
 2        referring to all three affidavits?
 3                    MR. WOLFF:  That is correct, Your Honor, yes.
 4                    THE COURT:  All right, very well.  The Government
 5        rests.
 6              Mr. Hallett, before we get to argument, which I think
 7        might be primarily what you're intending, is there anything
 8        else by way of proffer or -- or evidence otherwise that the
 9        defense wishes to present on the issue of probable cause?
10                    MR. HALLETT:  No, thank you.
11                    THE COURT:  All right.  The defense then rests.  All
12        right, I'd be happy to hear both sides' legal argument on the
13        issue of probable cause.  Again, it's the Government's burden
14        so, Mr. Wolff, I'll start with you.
15                    MR. WOLFF:  Your Honor, I would submit that the
16        complaint and affidavits filed in support of it do establish
17        that the threat that Mr. Dennison posted to Twitter on
18        September 8th does constitute a true threat under the First
19        Amendment under the relevant case law.
20              Under Virginia v. Black, Your Honor, 538 U.S. 343, which
21        is a 2003 Supreme Court decision, true threat is defined as,
22        quote, a serious expression of an intent to commit an act of
23        unlawful violence to a particular individual or group of
24        individuals, unquote.
25                    Even after the Supreme Court's decision in Elonis in
```

1    2015, Your Honor, I believe the definition of a true threat

2    remains unchanged and that that is the governing standard in

3    order for a threat to be actionable and able to be prosecuted

4    and not be a violation of the First Amendment.

5        In this case, Your Honor, the threat that was posted was

6    clear and unambiguous.  It stated on Twitter on September 8th,

7    quote, I'm going to kill Jews with my AR-15 tomorrow, period.

8    That was the -- that was the threat that was made, Your Honor.

9    And just prior to that was another statement, which I believe

10   the Court certainly can take in considering the context, which

11   was building a pipe bomb.

12       So, Your Honor, the threat was not one that was

13   conditional.  It was not made in the midst of any political

14   hyperbole or any -- and no indication that it was made in

15   jest.  It specified the targets of the intended violence,

16   namely Jewish people.  It specified the time frame of the

17   intended violence, the next day.  And it specified the weapon

18   that was to be used to commit that act of violence, which was

19   an AR-15 rifle.

20       Your Honor, I would submit that under the relevant case

21   law and under the First Amendment this is absolutely a true

22   threat.  It is -- it is not something that's protected by the

23   First Amendment and it, therefore, can be prosecuted under

24   Section 875(c).

25       THE COURT:  All right, thank you, Mr. Wolff.

1          Mr. Hallett?

2              MR. HALLETT:  Thank you.  Your Honor, I would cite

3     to the same case, and that case is Virginia v. Black, and true

4     threats under Virginia v. Black, sort of the pivotal case in

5     this area, dealing with 18 U.S.C. Section 875(c), encompass --

6     a true threat encompasses those statements where the speaker

7     means to communicate a serious expression of an intent to

8     commit an act of unlawful violence to a particular person or

9     to a particular individual or group of individuals.

10             It is the defense's position, Your Honor, that by

11    designating the alleged victims as Jews, it lacks the

12    particularity necessary to meet First Amendment requirements.

13             Now, the threat specifically is I'm going to kill Jews

14    with my AR-15 tomorrow.  There is no location mentioned in the

15    threat.  There is no identification of where the individual

16    allegedly making the threat is located.  The -- Twitter, as I

17    understand, goes all over the world.  It could be anywhere in

18    the world.  It could be anywhere -- perhaps one of -- I

19    understand there are 15 million Jews throughout the world.

20    That is not a specific group sufficient to meet constitutional

21    requirements.

22             The case law -- let me just first define sort of what a

23    group is, Your Honor.  And -- and there are a number of

24    definitions for group, but the primary definition under most

25    dictionary definitions is a group is defined as a group -- is

1     a number of people or things that are together in one place at

2     one time; a number of people or things that are put together

3     and considered as a unit; an assemblage of persons or objects

4     gathered together or located together.

5         Jewish people are throughout the world, scattered

6     throughout all the countries of the world.  There is no

7     limiting information contained in the alleged threat to

8     designate a subgroup, a group of Jewish people.  Rather, it

9     delineates an entire class of an ethno-religious group of

10     people.

11         The case law has dealt primarily, when it deals with

12     groups, with small groups.  So, for example, in the case where

13     this was a specific issue, in the case of United States v.

14     Baker -- I'll candidly admit, it's a district court decision,

15     it's at 890 F. Supp. 1375 out of the Eastern District of

16     Michigan, 1995, of limited precedential value to this Court.

17     However, it does discuss the specificity required to meet the

18     standard of a true threat in respect to 875(c).  And in that

19     case there were threats made to violate 13- and 14-year-old

20     girls.  The Court said that describing the alleged victims as

21     13- or 14-year-old girls lacked the specificity necessary to

22     delineate a group in order to create a true threat.

23         THE COURT:  Was that decided -- was that case

24     decided, Mr. Hallett, on probable cause or on a motion to

25     dismiss?

1          MR. HALLETT:  Actually I believe it was a motion to

2     dismiss, Your Honor.

3          THE COURT:  Right.

4          MR. HALLETT:  Okay.  And then there are other cases

5     dealing with people at a bank being threatened, a specific

6     bank, and it was anyone that was at that specific bank.  Now,

7     that's a -- that was an appellate decision, U.S. v. Cox, 957

8     F.2d 264.  And other decisions have dealt with threats to kill

9     judges in a specific circuit, I believe it was the Eighth

10    Circuit.

11         And then there's one case which deals with a threat to

12    kill people at a post office, and that was made to an

13    Assistant U.S. Attorney.  And it did not describe the post

14    office.  That's the most general threat that I can find that

15    meets the true threat standard.  So in that case, which was

16    U.S. v. Schroeder, 902 F.2d 1469, that case did -- the

17    specificity --

18         THE COURT:  What circuit was that?

19         MR. HALLETT:  Excuse me, that's the Tenth Circuit.

20    Very few decisions -- I didn't find any decisions in the First

21    Circuit, Your Honor, on this particular issue.  There simply

22    have not been many.

23         Fundamentally that is the law as we see it on the

24    defense side, Your Honor.  I think that this is a very broad

25    class of people that is being described.  They -- there needs

1    to be a threat such that those people would feel in fact

2    threatened, the objective person would feel threatened.  It's

3    impossible to make an assessment here as to what people would

4    feel threatened, how they would feel threatened, the

5    likelihood of any threat.  It's simply too broad a category.

6    It does not meet a First Amendment muster, and as a matter of

7    law this complaint fails on its face.  That would be our

8    argument.

9            THE COURT:  All right.  So let me -- I want to hear

10   from the Government in rebuttal, of course.  But let me just

11   raise a procedural issue, then.  Of course I was expecting

12   excellence in advocacy from both counsel this morning, but I

13   was not expecting this issue.  That's not meant as a criticism

14   at all, absolutely no reason for the Court to be advised in

15   advance.  But given the purely legal nature of the arguments

16   being made, have counsel discussed briefing this issue to

17   the -- to the Court on an expedited -- we would do it on an

18   expedited basis because I appreciate Mr. Dennison's detained.

19   But obviously if you're right, Mr. Hallett, then the complaint

20   would be dismissed.  So this is an important issue, to state

21   the obvious.  Go ahead, Mr. Hallett.

22           MR. HALLETT:  Excuse me, Your Honor, no, we have

23   not.  However, I did have at the beginning of my notes, which

24   I didn't mention, was I would request permission to file a

25   memorandum on this issue.

```
1           THE COURT:  You're way ahead of me.  You're way

2    ahead of me, Mr. Hallett.  All right.

3           Well, what about that, Mr. Wolff?  I mean, I don't mean

4    to cut you off, you -- I suspect you have a response to what

5    Mr. Hallett just told me.  But given the cases being cited,

6    which frankly the Court has not looked at in any detail,

7    not -- because I was unaware of this specific issue being

8    raised, doesn't briefing make sense?

