1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF MAINE

3    _____

4    UNITED STATES OF AMERICA,              CRIMINAL ACTION

5                 Plaintiff            Docket No:  2:21-00149-JDL

6

7         -versus-

8

9    BRIAN DENNISON,

10                 Defendant
     _____
11                      Transcript of Proceedings

12

13   Pursuant to notice, the above-entitled matter came on for
     **Motions Hearing** held before **THE HONORABLE JON D. LEVY,** United
14   States District Court Judge, in the United States District
     Court, Edward T. Gignoux Courthouse, 156 Federal Street,
15   Portland, Maine, on the 23rd day of May 2022 at 9:05 a.m. as
     follows:

16

17   Appearances:

18   For the Government:     Craig M. Wolff, Esquire
                             Johnathan Nathans, Esquire
19                           Assistant United States Attorneys

20   For the Defendant:      Thomas F. Hallett, Esquire
                             Jordan T. Ramharter, Esquire

21

22
                             Lori D. Dunbar, RMR, CRR
23                           Official Court Reporter

24                   (Prepared from manual stenography and
                         computer aided transcription)

25

```
 1                    (Open court.  Defendant present.)

 2            THE COURT:  Good morning.

 3            MR. WOLFF:  Good morning, Your Honor.

 4            THE COURT:  We are convening a hearing in the matter

 5    of United States versus Brian Dennison.  This is Docket

 6    21-CR-149.  Counsel, would you please note your appearances

 7    for the record.

 8            MR. WOLFF:  Good morning, Your Honor.  Craig Wolff

 9    for the United States.  Also with me is Assistant United

10    States Attorney Johnathan Nathans.

11            THE COURT:  Good morning, thank you.

12            MR. HALLETT:  Good morning, Your Honor.  Thomas

13    Hallett and Jordan Ramharter for the defendant.

14            MS. RAMHARTER:  Good morning, Your Honor.

15            THE COURT:  Very good, thank you.  Good morning.

16        First matter I'd like to take up, counsel, is to just

17    have the record reflect why it is that we are not summonsing

18    the jury for today.  This is a product of a request that the

19    Court received by e-mail yesterday from the Government to

20    postpone the beginning of evidence until tomorrow because of

21    difficulties with the -- as I understand it the Government's

22    leadoff witness.

23        And so, Attorney Wolff, if you would for the record,

24    please, why don't you explain -- or Attorney Nathans, explain

25    the background and why it is that you made that request.
```

 1          MR. NATHANS:  Thank you, Your Honor.  Our first

 2   Government witness as anticipated is Frederick Witt.  Mr. Witt

 3   was the witness that first observed the Tweet that's in

 4   question here that's going to be presented to the jury

 5   tomorrow.

 6        Mr. Witt was scheduled for a morning flight tomorrow.

 7   He got to the airport I believe about 6:30 in the morning.  He

 8   had a number of flights that were canceled from Dulles airport

 9   all throughout the day and was sitting on standby on at least

10   two or three different flights in an attempt to get here.

11   Ultimately he was unsuccessful in getting on any flight due to

12   the severe weather on the east coast, coming up the coast.

13   And then subsequently he is now scheduled to be here tonight,

14   I believe by 9:30 tonight was the next available flight that

15   could get him into Portland today.

16          THE COURT:  And as I understand, Attorney Nathans,

17   you or your office was in touch with Attorney Hallett

18   yesterday and informed him of this?

19          MR. NATHANS:  We did, Your Honor.  As soon as we

20   learned that he had missed his first flight we reached out to

21   Attorney Hallett and discussed this as a possibility, pushing

22   everything back.  I think both parties were confident that

23   based on the pared-down number of witnesses that the

24   Government had in particular that we could get this entire

25   trial put together in two days.

1          THE COURT:  Thank you.

2      Attorney Hallett, you received -- or you heard from the

3   U.S. yesterday, and it's been represented to me that you

4   agreed that this would be a suitable way to proceed, that is,

5   to not present evidence today and to begin the evidence

6   tomorrow?

7          MR. HALLETT:  I did, Your Honor, with the only

8   caveat that I -- as I explained, I anticipate that the time --

9   to the extent that I need the time, I don't anticipate, but

10   that the time would be evenly split between us.  Not -- it was

11   sort of originally talked about one day for them, one day for

12   me.  And I said but that may include charge and argument.

13   That may not work.  I suspect it will but I'm just putting

14   them on notice that I -- I would anticipate getting a -- one

15   half of the time allotted.

16          THE COURT:  All right.  I want both sides to

17   remember that the court is operating with limited capacity to

18   the extent that we're not using all of our courtrooms and

19   all -- we're not using our jury deliberation rooms, and that

20   makes the scheduling in the courthouse very difficult.  That

21   means that I am holding you to the representation I received

22   yesterday that the case can be presented in full in two days.

23   And obviously on the second day, to the extent that we will go

24   longer or need to go longer than the schedule I believe ending

25   at 2:45, it almost goes without saying that we will go longer

1    on day two as needed.  But, counsel, I expect you to do

2    everything you can to make sure that this case does get

3    presented as you've represented in two days.  Because if it

4    were to go into a third day that would present some very major

5    logistical problems for the court and our ability actually to

6    go into the third day on -- it would be I guess at that point

7    on Thursday.  So please bear that in mind as we proceed at

8    every step.

9         I want to turn to the motions in limine.  Before I do

10   that, let me just ask counsel if there's any other preliminary

11   matters you wanted to bring to my attention before we get into

12   the motions in limine.

13             MR. WOLFF:  No, Your Honor.

14             MR. HALLETT:  Your Honor, I did receive a copy of

15   the proposed juror questionnaire.

16             THE COURT:  Yes.

17             MR. HALLETT:  I may have some -- we may have some

18   issues with question No. 2, depending on what happens with

19   these motions in limine.