9           MR. WOLFF:  I absolutely think it does, Your Honor.

10    I mean, Mr. Hallett did tell me yesterday that he intended to

11    pursue a legal argument and that it related to whether it was

12    a true threat.  I was not aware of the specific argument to be

13    made, and obviously there's no reason for Mr. Hallett to have

14    informed me of the precise argument.  But as a result, like --

15    like you, Your Honor, I have not -- this is the first time I'm

16    hearing of these cases and I have not reviewed the cases, what

17    other case law there is.

18           So I do think that this is something that it makes sense

19    for the parties to brief and certainly can do it on an

20    expedited basis.  And I think given the nature of the issue it

21    probably -- it can be simultaneous so we don't have to wait

22    for one another to brief it, but I agree with the Court and

23    Mr. Hallett that I think this is something that does merit

24    briefing.

25           THE COURT:  I cannot recall in the last almost 14
```

1   years that I've had this issue briefed, the true threat issue.

2   So it is something that would assist me.  And it sounds like,

3   from what Mr. Hallett indicated and you as well, Mr. Wolff,

4   that there are cases out there that it would be very helpful

5   to have each side marshal and then make argument from.

6        So I think the simultaneous brief makes sense, and also

7   we should talk about length of the briefs as well as filing.

8   So let me start there.  How quickly can you each file your

9   principal brief?  What I'm envisioning that simultaneous

10  briefs would be filed on this issue and then simultaneous

11  responsive briefs would be filed sometime thereafter.  What --

12  how quickly can you get your briefs in, counsel?  Mr. Wolff,

13  what are you looking at?

14        MR. WOLFF:  Your Honor, would Monday be acceptable

15  to the Court?

16        THE COURT:  Sure.  Does that give you enough time?

17  I mean, I -- I want to be sensitive to time; but, of course,

18  I'm also looking for, you know, your best efforts.  So I just

19  want to make sure -- does that give you -- and how about you,

20  Mr. Hallett, what were you envisioning?

21        MR. HALLETT:  Well, I'm embarrassed in that I've

22  already got a head start on this, but I was hoping perhaps

23  next Wednesday, a little more time.

24        THE COURT:  Yeah, I was thinking -- right, I was

25  thinking more in the nature of the middle of next week with

1    simultaneous responsive briefs by Friday.

2         MR. WOLFF:  And that's fine, Your Honor.  That is

3    certainly fine with me.

4         THE COURT:  Why don't we do that, then.  And how

5    about page limits, any difficulty with limiting the initial

6    briefs to ten pages?

7         MR. HALLETT:  Not for the defendant.

8         THE COURT:  Okay.  Mr. Wolff?

9         MR. WOLFF:  No, that's fine, Your Honor.

10        THE COURT:  All right.  So those will be due, then,

11   on the 22nd, which is six days from today.  And then the

12   responsive briefs by close of business on the 24th; does that

13   give you enough time?  Or do you need until the Monday?

14        MR. HALLETT:  I can do that by the 24th, Your Honor.

15        THE COURT:  Okay.

16        MR. WOLFF:  As can I, Your Honor.

17        THE COURT:  And why don't we say a six-page limit on

18   those responsive briefs.  And I'm envisioning double spaced?

19   Sometimes in the civil context I -- I let counsel file single

20   spaced, but these will be filed on the docket and so they

21   should confirm to the format.  So even double-spaced I take it

22   you're both comfortable with ten pages on the principal briefs

23   and six pages on the responsive briefs?

24        MR. WOLFF:  Yes, Your Honor.

25        MR. HALLETT:  Yes for the defendant.

```
 1          THE COURT:  Okay, very well.  All right, well, I

 2   appreciate counsel's willingness to provide the Court with

 3   that assistance.  Of course, I'll have one of my law clerks

 4   research this issue as well, and given the fact that

 5   Mr. Dennison is detained, the Court obviously will be very

 6   conscious of the need to get a decision out quickly.

 7       Are counsel interested in further argument after the

 8   briefs are filed or what's your pleasure?

 9          MR. WOLFF:  I guess if we -- perhaps we can at least

10   reserve the possibility of that, Your Honor, and maybe see

11   whether that will be necessary?

12          THE COURT:  Okay.

13          MR. HALLETT:  That would be -- that would be fine

14   with the defendant, Your Honor.  However, I -- I would hope

15   that we proceed forward with the detention hearing today to

16   determine whether he will be further detained pending

17   resolution of this issue.

18          THE COURT:  All right.  I'm wondering, with regard

19   to probable cause, I guess if we -- if we're going to go

20   forward with a detention hearing, which -- what's the

21   Government's position on that, Mr. Wolff?  Any objection?

22          MR. WOLFF:  No, Your Honor, we're prepared to go

23   forward on that.