20             THE COURT:  We're going to discuss that further.  So

21   let me -- let me get into the motions in limine, and then

22   we'll specifically focus on the proposed voir dire as we need

23   to.

24        The first motion that I want to address is the

25   defendant's motion in limine ECF No. 85.  This is the motion

in which the defendant has requested the Court to exclude Government witnesses, specifically the Government's proposed expert witness, as having been provided in an untimely fashion.

Under the rule that applies here, 16(a)(1)(G), the Government is obligated to provide a defendant with a written summary of expert testimony that it plans to offer at trial upon the defendant's request.  That rule doesn't impose a specific time frame for disclosure, but the case law recognizes that the disclosure must be timely.  The case law recognizes that on this issue of timeliness that a Court should not exclude an untimely disclosed expert testimony absent a showing by the defendant that the untimely disclosure prejudiced him.  The First Circuit has recognized that the Court should not grant the Draconian relief of suppression, suppression of evidence, if it's grossly disproportionate both to the prosecutor's nonfeasance and any prejudice to the defense.

Now, in this case Mr. Dennison provided the Government with his discovery demand under the rule on November 10th of 2021.  On November 16th the Government provided Dennison with reports documenting the items found on Dennison's electronic device that it believed to be relevant to the pending charge as well as the underlying image and video files referenced in the reports.  On April 14th of 2022 the Government notified

Dennison that it would be providing expert disclosure for FBI
Task Force Officer Maurice Drouin, the investigator who had
imaged Dennison's devices.  The report sent by the Government
to Dennison in November was generated as a result of Drouin's
imaging work.

The Government provided Dennison with a copy of Drouin's
CV and a report detailing the number of forensic exams he had
conducted on April 23rd, 2022, and on April 28th, 2022.  I'm
sorry, the images were -- the report, rather, resulted from
examinations conducted on April 23rd.  Then on April 28th the
Government provided Dennison with a report from Drouin that
described how he had imaged and analyzed Dennison's devices.

On May 8th, 2022, the Government provided Dennison with
additional details about Drouin's anticipated testimony
pertaining to how Drouin imaged the device.  Mr. Dennison's
attorney met with Drouin on May 13th, 2022, and during the
meeting questioned Drouin about his work on the case.

Looking at the timeline of these events, I think it's
fair to characterize the Government's disclosures regarding
expert witness Drouin as being untimely.  However, I also find
that Mr. Dennison has not established that he was prejudiced
by this.  He was in possession of the information in the
reports since November, and that provided him with notice of
the proposed testimony regarding the reports and the relevant
information, specifically information pertaining to what was

found on Mr. Dennison's electronic devices.  Mr. Dennison's
counsel had the opportunity to question Drouin, and that goes
against the argument that the defendant's ability to prepare
for cross-examination has been hampered.

Finally, there's no indication that the delay in
providing Mr. Dennison with the disclosures regarding
Mr. Drouin was in any way in bad faith, and there's really no
serious argument made in that regard.  Furthermore, as I
understand, the Government has been now specific that it is
not offering any other expert witness testimony in this case,
and so other arguments raised in Mr. Dennison's motion with
regard to potentially other expert witnesses are now moot.
Because I conclude that Drouin's testimony should not be
excluded, I'm denying the motion.

The second motion I wish to address is the Government's
motion in limine which is ECF 86.  And as you'll see, counsel,
as I report my assessment of the motion to you, I will also be
entertaining additional argument on this.

The Government's motion in limine ECF 86 seeks the Court
to affirmatively rule that evidence of information found on
the defendant's electronic devices demonstrating his
anti-Semitic views is admissible as evidence of identity and
his intent to commit a true threat.  Now, in his response to
this motion Mr. Dennison states -- this is ECF No. 87,
Page 3 -- that he is, quote, not contesting that he wrote and

1    transmitted the Tweet, end of quote.  This -- of course, if

2    that is the case, the fact that Mr. Dennison wrote and

3    transmitted the Tweet is a stipulated fact.  If it indeed is

4    stipulated, then it seems to me that the Government's argument

5    that the evidence regarding his anti-Semitic views and the

6    like is not needed on the question of identity.

7         So let me ask you first, Attorney Hallett, what is your

8    Government -- what is your client's position, rather, with

9    respect to this issue?  Does he stipulate that he wrote and

10   transmitted the Tweets that are the subject of this

11   prosecution?

12             MR. HALLETT:  We would stipulate to that, Your

13   Honor.

14             THE COURT:  And, Attorney Wolff, Attorney Nathans,

15   what's the Government's view on that?

16             MR. WOLFF:  You mean the view on the stipulation,

17   Your Honor?

18             THE COURT:  Yes.

19             MR. WOLFF:  I mean, I -- I agree, if that's -- if

20   that is in fact a formal stipulation that the jury will hear,

21   then obviously I think identity is not an issue here.  I do

22   believe, and as the motion lays out, that there is an

23   alternative reason, obviously, for introducing that evidence.

24             THE COURT:  I'm about to address that.

25             MR. WOLFF:  Yes.

1      THE COURT:  It seems to me it's a very important --

2  obviously this is a very important fact in this case, and so

3  I'm going to ask counsel to reduce that to writing in the form

4  of a written stipulation, satisfactory to both sides, of

5  course.  Attorney Hallett, I know that you'll review it

6  carefully with your client.  And that will then finalize a

7  stipulation that can be presented to the jury at trial.  Any

8  question about that?

9      MR. WOLFF:  No, Your Honor.

10      MR. HALLETT:  No question about that, Your Honor,

11  but I think it depends to a certain extent on your rulings

12  with respect to the additional evidence.  We might not want to

13  stipulate if a lot of this evidence is coming in.

14      THE COURT:  Okay.  All right, so it was a

15  stipulation but maybe.

16      MR. HALLETT:  A conditional stipulation, Your Honor.

17      THE COURT:  All right.  You'll tell me whether you

18  stipulate after I give you the rest of my ruling.