24          THE COURT:  Yeah, the sequencing, then, would be a

25   little bit out of the ordinary.  And in that event I'll --
```

1    with regard to probable cause I'll allow either side to

2    request oral argument.  But there'll be less pressure, of

3    course, once the Court's ruled on the issue of pretrial

4    release.  So I -- I'll be more flexible either way on that.

5         All right, is there anything else on the preliminary

6    hearing that we should discuss?  Mr. Wolff, anything else from

7    the Government?

8              MR. WOLFF:  No, Your Honor.

9              THE COURT:  Mr. Hallett, anything else?

10             MR. HALLETT:  No, thank you, Your Honor.

11             THE COURT:  All right.  So the Court will reserve on

12   the issue of probable cause pending the submission of the

13   briefs pursuant to the schedule that's just been set.

14        And why don't we then proceed to the issue of bail.

15   It's the Government's motion for detention, so of course the

16   Government has the burden.  The Government is arguing danger

17   alone, where it has the burden by clear and convincing

18   evidence.  Are both sides prepared to proceed, Mr. Wolff?

19             MR. WOLFF:  Yes, Your Honor.

20             THE COURT:  Mr. Hallett?

21             MR. HALLETT:  Yes, Your Honor.

22             THE COURT:  All right, very well.  Mr. Wolff, the

23   floor is yours.

24             MR. WOLFF:  Thank you, Your Honor.  Your Honor, in

25   terms of evidence, the Government would like to call Task

1    Force Officer Jonathan Duquette to testify.

2              THE COURT:  He may be called.

3              THE CLERK:  Please raise your right hand.  Do you

4    solemnly swear that the testimony you shall give in the cause

5    now in hearing shall be the truth, the whole truth, and

6    nothing but the truth, so help you God?  We can't hear you.

7              THE COURT:  You might be muted.

8              THE WITNESS:  Can you hear me?

9              THE COURT:  Yes.

10             THE WITNESS:  I do.

11             THE CLERK:  Thank you.  Please state your name and

12   spell your last for the record.

13             THE WITNESS:  Jonathan Duquette, D-U-Q-U-E-T-T-E.

14             THE COURT:  Mr. Wolff.

15             MR. WOLFF:  Thank you, Your Honor.

16                       DIRECT EXAMINATION

17   BY MR. WOLFF:

18   Q.    Good morning.

19   A.    Good morning.

20   Q.    Could you please first tell us where you work?

21   A.    I'm a U.S. Border Patrol Agent, and I'm assigned to the

22   National Security Squad at the FBI in Portland, Maine.

23   Q.    And you are a task force officer with the FBI; is that

24   correct?

25   A.    That's correct.

1    Q.    How long have you been in that position?

2    A.    A little over three and a half years.

3    Q.    And how long have you been with the U.S. Border Patrol?

4    A.    I'm approaching 12 years.

5    Q.    And are you the case agent in the investigation of

6    Mr. Dennison?

7    A.    Yes.

8    Q.    You obviously have authored now three affidavits that

9    were submitted to the Court in support of the criminal

10   complaint in this case.  I'm not going to go over what you've

11   already written, but I do want to ask you a few more details

12   about your investigation.

13          First of all, on September 8th, did you have the

14   occasion to speak with Mr. Dennison's parents?

15   A.    We did, myself and a special agent with the FBI.

16   Q.    And where did that conver -- I take it that you spoke

17   with him on multiple occasions; is that right?

18   A.    Yes, two in person and one on the telephone.

19   Q.    In terms of an in-person conversation, can you tell us

20   where those took place?

21   A.    The in-person conversations occurred at the --

22   Mr. Dennison's residence, 86 Fogg Road in Buxton.  And then

23   the -- the second interaction I had with the -- his parents

24   was just slightly down the road from their house in Buxton.

25   Q.    During one of those in-person conversations with

1  Mr. Dennison's parents on the 8th, was there a conversation

2  about Mr. Dennison's views regarding Jewish people?

3  A.    There was.

4  Q.    Can you tell us what his parents said about

5  Mr. Dennison's views regarding Jewish people?

6  A.    They said that in the last few years he's just become

7  obsessed with Jewish people and has a -- a strong hatred for

8  them.

9  Q.    Were there -- and did they indicate that they had had

10  conversations with him about that?

11  A.    They had had conversations with their son about that,

12  correct.

13  Q.    Did they give you any details about the nature of those

14  conversations?

15  A.    Not really in details, but they just said they had

16  uncomfortable conversations, you know, that -- concerning

17  Jewish people and Brian's dislike for them.

18  Q.    Did you discuss with Mr. Dennison's parents their --

19  whether they had -- themselves had any concerns about whether

20  he might act on his hatred towards Jewish people?

21  A.    They did.  They -- they expressed they -- you know,

22  like any parent would want, they would never hope that their

23  child was willing to commit acts of violence, but they -- they

24  were concerned that their son had the capability to do the

25  acts of violence that he had written about.

1   Q.    And as part of that conversation, did Mr. Dennison's

2   mother make any specific requests regarding her son to you?

3   A.    She made -- she had asked a question if we could just,

4   you know, essentially arrest her son.  She asked if we could

5   handcuff her son.

6   Q.    And what was your response?

7   A.    I said we could not without an arrest warrant or

8   probable cause.

9   Q.    Did you ask Mr. Dennison's parents about whether he

10  owned or possessed any firearms?

11  A.    We did.

12  Q.    And what did they tell you?

13  A.    They said he had at least a couple of handguns and a

14  couple of rifles.  And one of the rifles they said was an

15  AR-15.

16  Q.    Did they give you -- did they know where the AR-15 was?

17  A.    They did not.

18  Q.    Did they tell you when was the last time they had seen

19  him in possession of the AR-15?

20  A.    Not at the time, they did not.

21  Q.    Did they at any point give you a sense of when they had

22  last seen that weapon?

23  A.    Yes, the father, John Dennison, while we were executing

24  a search warrant at the residence on the following day,

25  indicated that it had been some time, possibly a year, that he

1    had -- since he had seen that AR-15 rifle.

2    Q.    Now, you have -- even after Mr. Dennison's arrest,

3    you've continued your investigation in this case; is that

4    right?

5    A.    Yes.

6    Q.    Has that investigation included an interview of

7    Mr. Dennison's sister?

8    A.    It did, yes.

9    Q.    When did you speak with her?

10   A.    I spoke to her via telephone yesterday.

11   Q.    Did she -- did you ask her how long it had been since

12   she had spoken with Mr. Dennison?

13   A.    I did.

14   Q.    What did she tell you?

15   A.    About four years.

16   Q.    Did she tell you why it was that she was not speaking

17   with her brother?

18   A.    She said that there's a couple of things.  Her brother

19   was -- had been upset with her when she became pregnant, and

20   then she said that any time she had tried to talk to him in,

21   you know, the last several years all he likes to talk about is

22   his -- you know, his feelings for the Jewish people and she

23   does not agree with those feelings so, you know, she has

24   chosen not to talk to him in order to prevent the

25   conversations from heading in that direction.

1    Q.    Did you also ask her whether she had ever witnessed him

2    commit any acts of violent or act violently?

3    A.    I did.  She --

4    Q.    And what did she say?

5    A.    She said that she has never seen him act violent.  She

6    said she's seen him get angry but never act out in violence.

7    Q.    When you executed the search warrants at 86 Fogg Road,

8    among the items that were seized were large amounts of

9    ammunition; is that right?

10   A.    Yes.

11   Q.    I'm going to ask you some specifics about what was

12   recovered.  Before getting to ammunition, were you able to

13   recover firearms as part of the search warrants?

14   A.    We did recover three firearms as part of the search

15   warrants.

16   Q.    And who did those firearms belong to?

17   A.    They belonged to Brian Dennison, but we -- we received

18   the firearms through his parents because Brian had turned them

19   over to them at their request.

20   Q.    Those firearms did not include an AR-15 rifle; is that

21   right?

22   A.    They did not include an AR-15.

23   Q.    Do you at this time have any information about where

24   that AR-15 is located?

25   A.    No.

1    Q.    In terms of ammunition that you found inside

2    Mr. Dennison's apartment, did you find any ammunition that

3    would fit or be shot from an AR-15 style rifle?

4    A.    We did.

5    Q.    Can you tell us what you found?

6    A.    So we found ammo cans that contained ammunition for an

7    AR-15 rifle, either .223 caliber or 5.56 caliber.  And in the

8    multiple ammo cans we calculated how many we had, we counted

9    them up, we came up with roughly -- a little over 1,700 rounds

10   of ammunition.  Of those there were 12 magazines that fit an

11   AR-style rifle that had combined 365 rounds preloaded into the

12   magazines.

13   Q.    And so when you -- when you talk about magazines --

14        MR. HALLETT:  Excuse me, I didn't hear how many

15   rounds that was.  I apologize.

16        THE WITNESS:  In total there was roughly -- there

17   was a little over 1,700.  So 1,700.  And subcategory of that,