19      MR. HALLETT:  Thank you.

20      THE COURT:  We'll come back to that, then.

21  I find that much of the evidence described in the

22  Government's motion but not all of the evidence described in

23  the Government's motion is admissible under Rule 404(b).  I

24  find that it's admissible to prove motive and intent.

25  These -- motive and intent on the specific issue of this case,

1    which is whether or not Mr. Dennison's alleged communication

2    was a true threat.  This is the communication of September

3    8th, 2021.  So I find the -- much of the proffered evidence is

4    admissible on the -- to prove motive and intent with respect

5    to Mr. Dennison's subjective intent.

6         Also the -- much of the information has an appropriate

7    temporal connection to the Tweets that are the subject of the

8    indictment and the prosecution that can demonstrate that

9    Mr. Dennison -- if these were his views, in fact, that they

10   were long standing and consistent with the antipathy towards

11   Jews that is expressed in the Tweet that is the subject of the

12   indictment.  So I find the evidence is specially relevant as

13   that term is used in connection with Rule 404(b) and is

14   admissible for that reason.

15        I also find that the evidence shouldn't be excluded

16   under Rule 403.  The alleged statements showing defendant's

17   antipathy towards Jews prior to the Tweets that are the

18   subject of the prosecution, those statements are not nearly as

19   inflammatory as those charged in the offense.  And so under a

20   403 analysis I don't find a basis for exclusion.

21        However, evidence of the browser search terms that the

22   defendant is alleged to have used as set forth in the

23   Government's motion is of concern because at least some of

24   those terms such as, quote, Jew mouth circumcision, end of

25   quote, are not self-defining and in the absence of additional

1    context lack meaning other than to demonstrate that the

2    search -- the search terms show an interest in finding

3    information related to Jews, Hitler, and fascism and so on.

4    And it seems to me that there is a risk of unfair prejudice to

5    the defendant for the Court to have essentially a trial within

6    a trial, that is, extensive testimony explaining the meaning

7    and significance of every search term that might have been

8    employed.

9         Therefore, it seems to me that the Government may

10   introduce evidence that characterizes the findings of what --

11   of searches that were conducted, specifically that there were

12   searches on specific dates that pertain to Hitler or Jews or

13   racism; but if the defendant objects it seems to me that it is

14   likely that I would exclude, in other words, grant objections

15   to testimony regarding the actual search terms used.  The

16   reason why I am indicating that I'm going to rely upon the

17   defendant to object is because it might be that the defendant

18   chooses not to object.  I don't know.  But it seems to me that

19   that should be at the defendant's discretion as to whether

20   defendant wishes to keep out of evidence the actual search

21   terms that were used or not.  But I just want to be clear that

22   my preliminary examination of this question leads me to the

23   conclusion that it is far more likely than not that I would

24   grant such objections.

25        Before I move on from that point, Attorney Wolff or

1    Attorney Nathans, do you have any questions or comments

2    regarding my ruling?

3           MR. WOLFF:  I don't, Your Honor, no.  I mean, there

4    is other Internet history besides searches.  I think we'll

5    have to go back and see if there's a reason that the

6    Government might introduce that independent of the search

7    terms that the Court has concerns with, and we can certainly

8    discuss that with counsel and raise it at an appropriate time.

9           THE COURT:  I have focused on the evidence that was

10    described in your motion and so that's what I'm addressing at

11    this point in time.

12           MR. WOLFF:  Yes, Your Honor.

13           THE COURT:  Attorney Hallett or --

14           MS. RAMHARTER:  Your Honor, Attorney Ramharter.

15           THE COURT:  Yes.

16           MS. RAMHARTER:  So we would just say, Your Honor, we

17    would wish to exclude those search terms at trial.

18           THE COURT:  You would wish to exclude them.

19           MS. RAMHARTER:  Yes, Your Honor.

20           THE COURT:  All right.

21           MS. RAMHARTER:  Also, Your Honor, you didn't note

22    about the notice requirement that's included in Rule 404(b).

23    My understanding is that, you know, by way of motion in limine

24    two weeks prior to trial, I'm not sure that notice is

25    sufficient under the rule.

1          THE COURT:  I did not comment on the notice.  I

2     found that any problems with notice was insubstantial and not

3     of consequence, so I'm not going to exclude the evidence for

4     that reason.

5          MS. RAMHARTER:  Thank you, Your Honor.

6          THE COURT:  The second part of the Government's

7     motion in limine ECF No. 86 relates to evidence that in July

8     of 2016 the defendant allegedly purchased a Smith & Wesson

9     AR-15 style rifle from a firearms dealer in Gray, Maine.

10    Further, that in February of 2020 he issued a text referencing

11    his AR-15 and attaching a photograph of it.  And then October

12    21st of 2021 investigators found the rifle and ammunition in

13    the woods on the Dennison property hidden by leaves and brush.

14         I'm granting this motion in limine in part.  The

15    evidence that the defendant owned a rifle similar to the rifle

16    cited in the September 2021 Tweet is probative on the question

17    of his intent, his subjective intent, specifically whether he

18    intended to communicate a true threat.  His ownership and

19    access to the type of rifle described in the Tweet is

20    probative on that point.  So the motion is granted in that

21    respect.