18   365 were preloaded into magazines.

19        MR. HALLETT:  Thank you.

20   BY MR. WOLFF:

21   Q.    Am I correct that in that case, with respect to

22   magazines, all that would be necessary would be to put the

23   magazine into the rifle and the -- the ammunition would be

24   ready to fire?

25   A.    Correct.  Insert the magazine, pull the charging

1    handle, and it would be ready to fire.

2    Q.    The remaining -- I mean, just doing some quick math --

3    over 1,300 rounds, what were -- how were they contained or

4    packaged?

5    A.    They were packaged in their factory packaging,

6    typically cardboard boxes.

7    Q.    Now, you had you mentioned both .223 and 5.56

8    ammunition, and I believe in your -- one of your affidavits

9    you describe that both of these calibers of ammunition can fit

10   in an AR-15 rifle; is that right?

11   A.    It depends upon the caliber of the rifle.  So typically

12   a 5.56 caliber AR-15 can shoot both 5.56 ammunition and .223

13   ammunition.  Conversely, a .223 should not be shooting the

14   5.56 ammo.

15   Q.    The .223 and 5.56 ammunition that you found, could that

16   have been shot out of any of the other firearms that you

17   seized under the search warrants on the 9th of September?

18   A.    No, it could not.

19   Q.    Also as part of your investigation have you started, at

20   least, to review the electronic devices that were seized from

21   Mr. Dennison's apartment?

22   A.    I have.

23   Q.    And those -- can you tell us what types of devices were

24   seized?  I'm not asking for a complete inventory but generally

25   speaking.

1   A.   A few cell phones, some thumb drives, various sizes.  A

2   tablet, several computers.

3   Q.   With respect to a thumb drive, did you find any video

4   files that you thought were relevant?

5   A.   I did.

6   Q.   And where was that thumb drive located?

7   A.   I don't recall the specific place in the apartment, but

8   it was found in the apartment that Mr. Dennison resided in.

9   Q.   Okay.  And can you describe for us the videos that were

10   found on that thumb drive?

11   A.   There was many videos that what I would interpret as

12   glorified Nazi Germany, Adolph Hitler.  The videos were set to

13   I would say catchy, upbeat music.  There was also several

14   videos that I would say again glorified some of the more

15   recent active shooters, such as the Christchurch shooting in

16   New Zealand, and the -- in 2011 there was an active shooter in

17   Norway, Anders Breivik, that killed 77 people.  There were

18   quite a few proceedings of his court proceedings where he was

19   shown giving the Nazi salute in his court proceedings.  The

20   videos were, as I said, to kind of upbeat music with

21   backgrounds, you know, these are our heroes, these are our

22   fighters, we need more heroes.

23   Q.   All right.  Task Force Officer Duquette, I believe

24   those are all the questions I have for you at this time.

25          MR. WOLFF:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2      Mr. Hallett, cross-examination.

3          MR. HALLETT:  Yes, thank you, Your Honor.

4                    CROSS-EXAMINATION

5  BY MR. HALLETT:

6  Q.    How should I refer to you, Mr. Duquette?  Are you

7  Special Agent FBI or Border Patrol or how do you like to be

8  referred to?

9  A.    Either works, sir.  So I'm not a special agent with the

10 FBI.  Task Force Officer Duquette or Border Patrol Agent or

11 Agent Duquette is fine, or Jon is fine.

12 Q.    Fair enough.  Agent Duquette, did you personally search

13 the premises?

14 A.    No, sir.

15 Q.    Okay.  But you reviewed the list of all the items found

16 there?

17 A.    Yes.

18 Q.    And certain guns were turned over willingly by

19 Mr. Dennison?

20 A.    They were turned over to his parents, yes.

21 Q.    And then there was ammunition that was located there

22 also?

23 A.    Yes.

24 Q.    Now, Mr. Dennison does not have a criminal record.

25 You're aware of that; are you not?

1    A.    I am.

2    Q.    There's nothing illegal about him having the ammunition

3    that he had.

4    A.    No.

5    Q.    And there's nothing illegal about him having the guns

6    that he had.

7    A.    Correct.

8    Q.    If he were to have had an AR-15, there's nothing

9    illegal about that; is there?

10   A.    Nothing illegal.

11   Q.    And there's nothing illegal about having white

12   supremacist type information in his possession, right?

13   A.    Correct.

14   Q.    Nothing illegal about white supremacy, right?

15   A.    Correct.

16   Q.    A number of people share the views that Mr. Dennison

17   apparently -- or at least the information that he had in his

18   house that -- favorable information about the Nazis, right?

19   A.    I'm sorry, can you repeat that question?

20   Q.    A common theme for white supremacists is that they

21   glorify the Nazis, correct?

22   A.    Yes.

23   Q.    Now, in your review of all the information that has

24   been obtained, have you located any specific -- specific

25   identity of any Jewish person that Mr. Dennison ever

1    threatened?

2    A.    Not to date.

3    Q.    And have you located any information identifying a

4    location that Mr. Dennison -- excuse me, included in

5    Mr. Dennison's computer information, et cetera, that suggested

6    that he was going to shoot Jewish people, other than the

7    alleged threat that is the subject matter of this case?

8    A.    Not to date, no.

9    Q.    You said that there were videos made -- videos in his

10   possession pertaining to Nazis, correct?

11   A.    Yes.

12   Q.    Those aren't videos that were made by Mr. Dennison.

13   A.    No, they -- they don't appear to be made by him.  You

14   know, I couldn't pick him out as anybody in the video.

15   Q.    They were downloaded from the computer, presumably?

16   A.    Presumably, yep.

17   Q.    Now, with respect to the alleged threat made by

18   Mr. Dennison, did you track the people that viewed that

19   threat?

20   A.    We have not obtained any of that information yet.

21   Q.    Did you obtain any information pertaining to who --

22   with whom he was communicating at that time?

23   A.    Not at this time.

24   Q.    So it could have been a group of individuals --

25   like-minded individuals, right?

1   A.    Conceivably, possibly, yes.

2   Q.    Are you aware of any Jewish people that have viewed his

3   allegations, other than now that it's been in the press?

4   A.    Only from the press I'm aware of people that have

5   viewed it.

6   Q.    I believe you indicated that Mr. Dennison's father said

7   that he had not seen the AR-15 for a year?

8   A.    That's correct.

9   Q.    Do you have any idea whether that AR-15 was sold to

10  another person?

11  A.    We have been not -- we have been unable to determine

12  where the AR-15 is.

13  Q.    So it could have been sold.

14  A.    It's possible.

15          MR. HALLETT:  I have nothing further, thank you.

16          THE COURT:  Redirect, Mr. Wolff?

17          MR. WOLFF:  Thank you, Your Honor.

18                    REDIRECT EXAMINATION

19  BY MR. WOLFF:

20  Q.    Agent Duquette, Mr. Hallett had asked you about --

21  about the particular Tweet and about the possibility that it

22  was a group of like-minded individuals, he said.  The Tweet

23  itself was not sent to some specific subset of individuals; is

24  that your understanding?

25  A.    That's my understanding.

1    Q.    To whom -- or can you explain sort of how it was posted

2    and what the -- what the potential audience would be for that

3    Tweet?

4    A.    It appeared that it was just Tweeted out there so it

5    would be visible to, you know, any number of people.

6    Q.    Potentially any user of Twitter who -- well, certainly

7    anybody who followed Mr. Dennison.

8    A.    Correct.

9    Q.    But it could be also happened upon by people who did

10   not follow him; is that correct?

11   A.    Correct.

12   Q.    Besides the -- understanding -- I know you've confirmed

13   with Mr. Hallett that it's not -- certainly not illegal to

14   harbor pro-Nazi or white supremacist views, but in addition to

15   the videos that you found on that thumb drive, did you find

16   any other memorabilia or items that showed an affinity for

17   Nazis in Mr. Dennison's apartment?

18   A.    Yes, there were several items that he had, you know,

19   Nazi swastika carvings and he had at least one uniform item

20   that was -- appeared to be like a uniform hat.

21           MR. WOLFF:  Thank you.

22           THE COURT:  Thank you.  Mr. Hallett, recross?

23           MR. HALLETT:  Yes.

24                   RECROSS-EXAMINATION

25   BY MR. HALLETT:

1   Q.    So as far as you understand it, a Tweet goes out to the

2   entire world; is that right?

3   A.    It's my understanding, yes.

4   Q.    And then people have to specifically -- unless they're

5   followers of Mr. Dennison, people have to specifically then

6   punch in information which will trigger that Tweet to be

7   available to them; is that right?

8   A.    That's my understanding, which is quite limited.

9   Q.    Okay.  Was there anything in the Tweet itself that

10  identified the area, the location, of the person that issued

11  the Tweet?

12  A.    In the Tweet itself there was nothing that identified

13  the area.  That information came from Twitter itself.

14  Q.    So according to the Tweet, it could have been Tweeted

15  in Canada, for example?  The person could have been in Canada?

16  A.    The -- the Tweet as it was written could have indicated

17  they were anywhere in the world.

18  Q.    But there was no specificity.  It certainly didn't say

19  Buxton, Maine.

20  A.    That's correct.

21          MR. HALLETT:  Nothing further, thank you.