22         I'm reserving ruling on any other objections the

23    defendant might raise as to the admissibility of evidence

24    connected to the manner in which the rifle was discovered,

25    including any objection associated with his proffer of

```
 1   evidence.  This is cited in the written submissions by the
 2   parties, and I am not fully informed as to how it is that this
 3   information apparently was communicated by the defense to the
 4   Government and the rifle was found and how that relates to
 5   whatever proffer agreements or understandings the parties had.
 6   So if there's more arguments to be made seeking to exclude
 7   this evidence in connection with the proffer history of this
 8   case, you'll have to make those arguments to me through
 9   objections during the course of the trial.
10        Attorney Wolff, any questions or further comment
11   regarding my ruling in this regard?
12             MR. WOLFF:  No, Your Honor.
13             THE COURT:  Attorney Hallett or --
14             MR. HALLETT:  No.
15             THE COURT:  Go ahead.
16             MR. HALLETT:  No, Judge, I do think that we run the
17   risk of undue prejudice arising out of the introduction of the
18   gun.  My understanding is that they also want to introduce a
19   number of rounds of ammunition, that he had 2,000 rounds of
20   ammunition.  There can be no real purpose other than to say
21   this guy had the capability to follow out with the threat he
22   was making.  And given the shooting that has occurred in
23   Buffalo, given all of what's happened across the country for a
24   number of years but certainly recently, this is going to turn
25   this case into a shooter case, Judge, not a threat case.  And
```

1   I'm going to have to try it as a shooter case, which is going

2   to take more time.  And the reason it's going to take more

3   time is because I'm going to have to do extensive

4   cross-examination of each of their witnesses with respect to

5   evidence that they gathered concerning the gun and any intent

6   ever to use the gun for violence.

7        So that sort of -- that's my objection in a nutshell.  I

8   think it's unduly prejudicial.  I don't think at its heart it

9   goes to the relevance of the case.  It does not show an intent

10  to threaten.  It doesn't say, okay, there's a gun, I'm going

11  to go threaten Jews, which is the question in this court for

12  the jury to answer.  And I just think that the introduction of

13  an AR-15 equivalent is going to explode this trial.  So I

14  would make that objection.

15           THE COURT:  All right.  Well, it seems to me that

16  you'll certainly make objections during the course of trial,

17  but I can't rule on beyond what has been presented in the

18  motion in limine at this stage.  I'm not prepared to rule on

19  the admissibility of the actual evidence, then, that the

20  Government does in fact seek to introduce.  I know that,

21  counsel, you'll make your arguments and I'll rule as

22  appropriate.

23        The third aspect of the motion -- Government's motion in

24  limine is the Government seeks to exclude evidence that

25  defendant -- I'm sorry, suggesting that the defendant is a

1   nonviolent person.  The Government argues that it's not

2   relevant under Rule 401 and, therefore, not admissible under

3   Rule 404(a)(2).  The Government further argues that, even if

4   defendant's character for nonviolence is admissible under 401

5   and 404(a)(2), evidence of specific examples establishing that

6   character trait is not admissible under Rule 405(b) because

7   the trait of nonviolence is not an essential element of the

8   charge or defense.

9        I conclude that evidence establishing that the defendant

10  is not nonviolent may be relevant under Rule 401 as it may

11  show defendant's subjective -- or it may reflect on the

12  defendant's subjective intent with respect to the events of

13  this case, that is, whether he intended to communicate a true

14  threat or instead intended to make a careless or joking remark

15  that was not intended to be taken seriously.  Such evidence

16  will be admitted in keeping with the limits of Rule 405(a).

17  I'm reserving decision on whether specific examples

18  establishing this character trait for nonviolence are

19  admissible under Rule 405(b).  But I didn't read the

20  defendant's memorandum of law to suggest that the defendant

21  intended to introduce specific examples.  It's not addressed.

22  But based on what I currently know, I don't see a reason to

23  admit specific examples because a person's character for

24  nonviolence is not an essential element of the charge or

25  defense at issue in this case.  I'm not ruling finally one way

1    or the other on that last point, though, under 404(b) --

2    405(b), pardon me, but that's where I currently lean.

3          Attorney Wolff or Nathans, any further questions or

4    comment?

5               MR. WOLFF:  No, Your Honor.

6               THE COURT:  And Attorney Hallett or Ramharter, any

7    further questions or comment?

8               MS. RAMHARTER:  No, Your Honor, thank you.

9               THE COURT:  Thank you.

10         The next motion will -- I'll address is the defendant's

11   motion for additional voir dire of the impaneled jury and then

12   the Government's motion to use alternative questions, ECF Nos.

13   91 and 100.  So, counsel, you can see from what I shared with

14   you that I intend to grant this motion.  The real question is

15   what specific questions the jury should be voir dired on here.

16         Before I hear from you further on this, I want to

17   comment that -- one moment -- the details of the Buffalo

18   incident related to the number of people who were shot seems

19   to me to just not be relevant here and nor is it a fact that

20   has been established and that I'm comfortable citing to the

21   jury.  I see it as unnecessary and I'm concerned that jurors

22   might attach some significance to the number which isn't

23   intended.  Instead it seemed to me what is widely reported --

24   what has been so widely reported is the fact that the

25   shootings took place in a supermarket, and that's why I chose

1   to use a supermarket in describing the shootings so the jury

2   can anchor that incident as the supermarket shootings that

3   took place in Buffalo, New York, on May 14th of 2022.  That

4   should jog their awareness as to that particular incident if

5   they have any.

6        It also seemed to me that in the second question it's

7   important to point out to the jurors, who have not heard any

8   evidence in this case and are being asked to respond to a

9   question, it's -- I think it's important to say to them that

10  this case does not involve a shooting or shootings.  I don't

11  want them to somehow treat this voir dire question as in some

12  way a description of this case.  This case does not involve a

13  shooting or shootings but instead involves an alleged threat

14  made on social media, which is what the case is about, and

15  then ask them, as the Government had proposed, does your

16  awareness of the Buffalo incident affect your ability to be

17  fair and impartial in this case.

18       Attorney Wolff or Nathans, I'll hear from the

19  Government.

20            MR. NATHANS:  Your Honor, the Government has no

21  objection to the proposed questions by the Court.

22            THE COURT:  Thank you.  Attorney Hallett or --

23            MR. HALLETT:  Yes, Your Honor.

24            THE COURT:  -- Ramharter?

25            MR. HALLETT:  Since the ruling preliminarily is that

1    the AR-15 will be admitted at trial, I think that it is

2    important that it be mentioned in the second question, that

3    you will hear testimony that the defendant possessed an AR-15.