22          THE COURT:  Thank you.  Mr. Wolff, anything further?

23          MR. WOLFF:  No, Your Honor.

24          THE COURT:  All right, thank you.  May the witness

25  be excused for purposes of the hearing?  He's welcome, of

1    course, to stay on and observe, but any reason to retain

2    Mr. Duquette as a potential witness, Mr. Wolff?

3            MR. WOLFF:  No, Your Honor.

4            THE COURT:  Mr. Hallett?

5            MR. HALLETT:  No, Your Honor.

6            THE COURT:  All right.  Any further evidence from

7    the Government, Mr. Wolff?

8            MR. WOLFF:  Your Honor, the only other thing the

9    Government would ask is that the Court take judicial notice of

10   the fact that September -- the morning of September 8th when

11   this Tweet was posted was during the Jewish holiday of Rosh

12   Hashanah.

13           THE COURT:  Very well.  Anything else?

14           MR. WOLFF:  The Government rests, Your Honor.

15           THE COURT:  Government rests, thank you.

16       Mr. Hallett, the floor is yours.

17           MR. HALLETT:  Your Honor, at this time we don't have

18   any evidence to present on this issue.  We will argue, though.

19           THE COURT:  All right.  Very well, the defense rests

20   on the factual presentation, and we'll proceed, then, to

21   argument.

22       All right, it's the Government's motion that's being

23   pressed, as the Court understands it, on danger only.  Again,

24   the standard there, of course, is clear and convincing

25   evidence.  Mr. Wolff, I'll be happy to hear your argument.

1    I'll give you a chance -- I'll give both of you a chance to

2    respond to each other, as is my typical practice.

3              MR. WOLFF:  Thank you, Your Honor.

4         Your Honor, the Government submits that there is clear

5    and convincing evidence that Mr. Dennison poses a danger to

6    others and to the community and that he should be detained

7    pending trial.  The Court is obviously quite familiar with the

8    factors the Court is obligated to consider under the Bail

9    Reform Act, and I'll go through each of those, if I may.

10        With respect to the nature and circumstances of the

11   offense charged, this is a crime of violence.  This was a

12   very -- and again understanding the legal challenge that we

13   still have to deal with in terms of the legal sufficiency of

14   whether it constitutes a true threat -- but it certainly, I

15   would submit, is clear that it was a threat to kill Jewish

16   people with an AR-15 rifle, an unambiguous, clear threat.  It

17   was issued in the midst of Rosh Hashanah, which is the Jewish

18   New Year.  So in terms of this being a violent act it was one,

19   Your Honor, and one does not need to actually commit an act of

20   violence in order for it to be considered a crime of violence

21   obviously under the Bail Reform Act.

22        In terms of the weight of the evidence, Your Honor, I

23   would submit that it is quite strong, and the complaint

24   affidavit lays out in considerable detail all of the various

25   ways that Mr. Dennison has been shown to be the author of that

1    Tweet, the subscriber information from Twitter, the subscriber

2    information from the communication service TextMe, the IP

3    address information that puts logins to that Twitter account

4    at both Mr. Dennison's home address as well as his place of

5    employment on Western Avenue in South Portland, images of the

6    threat itself that were found on Mr. Dennison's cell phone,

7    evidence of use of both Twitter and TextMe on that cell phone.

8         And I would submit also, Your Honor, that corroborating

9    all of that is the fact that we have heard from multiple

10   individuals that Mr. Dennison does indeed harbor anti-Semitic

11   views.  And obviously I agree with Mr. Hallett that those

12   views themselves are not illegal, but in terms of showing that

13   it was in fact Mr. Dennison who committed this crime, I think

14   certainly the Court can properly consider the fact that

15   Mr. Dennison has been shown to have a hatred of Jewish people

16   in deciding whether in fact he was the individual who

17   committed the crime and in deciding what the weight of the

18   evidence is in this case.

19        That also goes, Your Honor, to his history and

20   characteristics.  He is from all accounts, from what we have

21   heard from both his parents and from his sister, vehemently

22   anti-Semitic.  His mother also reports that he's very angry,

23   although she does not -- she claims not to know the specific

24   origin of that anger and she talks more about the death of

25   Mr. Dennison's grandmother as perhaps being the trigger of

1   that anger.

2       Significantly, Your Honor, as the Court heard from Agent

3   Duquette, his own parents expressed concern about the

4   possibility that Mr. Dennison could act on his -- on his

5   hatred.  They of course had the hope that he wouldn't, as any

6   parent would.  But they had a feeling that he could act on the

7   things that he talked about doing.  And Mrs. Dennison went so

8   far as to ask Agent Duquette if they could arrest Brian

9   Dennison, and obviously Agent Duquette told them they couldn't

10  do that without probable cause or an arrest warrant.

11      Mr. Dennison was employed at ON Semiconductor, but he is

12  no longer employed there as a result of his actions and as a

13  result of the publicity that has resulted from his actions.

14  And we know also that he has shown -- additionally shown his

15  anti-Semitic views and sort of pro-Nazi views because we heard

16  about the videos that were found on his thumb drive and the

17  other items that were found in his apartment.

18      What we really obviously need to focus on is the nature

19  and seriousness of the danger here.  And I would submit that

20  there is a very real danger here.  Mr. Dennison has clearly

21  and repeatedly expressed his hatred of Jews, not just in the

22  Tweet that's the subject of this case but other times it's

23  caused -- at least in part been one of the reasons he hasn't

24  spoken to his sister in four years, apparently.

25      He threatened to kill Jews with an AR-15 in the midst of

1    Rosh Hashanah.  We know he owned an AR-15.  We don't know if

2    he still owns an AR-15, because he refused to provide

3    information about where that weapon is and apparently still

4    refuses to do so.  He obviously is not obliged to do that, but

5    it's still obviously a significant piece of information for

6    the Court to consider is that we don't know whether that AR-15

7    is still in Mr. Dennison's constructive possession and if he

8    were released whether he would be able to access that weapon

9    because we don't know where it is.

10        What we do know is that on September 8th -- excuse me,

11   September 9th he had over 1,700 rounds of ammunition that

12   could fit an AR-15.  I guess you could -- you could conceive

13   of a situation where Mr. Dennison got rid of that weapon some

14   time ago but still held on to that many rounds of ammunition.

15   I would submit that's not as likely as the possibility that

16   Mr. Dennison still does have control over that weapon, given

17   the number of rounds of ammunition that he had, and not just

18   rounds that were still in the box, although there were quite a

19   few of those, Your Honor, as the Court has heard, but also

20   rounds that were in magazines ready to be put into a rifle.

21   Mr. Dennison did turn over three other firearms, but we know

22   those firearms don't fit the ammunition that was found, the

23   1,700 rounds of ammunition that were found in his apartment on

24   September 9th.

25        And so, Your Honor, this is an individual who we know

1   had access to that weapon.  We don't know precisely if -- we

2   don't know if he still does.  But, again, without knowing

3   that, if we knew for certain that he no longer had it, that

4   would be a significant fact.  But we don't and Mr. Dennison is

5   apparently the only one who could conceivably clear up that

6   mystery.

7        Your Honor, the people closest to Mr. Dennison, his

8   parents, told investigators of their concerns about whether he

9   could act on his beliefs.  There is absolutely nothing to

10  indicate that this was an idle threat, Your Honor.  From what

11  we can tell, it was a serious expression of an intent to

12  commit violence by an individual who harbors hatred of the

13  individuals he has threatened to kill.  And so, Your Honor, I

14  would submit that there is a very real danger here, that the

15  Government has shown that by clear and convincing evidence.

16       And if I -- as a final point, Your Honor, the --

17  probation is recommending release.  We obviously respectfully

18  disagree with that.  And I would submit to you, Your Honor,

19  what is being proposed, which is home detention, basically

20  puts Mr. Dennison back in the exact spot he was before.  We

21  know from the complaint affidavit that Mr. Dennison's parents

22  told investigators that he never left the -- his apartment

23  except to go to work or to get food, that he was basically

24  alone the entire time.  And we are -- under the proposed

25  conditions of release we are sending Mr. Dennison back

1    apparently to his apartment at the exact same location,

2    without anybody else being there with him.  I mean, there will

3    be people on the property, but these are people who have --

4    have expressed serious concern about what he is capable of

5    doing.

6              THE COURT:  Let me press you on that, Mr. Wolff.

7    And I -- I didn't confirm with both sides your receipt of the

8    bail report in this case, but I take it, Mr. Hallett, you've

9    received that as well?

10              MR. HALLETT:  Yes, Your Honor.