4    That's going to change the whole tenor of the case because now

5    it is about a shooting or a shooting that could occur.  And

6    that is where the jury may go off the rails, I suspect, is

7    when they find out that not only did -- was there a threat to

8    shoot with an AR-15 but now there's confirmation that he had

9    an AR-15 and the capability to follow out that threat.

10         And I think the case law is -- sort of highlights the

11    problem in dealing with an 875(c) threat and all that goes

12    with it in terms of the capability then to follow out the

13    threat and how that's not the issue.  The only issue is the

14    threat itself.  But that water gets so muddied by the AR-15

15    that I think it's got to be brought up in the questionnaire

16    itself.  So the jury can sit there and say, okay, so we got a

17    guy, got an AR-15, we had this mass shooting, I don't know,

18    I -- you know, that's my thought.

19         The other part here, does your awareness of the Buffalo

20    incident affect your ability to be fair and impartial in this

21    case.  That's always a difficult question to ask a jury, if

22    they can be fair and impartial.  I personally, and I argue

23    this continuously, think it's an absolutely inappropriate

24    question given that it is the Court's determination as to

25    whether a juror can be fair and impartial.  What we need is an

 1   explanation from them or an answer that will give this Court

 2   an idea.

 3        I would much prefer that it include language, does your

 4   awareness of the Buffalo incident impact in any way your

 5   ability or -- yeah, impact in any way whether you think you

 6   can be fair and impartial in this case.  The Court could then

 7   follow up on that question.  If we have yes answers, then you

 8   can follow up and sort it out, Judge.  But as it stands now

 9   we're asking them to make the determination as to their

10   ability to be fair and impartial, and they do not have that

11   capability, and the case law is clear on that.  That's not

12   their -- they can't tell whether they can be fair and

13   impartial.  That's for the Court to decide.

14             THE COURT:  I understand, thank you.  Let me remind

15   everyone that -- maybe you don't need reminding -- that when

16   the jury was selected Judge Wolf, among other things, told the

17   jury what this case was about.  And her introductory

18   instruction stated the -- he's charged in a single-count

19   indictment that alleges that on or about September 8, 2021,

20   the defendant knowingly and willfully transmitted in

21   interstate commerce a threat to injure the person of another,

22   specifically that he used the Internet to post on Twitter the

23   statement, quote, I'm going to kill Jews with my AR-15

24   tomorrow, end of quote, in violation of Title 18 United States

25   Code Section 875(c).  She went on to explain that the

1    indictment is simply the description of the charge against

2    Mr. Dennison.  It is not evidence of anything.  Mr. Dennison

3    pleaded not guilty to the charge and denies committing the

4    crime.  So the jurors have already been told once, at least,

5    that the case involves a threat that included the term AR-15.

6         So, Attorney Wolff, does the Government see any reason

7    for me not to accept Mr. Hallett's request that I include in

8    the sentence a reference to the AR-15 so it would read, but

9    instead involves an alleged threat involving the use of an

10   AR-15 made on social media?

11        MR. NATHANS:  Your Honor, the -- the original voir

12   dire questions that were handed out made it clear that there

13   was going to be evidence presented to the jury about an AR-15.

14   So they've already been aware of that; they've already been

15   vetted on that specific issue.  I don't think it's necessary

16   to add that additional language in this context.

17        And, quite frankly, question 2 to the -- to the question

18   of the fair and impartial language that defense counsel is

19   objecting to is consistent with the language that was used in

20   the other voir dire questions that the jury has already had.

21   So I don't think that there's any need to change it or add a

22   reference to an AR-15.

23        THE COURT:  All right.  So seems to me that the jury

24   has already been told what the case is about when I -- and

25   when we refer to the alleged threat they have the earlier

 1    instruction to refer to in their minds to the extent they

 2    recall it.  I'm not going to add the AR-15 reference here, but

 3    I am going to add the qualification that Attorney Hallett's

 4    requested in the second sentence.  It will read, does your

 5    awareness of the Buffalo incident affect your ability in any

 6    way to be fair and impartial in this case.

 7          Counsel, I wanted to remind you that also I've shared

 8    with you previously the message we received from one of our

 9    jurors following jury selection who reported to us that he did

10    recognize the name of one of the witnesses and explained that

11    he had purchased a gift certificate from that witness in

12    connection with the gun shop.  And so it's my intention

13    tomorrow to have that juror -- to voir dire that juror on that

14    point.  Any further comment about that, counsel?

15          MR. WOLFF:  No, Your Honor.

16          MR. HALLETT:  No, Your Honor.

17          THE COURT:  Okay.  The next motion in limine is the

18    Government's second motion in limine, this is ECF 97.  This is

19    the Government's request to exclude the defendant's expert

20    witness testimony, that is, the testimony of Emma James.  As

21    it's explained in the papers, Ms. James is freelance social

22    media marketing strategist who uses a number of social media

23    platforms.

24          The Government's argued that her testimony should be

25    excluded for three reasons.  First, she's never worked for

1    Twitter or been trained in the algorithms, procedures, or

2    methods of Twitter when it reviews Tweets that allege a threat

3    to life or are related to cyber crime.  Secondly, permitting

4    her to testify about the inner workings and policies of

5    Twitter should be excluded under Rules 401, 402, 403, and 702

6    because the issue in this case is not whether defendant

7    violated a written Twitter policy that doesn't involve that --

8    any of these policies that Ms. James might have reviewed

9    online.  And, third, if the defendant is seeking to establish

10   the number of people that viewed the Tweet and whether the

11   Tweet violated Twitter policy or if the Tweet was blocked by

12   Twitter in some fashion, that should come from witnesses who

13   are either from Twitter or have access to records of Twitter

14   and the like pertaining to the Tweets that are the subject of

15   this prosecution.