11              THE COURT:  Right.  And of course it's been docketed

12    for use by the parties in the case.

13         As you know, Mr. Wolff, what is recommended by the

14    United States Probation and Pretrial Services Office is, as

15    you correctly say, home detention, but also electronic

16    monitoring.  Let me -- let me drill down on that a little bit.

17         With regard to conditions that would reasonably assure

18    that Mr. Dennison would not be a danger, isn't this a case

19    where the Court could impose conditions that would essentially

20    not give Mr. Dennison the means to execute?  I mean, I

21    appreciate the crime that's charged here is the transmission

22    of threatening interstate communication and that that can be

23    done, of course, from anywhere, including an apartment in

24    which an individual is the sole occupant.  But the threat, of

25    course, requires use of the AR-15 and leaving the apartment.

1   And if the Court were to impose home detention, perhaps even

2   home lockdown, and electronic monitoring, then what remains of

3   the danger?

4         MR. WOLFF:  Your Honor, what remains of the danger

5   is Mr. Dennison just leaving.  I mean, certainly there would

6   be some notice that he left and probation and law enforcement

7   would be on his heels, presumably, at that point.  But he

8   would have the advantage -- and if he was intent on committing

9   an act of violence, Your Honor, he would have time to do that.

10  If he had -- still had access to that AR-15 and wanted to harm

11  someone, whether it was -- whoever it was, whether it was

12  somebody nearby or a specific target, certainly probation

13  would know that he had left the apartment.  But there's

14  nothing preventing him from leaving, and so the conditions are

15  really still dependent on his willingness to abide by them.

16  And I would --

17        THE COURT:  Let me -- so let me ask you about that,

18  that issue of what I'll call compliance.  How much weight, if

19  any, should the Court give to the fact, as you said correctly,

20  of course, Mr. Dennison's not obligated to cooperate with law

21  enforcement or, for that matter, with United States Pretrial

22  Services in terms of disclosing where other firearms, if he

23  has any, are located.  How much weight should the Court give

24  to the fact that it appears on this record that neither with

25  law enforcement nor with Probation -- Pretrial Services was

1    Mr. Dennison willing to cooperate, and does that evince a lack

2    of respect for both law enforcement and the judicial system,

3    which of course is what issued the warrant in this case, and

4    can the Court consider that in assessing both the history and

5    characteristics and the danger prong?

6            MR. WOLFF:  I think the Court absolutely can and

7    should consider that, Your Honor.  Because, again, this is not

8    just a possibility that Mr. Dennison owned the specific

9    firearm that he's threatening to use to kill people.  We know

10   he owned it at some point, and we know that as recently as the

11   9th he owned 1,700 rounds of ammunition that would fit such a

12   weapon.  And so he's absolutely not required to speak with

13   investigators or with probation.  But I think the Court

14   certainly can factor that into whether he poses a danger.

15          Again, if we knew where that weapon was or if it had

16   been sold to someone and if the FBI had been able to verify

17   that fact, I think that would be a very significant fact.  But

18   on the flip side, we are left with immense uncertainty about

19   where that weapon is and whether Mr. Dennison still has the

20   ability to access it.  And in combination with the views that

21   he's expressed, I think that is a very volatile situation and

22   one that the Court definitely should consider.

23            THE COURT:  Anything further, Mr. Wolff?

24            MR. WOLFF:  No, Your Honor, thank you.

25            THE COURT:  All right.  I'll give you a chance for

1    rebuttal.

2         Mr. Hallett, I'd be happy to hear from you.

3         MR. HALLETT:  Yes, thank you, Your Honor.  I -- I

4    think I'm just going to direct the Court primarily to the

5    probation officer's report here.  I think that Stacy has got

6    it exactly right, that there are conditions which will ensure

7    the safety of the community.  I don't see it on the sheet

8    here, but I know that Stacy and I talked about this, and I

9    think it's in the report itself.  I don't see it as the

10   conditions of release that she's attached to the report, but

11   one of those could certainly be that he has no access to the

12   Internet so that he would not be able then to issue any

13   alleged threats to anyone.  That would take care of that

14   issue.  I think it takes care of a number of issues, quite

15   frankly.

16        I think one of the problems with the Internet is going

17   down the rabbit hole that is the Internet and getting involved

18   with sites and people that espouse certain views.  And

19   certainly time away from those views, to the extent that my

20   client did do that, would not be hurtful to him.

21        I do want to discuss the issue of the AR-15.  As the

22   defense attorney, obviously my -- I started to bristle at the

23   idea that my client is somehow compelled to cooperate with the

24   prosecution in this case by providing them information of --

25   which may very well be incriminating to him if he were to have

1    an AR-15.  That is the -- that's the --

2         THE COURT:  How is that incriminating?  It's not --

3    as Officer Duquette admitted, that's not a crime.

4         MR. HALLETT:  No, it's not a crime but it certainly

5    is information pertaining to the alleged crime in this case.

6    It's incriminating.  If he were to have it, they would then

7    say at trial, he had the means, you know, and here it was.

8    Here we have this AR-15.  I perceive it as incriminating or

9    potentially incriminating.  And I don't -- under the

10   unconstitutional conditions doctrine, no one can force an

11   individual to give up one of his rights, which is a Fifth

12   Amendment right not to talk to the prosecution or law

13   enforcement, to give up that right so that he can get another

14   right, such as not being detained.  He has an absolute

15   constitutional right to not be detained under certain

16   situations.

17        So there are a number of conflicts here, Judge, that I

18   think are legal in nature which should impact -- the Court

19   should not take into account that he has not provided

20   information to the police.  He didn't provide any information

21   to the police.  That's what I recommend to all my clients.

22   That's because they have a Fifth Amendment right not to do

23   that.

24        I understand that that doesn't allay the concern that is

25   present here, that there's somehow an AR-15 out floating

1    around that my client could conceivably get his hands on if he

2    were to be -- if he were being released to home confinement,

3    for example, or home detention, I guess, which is what you

4    may -- you brought that possibility up as well.  Certainly, if

5    he is confined to his home, everyone -- the -- he has a GPS

6    monitoring system, immediately that goes off, as I understand

7    it, if he leaves his home.

8         His mother is willing to act as a responsible party in

9    this case, to notify probation to the extent that Mr. Dennison

10   is not in compliance or that she sees him leave the residence.

11   This is -- home confinement is a serious kind of restriction

12   on one's liberty.  And I understand why that would be imposed

13   in this case.  I don't understand why anything more stringent

14   than that would be imposed.  I believe that that is probably

15   from the view -- Court's view the least restrictive measure

16   that can be applied to safeguard the public.  And I think that

17   the probation officer has accurately addressed the issue that

18   there are significant safeguards which can be employed.

19        My client has never been convicted of any crime ever.

20   He has never done anything illegal other than perhaps put on

21   the Internet a threat which I believe, and the Court will make

22   a ruling on, is not a true threat.  And I do not agree with

23   Mr. Wolff that if it's not a true threat it's a threat.  I

24   don't agree with that.  It's protected by the First Amendment.

25   And the stuff that is placed on the Internet that is First

1    Amendment protected is astounding.  And in my view this
2    certainly falls within that category, and this isn't the worst
3    of the stuff that's protected under the First Amendment.
4         So I would just suggest that the Court follow the
5    probation officer's recommendations in this case, given that
6    he's lived here all his life, he's a young man without any
7    blemishes whatsoever in the legal system, that the threat
8    itself appears to me to be some kind of communication to
9    like-minded people that has no direct victim of any kind and
10   cannot fall within the true threat nature of it.  But just
11   looking on it on -- at -- on its face, followed by the fact
12   that they have discovered no information with respect to any
13   specificity of an individual that Mr. Dennison in fact
14   intended to threaten or intended to harm or any plan
15   whatsoever, it is unlikely that there would be nothing about a
16   plan for him to actually execute a threat.  Usually there
17   would be some kind of notation to the effect that this is the
18   day, I'm putting together this, this is what I'm doing.
19   There's nothing like that.  It is much more likely that it's a
20   young man, 24 years old, who shot his mouth off on Twitter,