16        The defendant's response clarifies the issue, as I see

17   it.  The defendant says that Ms. James has a deep

18   understanding of Twitter at the user level.  And the defendant

19   has indicated that through her experience Ms. James will

20   testify that in her opinion post notification to followers of

21   the pertinent Twitter post did not go out before the Tweet --

22   Tweets were removed because of the time delay in

23   notifications.  Ms. James will also testify according to the

24   defendant that to the extent early notifications did go out

25   they would go specifically to like-minded individuals because

 1    that is how Twitter functions.

 2         The defendant also has indicated that he intends to

 3    argue that, because it was obvious that Twitter would require

 4    the Tweet be deleted, he didn't intend to issue a threat or

 5    act with the knowledge that it would be viewed as a threat.

 6         Attorney Hallett or Ramharter, which of you will be

 7    addressing this?

 8              MR. HALLETT:  Yes, I'll be handling this, Your

 9    Honor.

10              THE COURT:  All right.  Attorney Hallett, this is a

11    witness who, as I understand, has far more knowledge than the

12    average person with respect to social media generally,

13    specifically how to use Twitter, and as I understand has gone

14    online and read Twitter's policies.  Is that a fair summary of

15    who this is?

16              MR. HALLETT:  Yes.

17              THE COURT:  So how can she offer an opinion as to

18    what actually happened in this case without any investigation

19    of, well, what actually happened in this case?  When the Tweet

20    was received by Twitter, it's one thing to have written

21    policies, but it's another thing to know what actually

22    happened.

23              MR. HALLETT:  Well, so she will testify

24    fundamentally, Judge, even without opinions, as to the way a

25    user uses Twitter.  That's sorely lacking from this case.  We

1   have no idea what happens to a Tweet once it's posted.  We

2   have no idea -- the jury will have no idea, except for what

3   personal knowledge they may have.

4       The Tweet doesn't go out to the world.  The Tweet isn't

5   viewed by some huge number of people.  The Tweet is viewed by

6   followers, and a limited number of followers, because Twitter

7   won't necessarily show it to all the followers.  Even if it

8   did, Judge, which we contend it didn't because there will be

9   evidence that the Tweet went out at -- I think it's 9:09 but

10  it was shut down by 9:45, something to that effect.  So there

11  was a half an hour or so where this Tweet was, quote, up.

12      But that's not how Twitter works.  Twitter sends out a

13  Tweet -- sends out 6,000 Tweets per second, 5 million Tweets

14  per minute, 250 billion Tweets per year.  Those all enter into

15  a scrolling feature, which goes down.  It's a stream, a

16  Twitter stream.  That stream can be viewed by followers who

17  are on Twitter at the time the Tweet is made.  That is all

18  knowledge that my client -- that our expert understands and

19  can testify to because that is the -- at the heart of her

20  business, what she does, is she wants to reach out to people.

21  She wants to make sure that she can put people in touch with

22  other people, and that's what Twitter does, like all of social

23  media, the whole intent of social media.  We need someone to

24  explain that, Judge.

25      The Government hasn't explained it at all.  We don't

 1   know where it went.  We have no idea.  We have no idea who it

 2   was intended to reach or whether it reached anyone.  That's

 3   the Government's burden.  I anticipate a motion at the end of

 4   their case that they have failed to show that this Tweet was

 5   ever sent to anyone who would be offended, that it was ever

 6   intended to be sent to anyone that would be offended.  To the

 7   extent it went to anyone, it would only be like people but

 8   they don't know that.

 9        There's an obligation on them to do that.  I am trying

10   to now, because they just simply say, okay, it goes into

11   Twitter and that's it.  As you may recall, this -- this law

12   was created in response to the Lindberg case, and this

13   involved times when it was a telephone call, it was a mailing,

14   it was something in a newspaper, perhaps.  It was a statement

15   that went into the stream of commerce, interstate commerce,

16   via those methods.

17        Social media has changed all of that so dramatically

18   that we are still trying to figure it out.  And that case --

19   the Baker case, U.S. v. Baker, which I cited in my original

20   motion to dismiss, talked about how there were communications

21   between two people via e-mail and that those two people were

22   talking about heinous things, and they were trying to use one

23   of those people as the victim.  And so they're like minded.

24   How can that be a victim, how can they feel -- that's exactly

25   what we have here.  We have the equivalent of an e-mail

1    communication between a person and like-minded people.  And we

2    can establish that in part through the expert testimony but

3    not exclusively.  She I think is qualified to render an

4    opinion that that's the basis of social media is to put people

5    in touch with other people that have similar interests.  She

6    certainly does that as a job and has done that as a job for an

7    extended period of time.

8        Now, she may not be able to testify exactly what

9    happened with that specific Tweet.  I would grant you that,

10   Judge.  But she can testify what her experience is and that

11   she studied all of the community guidelines of all the

12   platforms.  That's part of what she does.  And then we can

13   show on a community platform what Twitter does with respect to

14   a specific Tweet of a certain nature.  And we can introduce

15   that.  And then that would illuminate for the jury why this

16   Tweet was suspended, which we know it was.  I am merely laying

17   a groundwork.  This person is more -- less an opinion witness

18   than simply providing the framework for how Twitter at the --

19   at the user level works and how you communicate with other

20   people through Twitter.  Just like law enforcement says this

21   is how a -- a drug conspiracy works.  Very little difference

22   there.  This is how they do it.  They set up this guy here --

23        THE COURT:  Attorney Hallett, I understand the

24   point.  I hear you arguing that she is largely a fact witness

25   to explain how Twitter works.

1          MR. HALLETT:  That's a big part of it.  I mean,

2    that's in my --

3          THE COURT:  But also you've suggested that she's

4    able to establish that only like-minded people received the

5    Tweet.  Is that what you're saying?

6          MR. HALLETT:  I'm saying -- yes, I think that she --

7    she'll say the followers received the Tweet, followers.

8          THE COURT:  And the basis for that opinion she's

9    going -- is what?