21   inappropriately perhaps, and that he should not be held under
22   these circumstances for the period of time that it's going to
23   take for this case to go to trial to the extent it goes to
24   trial.
25        So I -- I submit to the Court that you can fashion

1       sufficient protections, that there is no clear and convincing

2       evidence that my client will engage in any kind of criminal

3       conduct given that he never has, other than the allegations in

4       this specific case.  And I don't deny that these allegations

5       are unpleasant in the extreme, but from my view they're not

6       illegal, Your Honor, and I think that should weigh into the

7       Court's decision-making process, Your Honor.  Thank you.

8                   THE COURT:  Thank you, Mr. Hallett.

9             Mr. Wolff, rebuttal?

10                  MR. WOLFF:  Thank you, Your Honor.

11                  THE COURT:  What about the -- I'd appreciate your

12      addressing the Fifth Amendment issue, because certainly a

13      defendant's behavior at the time of arrest or in this case

14      execution of the search warrant and subsequent arrest is a

15      factor that the Court routinely considers in evaluating

16      history and characteristics, and of course owning an AR-15 is

17      not illegal, certainly for someone with no criminal record.

18      So there is a question on this record of cooperation, which

19      arguably is related to compliance with conditions that this

20      Court would impose, which is also a part of the -- of our

21      system of justice.

22            On the other hand, Mr. Hallett articulates very well his

23      concern with essentially creating a Hobson's choice between,

24      you know, your right not to cooperate and your right to be

25      released absent the Government making its showing.

1    What's your take on that?

2         MR. WOLFF:  Your Honor, nobody is asking

3    Mr. Dennison to give up any rights.  But we absolutely can and

4    should consider his actions when he was confronted by -- when

5    law enforcement tried to speak with him.

6         Certainly on the flip side, if Mr. Dennison, as we've

7    seen in some of these other threat cases, other individuals,

8    you know, they respond very differently when law enforcement

9    comes to see them and are -- can be apologetic or can explain,

10   and that's obviously a point in their favor.  But the Court

11   absolutely can and should consider the fact -- what

12   Mr. Dennison's demeanor was towards investigators, whether he

13   was willing to clear up the mystery of this -- the location of

14   this rifle.

15        The location of this rifle is a pivotal fact I would

16   submit in this case, Your Honor.  And the -- the Court

17   absolutely should consider the fact that we don't know where

18   it is and only Mr. Dennison could clear up that mystery.

19   We're not -- we're not -- he's not being prosecuted for

20   failing to -- obviously he can't be prosecuted for failing to

21   speak with investigators; it's not impacting -- there's no

22   violation of his rights here.  But it is one of the important

23   facts in this case that the Court should consider, and it does

24   go to, I would submit, his willingness to cooperate with

25   conditions, his willingness to comply with the Court's order

1      if the Court were to release him.

2          And, Your Honor, with respect to the absence of evidence

3      of planning or any other details about -- about any potential

4      plans Mr. Dennison might have, the only thing I can say to

5      that, Your Honor, is, as the Court knows, we are in the very

6      early days of this case.  This threat was issued eight days

7      ago.  Law enforcement showed up on Mr. Dennison's doorstep

8      later that same day, executed search warrants the following

9      day, arrested him on the 11th, and they've been reviewing the

10     evidence since then.  And, yes, it's absolutely the case that

11     to date they have not found any evidence, and the Court

12     certainly can consider that.  But I certainly don't want the

13     Court to think that we know the universe of the information

14     that was taken from Mr. Dennison's apartment.  That's

15     absolutely not the case.  There were large numbers of devices

16     that were seized from the apartment.  Those are still being

17     gone through.

18         And I'm not asking the Court to draw some sort of

19     negative inference against Mr. Dennison, obviously, the fact

20     that we haven't gone through that, but I just would want to

21     make sure the Court is aware that the record is not complete

22     here, that the investigation continues and there is much more

23     to do in terms of reviewing the electronic evidence here.  So

24     that's the only thing I would say in response to Mr. Hallett

25     indicating that there's been nothing found so far to indicate

1      any plans to act on the threat.  Thank you, Your Honor.

2              THE COURT:  Thank you, Mr. Wolff.

3          Mr. Hallett, I'll give you a chance for rebuttal.

4              MR. HALLETT:  Thank you, Your Honor.  With respect

5      to their not having gone through the evidence, I do understand

6      that.  However, it's their burden to prove by clear and

7      convincing evidence and they need to submit that to the Court.

8      They don't have that evidence currently.  I think the Court

9      can take that into account, that that evidence is unavailable

10     for this Court on this record to make any determination.  And

11     what's on the record is that there is no evidence that he had

12     any specific intent or plan created.

13         I do want to go back just briefly to the Fifth Amendment

14     argument.  If Mr. Wolff is suggesting that the keys to the

15     castle here are in my client's possession as long as he waives

16     his Fifth Amendment right, then I would say to you that is a

17     clear violation of the unconstitutional conditions doctrine,

18     which preclude that exact and very issue.  You cannot force

19     someone to give up a constitutional right in order to benefit

20     from another constitutional right.

21         I don't think that that ends the debate, Your Honor,

22     with respect to the AR-15.  I -- I think that this Court

23     certainly can look at the issue of the concern that an AR-15

24     may be out there floating around somewhere.  But on this

25     record you can't take into account that the -- that my client

1     has exercised his Fifth Amendment right.  That would be

2     improper in the context of this hearing.  What you can take

3     into account is that there may be a missing weapon.

4          With respect to the missing weapon, I would simply say

5     that the probation officer knew about this missing weapon.

6     She did not ask him about the -- well, I shouldn't say that.

7     I can't remember exactly all the questions she gave.  I don't

8     recall her asking about the location of any weapon but she

9     might have.

10          THE COURT:  I mean, the bail report indicates that

11     during the interview Mr. Dennison acknowledged owning firearms

12     but declined to provide information about where the firearms

13     are currently located.

14          MR. HALLETT:  I objected to that.  I objected to

15     that and told him not to answer that, Your Honor, because of

16     his Fifth Amendment right.  And that I perceived as being

17     questioning about the incident itself.  Okay, so that's how

18     that came about.  I do recall now objecting to that,

19     instructing him not to answer.

20          And so with that said, he has no obligation to provide

21     that information to the Court.  And I -- I don't want to be

22     too strident about this, but it does seem to me that we need

23     to make sure that we understand that he has no obligation to

24     provide any information of any kind to either the Court or to

25     the Government or to the FBI.  He simply doesn't.  And he's

1   protected, cloaked, with the Constitution on that particular

2   issue.

3        So in any event, I think that the probation officer got

4   it right, that there are sufficient safeguards here to protect

5   the public in the absence of any specificity with respect to

6   the threat, in the nature of the threat itself, which was just

7   this overreaching kind of allegation of attacking Jews

8   somewhere, sometime, in some location.  So nothing further,

9   thank you.

10            THE COURT:  Thank you, Mr. Hallett.

11        Mr. Wolff?

12            MR. WOLFF:  Your Honor, he doesn't have to tell --

13   tell them anything about the weapon, but he then has to live

14   with the ambiguity that's created as a result.  And the Court

15   can consider that ambiguity in determining whether there's a

16   danger.

17            THE COURT:  All right.  Counsel, thank you very

18   much, both of you, for your excellent presentations this

19   morning.  I'm not surprised at the quality of the

20   presentations, but I do want to acknowledge it and to thank

21   both counsel for their insights and helpful arguments.

22        The issue before me is the Government's motion for

23   detention, and as has already been noted, the Government is

24   only pressing its motion on the second prong under 3142.  The

25   Government is not alleging that there are no conditions that

1    would reasonably assure that Mr. Dennison would appear in

2    court whenever required, in other words, not alleging that

3    there are no conditions to assure that Mr. Dennison would not

4    flee.  And I do find, for the record, that in fact there are

5    conditions that can be imposed on the defendant to reasonably

6    assure that he would not flee, even though the Government has