10          MR. HALLETT:  It can only possibly go to followers.

11    It can't go anywhere else.  It's an e-mail to followers.

12          THE COURT:  All right.  Thank you.

13        Attorney Wolff or Nathans -- Attorney Nathans, is this

14    your issue?

15          MR. NATHANS:  Yeah, thank you, Your Honor.  I think

16    with respect to the idea that Ms. James is going to be a fact

17    witness, the facts that Attorney Hallett is asking Ms. James

18    to instruct the jury on are best positioned for a witness from

19    Twitter themself.  Twitter knows the inner workings and how

20    that Tweet is received and what is the intention and --

21          THE COURT:  Why should I exclude testimony from

22    somebody who is certainly more expert than I am in the -- I

23    shouldn't say obviously -- is allegedly more expert than I am

24    and perhaps many people who don't use Twitter, what prevents

25    her from testifying as to her special knowledge about what

1      Twitter is and how one uses it as a user and so on?

2              MR. NATHANS:  Because I don't think how she uses it

3      in her capacity as a marketing individual or professional is

4      relevant to the discussion as to how the defendant has

5      allegedly used Twitter to put out a true threat to the world.

6      And the --

7              THE COURT:  Do you have a witness who's going to

8      explain to the jurors what Twitter is and what a Tweet is and

9      how it works?

10             MR. NATHANS:  We have -- we have a witness who is

11     going to explain how they observed the Tweet using open source

12     data and how that through the C-T Watch was eventually relayed

13     to the witness as -- in a word.  So this was publicly sourced

14     available information that that software picked up on key

15     words in one of the Tweets.  So to say that this was just

16     information being relayed from one individual to another group

17     of like-minded individuals is not consistent with the evidence

18     that we expect to present at trial and I think goes to the

19     point that, if she is allowed to testify to that specific

20     issue, that it would do nothing but confuse the jury because

21     she doesn't currently understand that this is not just being

22     directed -- these Tweets were not being directed just to

23     like-minded individuals or a small group of individuals and

24     that the world could not see them.  The world could see these

25     Tweets.  It may have required search terms; it may have

1    required the specific sort of motive to go out and look for

2    these things, but it was out in public purview for anybody to

3    see.

4            THE COURT:  So is it your position that the

5    Government, to establish the elements of the offense, that is,

6    the defendant knowingly and willfully transmitted in

7    interstate commerce a communication containing a threat, that

8    the Government satisfies its burden of proving the

9    transmission in interstate commerce of a communication

10   containing a threat by proving that an individual using their

11   own electronic device transmitted a Tweet on the Twitter

12   platform, period, and it's not necessary to establish then

13   what happened to that Tweet in terms of the -- in terms of

14   beyond the platform itself?

15           MR. NATHANS:  Well, Your Honor, I would say with

16   respect to the evidence that we expect to present at trial in

17   this case, there is evidence that people in other states

18   viewed this Tweet.  So I think our ability to meet that

19   requirement is -- will be met with the presentation of

20   evidence that other people outside of the state of Maine

21   viewed that Tweet and that the defendant was present in Maine

22   at the time that he made that.

23           THE COURT:  Mr. Hallett has also made the point that

24   it's the purpose of this witness's testimony to establish that

25   if others viewed the Tweet they were for some reason

1    necessarily like-minded people and therefore wouldn't view it

2    as a threat.  What do you say to that?

3              MR. NATHANS:  I would say that -- well, I would

4    presume that the -- that the agent that viewed the Tweet was

5    not of like mind, so that would be at least one other

6    individual that viewed the Tweet that was not of like mind.

7         In addition to that, Your Honor, I would say that

8    Ms. James is not necessarily qualified based on any records

9    that we've seen that -- as to who actually viewed the Tweet.

10   And we know that there were views on that Tweet.  There was at

11   least one comment and two likes on the Tweet in question, so

12   we know that other people viewed it.  Do we know whether or

13   not those people were like minded or not?  We don't know that

14   and neither does Ms. James.

15             THE COURT:  All right, thank you.

16             MR. NATHANS:  Thank you, Your Honor.

17             THE COURT:  Attorney Hallett, anything further?

18             MR. HALLETT:  Briefly, Your Honor.

19             THE COURT:  Yes.

20             MR. HALLETT:  So this is the first time I've heard

21   we're going to delve into the open source method for obtaining

22   the Tweet in this case.  Now, I'm going to represent to the

23   Court that open source is a type of -- it's a complex type of

24   processing which -- what they've said is there are some key

25   words you punch in.  It's not like that.  I don't know whether

1    it hacks into accounts; I don't know anything.  It's an open

2    source.  They gather information from people all around the

3    country.  It's not even the FBI.  They don't know what

4    standards are being imposed; they don't know what it's

5    measuring.

6         I am requesting right now, Judge, that I get an expert

7    opinion report on that particular issue, which I brought up

8    previously but I was told that their witnesses were not going

9    to testify to any expert matters.  Now I'm being told that

10    expert issues are going to be delved into by their lay

11    witness, Mr. Witt.

12         If we're going to go forward with this, Judge, I need to

13    know exactly what that open source is, how it operates, and

14    why Mr. Witt is qualified to testify as to any of that.  I

15    understood from the representations Mr. Witt was going to

16    testify that he received the Tweet, a notification of a Tweet,

17    a flag that a Tweet had gone out, not even the Tweet in

18    question but a flag that a Tweet had gone out, that he viewed

19    that, he went online to the account, he took screenshots of

20    that, and that is acceptable.  What's not acceptable is to now

21    hear that we're going to go into how that happens and that

22    that somehow means that the Tweet was put out into the public

23    Twitterverse, which is not the case.

24         THE COURT:  Attorney Nathans?

25         MR. NATHANS:  Your Honor, I think Attorney Hallett's

 1    representation of what Mr. Witt's testimony is going to be is

 2    accurate.  I don't expect this to be a -- an expert

 3    designation situation where he's going to talk about the open

 4    source data.  The Tweet that's in question about the killing

 5    Jews with his AR-15 wasn't the Tweet that was triggered --

 6    that triggered the -- the notification to him.  It was the one

 7    about the pipe bomb.  He then went on to the Twitter profile

 8    and viewed the Tweet of the AR-15.