7    a lesser burden with regard to that prong, just a

8    preponderance of the evidence.

9         Mr. Dennison is a lifelong resident of Maine, has, as

10   noted in the bail report, apparently some funds, but at 24

11   years of age hardly has a substantial wherewithal to flee.  Of

12   course, no evidence in the record of ever failing to appear in

13   court, not the least because he has no criminal record, and

14   working at an hourly position that he no longer works at,

15   which of course has ended that income stream.  He has some

16   money saved up, but he's living on his parents' property in an

17   apartment above their -- their garage.

18        And so I'm very comfortable based on both those

19   longstanding community ties and what the Court views as modest

20   ability to flee that conditions can be fashioned to reasonably

21   assure that in fact Mr. Dennison would not flee.

22        So as the Government has postured it and as has been

23   argued by both sides this morning, the issue before me is

24   whether conditions can also be fashioned to reasonably assure

25   that Mr. Dennison would not be a danger to any other person or

1    the community if released before trial.  There of course, as

2    has also been acknowledged this morning, the Government's

3    burden is a higher burden, namely proof by clear and

4    convincing evidence.  And in my view, this is a very close

5    case.

6        The factors that are set forth for the Court to consider

7    have already been addressed.  There are four principal ones:

8    The nature and circumstance of the offense, number one; the

9    weight of the evidence against Mr. Dennison, two; thirdly, his

10   history and characteristics, including family ties and mental

11   condition; and then lastly the nature and seriousness of the

12   danger that would be posed by his release.

13       As I mentioned, in connection with flight, Mr. Dennison

14   is a lifelong resident of the state of Maine.  He was born in

15   Portland.  He has been living at his parents' property and has

16   no criminal record and no run-ins, no charges against him, to

17   say nothing of no convictions.

18       On the other hand, the facts that are before the Court

19   for purposes of a bail hearing are very troubling.  First of

20   all, with regard to the nature and circumstance of the

21   offense, this is a -- a serious crime.  Of course, I'm putting

22   aside the issue of the legal sufficiency of the evidence.

23   I'll await the briefs on that.  But passing by the issue of

24   probable cause in this case and for purposes of the bail

25   determination, accepting that the charge will remain, then it

1    is a charge that carries with it a term of imprisonment of up

2    to five years, showing the seriousness of Congress's

3    determination with regard to this felony offense.

4         I also agree, again putting aside the issue of whether

5    or not this was a true threat, which the Court will decide

6    subsequently on probable cause, that the weight of the

7    evidence against Mr. Dennison, limited to whether or not he

8    made the threat, putting aside the issue as to whether or not

9    the threat was a true threat or not, is very strong.  In the

10   Court's view there's no question based on this record that the

11   threat, whether it's a true threat or not in this case, came

12   from Mr. Dennison, which then leaves the Court with the third

13   and fourth factor, which are the history and characteristics

14   of the defendant and the danger posed to either any person or

15   to the community by his release.

16        As has been argued, again, this is a case in which the

17   defendant has no criminal record.  On the other hand, it is a

18   case in which at best his family ties are strained.  The

19   evidence is that his sister has not spoken with him for years,

20   and that at least one of his parents had asked law enforcement

21   at the time of their first arrival at the residence whether or

22   not Mr. Dennison could be detained or arrested, I think is

23   what the testimony was.

24        So that in my view is significant because it not only

25   demonstrates a -- a strained relationship between Mr. Dennison

1    and his family but also, more importantly, it greatly

2    diminishes, if not removes entirely, the ability of his family

3    members, in my view, to provide the -- the custodianship that

4    frequently the Court requires in cases such as this,

5    particularly where individuals are still living with their

6    parents.  In my view it does not appear, based on this record,

7    that either of Mr. Dennison's parents or his -- or his sibling

8    could be effective third-party custodians.  And that removes,

9    I find, that tool from the potential supervision that would

10   occur if Mr. Dennison were granted bail.

11        In addition, there is, of course, as has been argued

12   primarily, the issue of the AR-15.  I agree, as I of course

13   must, with defense counsel -- and the Government doesn't

14   dispute this -- that the Court can give no weight to

15   Mr. Dennison's exercise of his Fifth Amendment rights.  But

16   the Court can consider the evidence that is before it,

17   notwithstanding the fact that Mr. Dennison, as he is of course

18   entitled to do, has declined to speak either to law

19   enforcement or to the probation officer during his interview

20   for the bail report.

21        The evidence that is present is that the parents, the

22   father in particular, has confirmed -- both parents, I

23   believe, confirmed, and the father put more of a temporal

24   scope on it, that indeed Mr. Dennison did own an AR-15, and

25   the Court can combine that with the testimony at the hearing

1   today that during the search 12 loaded magazines that would

2   not fit any of the guns, which the Court understands is a

3   shotgun and two pistols, that apparently were surrendered by

4   Mr. Dennison, were recovered in his apartment.  So no AR-15

5   has been found, but 12 magazines with 365 rounds in them have

6   been found.

7        In my view, as the Government has argued, that

8   dramatically increases the danger equation, which is one of

9   the four factors that the Court must consider under 3142(g).

10  Because we know that ammunition, loaded ammunition, in

11  magazines that would only fit an AR-15 of the guns known to be

12  owned by Mr. Dennison, were in fact recovered in the

13  apartment.  When that information, which is indisputable, is

14  combined with the evidence concerning Mr. Dennison's hatred of

15  a particular group and his apparent fascination with Hitler

16  and Nazism, and the -- I'll call it a statement in order to

17  not prejudge the threat issue that is going to be briefed by

18  the -- by the lawyers, I do find that the danger in this case,

19  which is Mr. Dennison acting out on what he said he would do,

20  is acute, if not extreme.

21       With regard to the history and characteristics, I do

22  think that, notwithstanding the lack of a criminal record,

23  both anger and the inability to control the anger, as well as

24  the fascination that I've already discussed with white

25  supremacy or Nazi themes, and of course the wherewithal that

1   he certainly had and based on the evidence I believe likely

2   continues to have because of the magazines that were recovered

3   that can only be used in that -- in that weapon, I do think

4   that this is one of those unusual cases where, even with a --

5   a lack of any criminal history, a defendant should be

6   detained.

7          One final word with regard to -- with regard to

8   cooperation.  I take, as I of course must, the argument

9   regarding the Fifth Amendment so ably made by Mr. Hallett, but

10  I do think that, as the Government argues, the way in which

11  defendants respond at the time that law enforcement arrive on

12  your property, in this case to execute an arrest warrant as

13  well as a search warrant, is a factor the Court can properly

14  consider.

15         At the end of the day all I can do is impose conditions

16  and then rely on the defendant to have the respect for the

17  system, our system of justice, to be reasonably assured that

18  those conditions will be followed.  And when a lack of respect

19  is shown for the system by one -- by how one interacts with

20  law enforcement, in my view that is a factor.  It's not the

21  controlling factor but it's a factor that the Court can

22  consider.

23         On balance, therefore, I do find, even under the higher

24  clear and convincing evidence standard, that the Government

25  has met its burden, even in this instance, where Mr. Dennison

```
1   has no criminal record and very strong ties to the community,

2   although perhaps unfortunately now less than strong ties with

3   his family.

4        So I'm going to grant the Government's motion for the

5   reasons stated on the record.  I'll follow up with a short

6   written order that will simply incorporate these comments by

7   reference.

8        Mr. Wolff, anything further from the Government?

9        MR. WOLFF:  No, Your Honor.

10        THE COURT:  Mr. Hallett, anything further?

11        MR. HALLETT:  Nothing, Your Honor.

12        THE COURT:  All right, thanks very much, everybody.

13   We'll be in recess.

14                 (Time noted:  12:31 p.m.)
```

**C E R T I F I C A T I O N**

```
16   I, Lori D. Dunbar, Registered Merit Reporter, Certified

17   Realtime Reporter, and Official Court Reporter for the United

18   States District Court, District of Maine, certify that the

19   foregoing is a correct transcript from the record of

20   proceedings in the above-entitled matter.

21   Dated:  November 10, 2021

22              /s/ Lori D. Dunbar

23              Official Court Reporter

24

25
```