 9         My reference to this open -- to this open source data

10    was really in response to the fact that the defendant was

11    claiming that -- that Tweets are sort of just sent to

12    followers.  It's -- they're not just sent to followers.  This

13    is out in the purview for everybody to view.  So it wasn't

14    with respect to the fact that Mr. Witt will be testifying to

15    what open source data is and how it's tracked.  It will be as

16    Attorney Hallett clarified it.

17              THE COURT:  All right.

18              MR. HALLETT:  We just don't know how open source got

19    it, Judge, we have no idea.

20              THE COURT:  You don't know what?

21              MR. HALLETT:  No idea how open source got it, got

22    the information.  And we need that because they're saying it's

23    public.  I'm saying it's --

24              THE COURT:  The issue relates to the second Tweet,

25    as I understand.  It's not suggested that the witness

1      discovered the second Tweet on open source.  It was an earlier

2      Tweet which brought this to his attention, and then you say,

3      as I understand Attorney Nathans, he went to the Twitter

4      account and saw this second Tweet.  Do I understand you

5      correctly?

6           MR. NATHANS:  That's correct, Your Honor.

7           THE COURT:  All right.  Well, you can make these

8      objections if you want during the trial itself.  I'm not going

9      to rule on this now.  The -- it seems to me that the defendant

10     should be permitted to have this individual testify first to

11     establish that she does have expertise and can help the jury

12     and the judge understand what Twitter is and how it operates.

13          However, opinions as to who viewed this Tweet and

14     whether or not they were like minded seems to me requires

15     special knowledge beyond that which I've heard about that this

16     witness has, I think.  So what I'd like to do is to not rule

17     finally on this issue until we have the witness in court.

18     I'll permit the Government to voir dire her specifically on

19     these questions related to the basis of any opinion she has as

20     to who viewed this Tweet and whether they were like minded,

21     and I'll hear more argument from counsel at that point and

22     make a ruling.

23          Again, as I said, the -- more foundational information

24     as Attorney Hallett has described it, which is the jury should

25     have some working knowledge of what Twitter is, how -- how it

1    works, if you're a user what that means to use it, seems to me

2    to be fair game.  The case is about a Tweet, after all, and we

3    all need to understand what that means.

4         Any further question on that?

5              MR. NATHANS:  No, nothing from the Government, thank

6    you.

7              THE COURT:  Attorney Hallett, any further question?

8              MR. HALLETT:  Nothing, thank you.

9              THE COURT:  Okay.

10             MR. HALLETT:  I will say, Your Honor, that we won't

11   be entering into a stipulation at this time with respect to my

12   client's --

13             THE COURT:  All right, and so that's plain enough.

14   Any further comment on that from the United States?

15             MR. WOLFF:  No, Your Honor, that's clear.

16             THE COURT:  Okay.  I believe I've now ruled on all

17   of the motion -- all of the issues raised in the motions in

18   limine in this case.  Anything, Attorney Wolff or Attorney

19   Nathans, I have not addressed from the Government's

20   perspective that needs to be addressed?

21             MR. WOLFF:  No, Your Honor.

22             THE COURT:  Attorney Hallett or Attorney Ramharter?

23             MR. HALLETT:  No, Your Honor.

24             THE COURT:  All right.  I will say it again.  We

25   have two solid days for trial, and this case will be tried in

1    two solid days.  Tomorrow morning we have the jurors reporting

2    at 8:00.  We'll convene in the courtroom at that time so that

3    I can engage in a <u>Frye</u> colloquy with the defendant.  The

4    jurors will be asked to complete the questionnaire upon their

5    arrival, and we'll have the opportunity in the courtroom,

6    counsel, you and I, to review the responses to those

7    questionnaires and then to decide whatever follow-up is needed

8    and also to engage in the follow-up with the individual juror

9    who may know one of the witnesses in the case or may have met

10   one of the witnesses in the case.

11       Attorney Wolff, would you remind me how much time the

12   Government has requested for opening statement?

13       MR. WOLFF:  Your Honor, I believe -- I believe that

14   Judge Wolf had suggested 30 minutes per side and Mr. Hallett

15   had asked for 45.  I think -- Mr. Nathans will be delivering

16   opening.

17       THE COURT:  Okay.

18       MR. WOLFF:  So he can represent how much time he

19   needs, but it's certainly nowhere near that limit.

20       MR. NATHANS:  Your Honor, I anticipate being no

21   longer than 15 minutes.

22       THE COURT:  Fifteen?

23       MR. NATHANS:  Fifteen minutes.

24       THE COURT:  Thank you.  And Attorney Hallett or

25   Attorney Ramharter?

1          MR. HALLETT:  Your Honor, I think -- I would still

2     reserve my 45 if possible.  I don't think I'll use it all up,

3     but the fact is now I've got a gun to deal with and I think

4     that's going to take time.

5          THE COURT:  All right.  Before we adjourn, then,

6     anything else, counsel?

7          MR. WOLFF:  No, Your Honor.

8          THE COURT:  Attorney Hallett?

9          MR. HALLETT:  No, thank you.

10          THE COURT:  All right.  Thank you, counsel, I'll

11     look forward to seeing you tomorrow.  And with that we stand

12     adjourned.

13               (Time noted:  10:03 a.m.)

14               **C E R T I F I C A T I O N**

15   I, Lori D. Dunbar, Registered Merit Reporter, Certified

16   Realtime Reporter, and Official Court Reporter for the United

17   States District Court, District of Maine, certify that the

18   foregoing is a correct transcript from the record of

19   proceedings in the above-entitled matter.

20   Dated:  June 10, 2022

21               /s/ Lori D. Dunbar

22               Official Court Reporter

23

24

25