```
 1                UNITED STATES DISTRICT COURT

 2                     DISTRICT OF MAINE

 3      _____

 4      UNITED STATES OF AMERICA,          CRIMINAL ACTION

 5             Plaintiff            Docket No:  2:21-00149-JDL

 6

 7          -versus-

 8

 9      BRIAN DENNISON,

10             Defendant

11      _____
                          Transcript of Proceedings
12
```

```
13      Pursuant to notice, the above-entitled matter came on for Jury
        Trial held before THE HONORABLE JON D. LEVY, United States
14      District Court Judge, in the United States District Court,
        Edward T. Gignoux Courthouse, 156 Federal Street, Portland,
15      Maine, on the 24th day of May 2022 at 8:15 a.m. as follows:

16

17      Appearances:

18      For the Government:   Craig M. Wolff, Esquire
                              Johnathan Nathans, Esquire
19                            Assistant United States Attorneys

20      For the Defendant:    Thomas F. Hallett, Esquire
                              Jordan T. Ramharter, Esquire
21

22
                              Lori D. Dunbar, RMR, CRR
23                            Official Court Reporter

24                     (Prepared from manual stenography and
                              computer aided transcription)
25
```

INDEX OF PROCEEDINGS                    Page

Frye Colloquy                                             3
Opening Statement by Mr. Nathans                         23
Opening Statement by Mr. Hallett                         28
Testimony (see below)

                  INDEX OF WITNESSES

Frederick E. Witt, Jr.  (called by Mr. Nathans)
   Direct Examination by Mr. Nathans                     35
   Cross-Examination by Mr. Hallett                      42

Jordan Holt  (called by Mr. Nathans)
   Direct Examination by Mr. Nathans                     48
   Cross-Examination by Mr. Hallett                      67

Jonathan Duquette
   Direct Examination by Mr. Wolff                       74


                  INDEX OF EXHIBITS

Government
Exhibit No.           Description            Admitted

   1   Screenshot of Twitter posts               40
   2   Screenshot of @Ma1lus Twitter profile     54
   3   Screenshot of Twitter post                54
   4   Twitter business records                  47
   5   Charter business records                  47
   6   TextMe, Inc., business records            47
   7   Photograph                                79
   8   Photograph                                79


SIDEBAR CONFERENCES

5, 8, 46, 72, 94, 98, 104

```
 1                   (Open court.  Defendant present.)

 2          THE COURT:  Good morning.  We are back on the record

 3    in the case of United States versus Brian Dennison, 20-CR-149.

 4    The record will reflect that counsel are present as well as

 5    Mr. Dennison.  There are some other individuals I see at

 6    counsel table this morning, so I'd like them to be introduced

 7    at this time.

 8          MR. WOLFF:  Yes, Your Honor.  In addition to

 9    Mr. Nathans and myself, Task Force Officer Duquette from the

10    FBI, who is the case agent, is here, and Katherine Whalen from

11    the U.S. Attorney's Office as well.

12          THE COURT:  Thank you.

13          MR. HALLETT:  Thank you, Your Honor, Kiersten Van

14    Syckle, who is a paralegal with my office, she will be

15    attending throughout the trial.

16          THE COURT:  Thank you very much.

17        The very first order of business is for me to conduct

18    the Missouri versus Frye colloquy.  So let's begin with that.

19    Attorney Wolff or Nathans, has your office extended any prior

20    formal plea offers to the defendant in this case and, if so,

21    please list the dates of each offer?

22          MR. WOLFF:  We have not, Your Honor.

23          THE COURT:  Thank you.  Attorney Hallett, is that

24    consistent with your understanding of what's transpired here?

25          MR. HALLETT:  It is, Your Honor.
```

1          THE COURT:  And I take it that you've discussed that

2    with your client, he understands?

3          MR. HALLETT:  Yes.

4          THE COURT:  Thank you.  Anything else on that point,

5    counsel?

6          MR. WOLFF:  No, Your Honor.

7          THE COURT:  No, okay.

8       All right.  As I understand we are still waiting for a

9    couple jurors to arrive.  However, one of the jurors --

10   they're here, all right.  I'm now told that all jurors are

11   here.  So the very first order of business as they're

12   completing their questionnaires is for me to voir dire Juror

13   No. 76.  You'll recall, counsel, this is the juror who

14   recalled after jury selection having some familiarity with one

15   of the named witnesses.  So we'll invite Juror 76 in at this

16   time and I will question him.  We will do this at sidebar

17   using our electronic system, so this is our first opportunity

18   for everyone to get their headset out and get them on.  So

19   please summons Juror No. 76.

20                    (Juror entered)

21         THE COURT:  Good morning, Juror No. 76, why don't

22   you step forward, please.  You can walk around here and walk

23   over to the witness stand have a seat there, please.  Please

24   be seated.

25                    (Sidebar)

1          THE COURT:  Good morning, Juror No. 76.  Can you

2     hear me?  All right.  Is your -- is the red circle lit up?

3          JUROR NO. 76:  It is now.

4          THE COURT:  Now I hear you.  Thank you.  Again, you

5     are Juror No. 76, correct?

6          JUROR NO. 76:  Yes.

7          THE COURT:  We've brought you in, Juror No. 76,

8     because I wanted to question you regarding the e-mail that we

9     received from you after jury selection.  Your e-mail explained

10    that after jury selection you realized that you might

11    recognize one of the people who has been identified as a

12    potential witness, and that is witness Thomas Ventresca of

13    Howell's Gun Shop; is that correct?

14         JUROR NO. 76:  Yes.

15         THE COURT:  In your e-mail you indicated that a few

16    years back, you said I'm thinking four to five, you purchased

17    a gift certificate from a guy named Tom at Howell's; is that

18    correct?

19         JUROR NO. 76:  Yes.

20         THE COURT:  You indicated that you didn't know the

21    guy's last name but you wanted to bring this to the Court's

22    attention.  You explained that you purchased a gift

23    certificate for your son.

24         JUROR NO. 76:  Yeah.

25         THE COURT:  With the intent of purchasing an

1  out-of-stock bow at a later date; is that right?

2  JUROR NO. 76:  Yes.

3  THE COURT:  After a couple months the bow still had

4  not arrived and you returned the certificate for cash out to

5  make a purchase for my son at a different location.  That's

6  what happened?

7  JUROR NO. 76:  Yes, that's what happened.

8  THE COURT:  You say, I wasn't happy with the

9  situation.  There were no issues with returning the

10  certificate and feel I was treated fairly.

11  JUROR NO. 76:  Yeah, that's correct.

12  THE COURT:  Is there anything else that you can tell

13  us about that encounter that's of any significance in your

14  mind?

15  JUROR NO. 76:  No, no, that was just the encounter

16  that I thought just --

17  THE COURT:  So your contact with Thomas Ventresca

18  would have been on one occasion or two?

19  JUROR NO. 76:  It would have been two.

20  THE COURT:  So when you brought the certificate back

21  for the refund you dealt with him as well?

22  JUROR NO. 76:  Yes.

23  THE COURT:  Based upon your prior encounter and

24  experience with Mr. Ventresca, would that in any way affect

25  your ability to be fair and impartial as a juror in this case?

```
 1              JUROR NO. 76:  No, I don't believe so.
 2              THE COURT:  Do you have any hesitations whatsoever?
 3              JUROR NO. 76:  No.
 4              THE COURT:  Thank you.
 5         Counsel, do you have any further questions that you
 6    would propose the Court ask on this point?
 7              MR. HALLETT:  Not for the defendant, Your Honor.
 8              THE COURT:  Thank you.
 9              MR. WOLFF:  Not for the Government, Your Honor.
10              THE COURT:  All right.  Juror 76, thank you very
11    much.  You can take the headset off, leave it right there, and
12    you can return to the jury room at this time.
13                         (Juror excused)
14                          (Open court)
15              THE COURT:  Teagan, do you know where we stand with
16    respect to completion of the juror questionnaires?
17              THE CLERK:  We just need 76 to fill it out and
18    Brenda will walk them down.
19              THE COURT:  I didn't hear you.
20              THE CLERK:  We'll just need Juror 76 to fill it out
21    and Brenda will walk them down.
22              THE COURT:  So, counsel, we will simply sit tight as
23    we wait for the completed juror questionnaires to be brought
24    into the courtroom.
25                          (Pause)
```

```
 1              THE COURT:  Attorney Ramharter, I was advised after
 2    yesterday's court session that I was mispronouncing your name,
 3    I apologize.
 4              MS. RAMHARTER:  That's okay, Your Honor, it happens
 5    all the time.
 6              THE COURT:  I had the M as a W.
 7                         (Pause)
 8              THE COURT:  Counsel, I'd like to discuss this matter
 9    with you at sidebar so please don your headsets.
10                         (Sidebar)
11              THE COURT:  Can you all hear me?
12              MR. HALLETT:  Yes.
13              THE COURT:  Counsel, all the jurors provided written
14    responses to the two voir dire questions or to the questions,
15    rather.  Three of the jurors indicated in response to question
16    No. 1 no, in other words, that they were not aware of the
17    shootings that took place in a supermarket in Buffalo, New
18    York, on May 14th, 2022.  All the remaining jurors responded
19    yes to that question and then responded no to question 2 in
20    terms of it -- whether their awareness of the Buffalo incident
21    would affect their ability in any way to be fair and impartial
22    in this case.  All of the questionnaires are signed as
23    required.
24         Would either side wish to actually see the
25    questionnaires before we move on to the next issue?
```

```
 1              MR. WOLFF:  No, Your Honor.

 2              MR. HALLETT:  No, Your Honor.

 3              THE COURT:  Thank you.  All right.  And so it seems

 4    to me, counsel, we're now ready to begin the trial in this

 5    case.  I'll summons the jury, it will be sworn, I'll provide

 6    my preliminary instructions, and we'll go right into opening

 7    statements.  Anything else, counsel?

 8              MR. HALLETT:  Your Honor, there is one issue, and

 9    that is that there are -- there are some -- there's a gun box

10    and an ammunition box in the courtroom that I don't want

11    observed by the jury when they come in, and I -- I think they

12    tried to hide them but they're still back there where I can

13    see them.  I don't know if they can be seen by the jury

14    members or not.

15              THE COURT:  Attorney Wolff?

16              MR. WOLFF:  Your Honor, Mr. Hallett's correct.  We

17    certainly endeavored to keep them out of the view of the jury.

18    We can remove them from the courtroom.  It just seemed less

19    disruptive to try to make then unobtrusive rather than take

20    them out and then bring them back in again.

21              THE COURT:  Where are they right now?

22              MR. WOLFF:  They're over here behind our second

23    table, Your Honor.  I don't believe they're visible to anyone.

24              MR. HALLETT:  If I can just view them from the jury

25    box?
```

```
 1                    THE COURT:  Go ahead.

 2                    THE CLERK:  Judge, I'm sorry to interrupt, but I can

 3      open the closet door and they could put it back there, too.

 4                    THE COURT:  Let's do that, please.

 5                    MR. WOLFF:  Thank you.

 6                    MR. HALLETT:  Pretty visible, Your Honor.

 7                    THE COURT:  We're going to have them moved into the

 8      closet.

 9                    MR. HALLETT:  Thank you.

10                            (Open court)

11                    THE COURT:  Please summons the jury.

12                 (Jury entered.  Time noted:  8:34 a.m.)

13                    THE CLERK:  Please raise your right hand.  Do each

14      of you solemnly swear that you will well and truly try the

15      issues between the parties at the bar according to the laws

16      and evidence given to you, so help you God?

17                    THE JURORS:  I do.

18                    THE CLERK:  Please be seated.

19                    THE COURT:  Ladies and gentlemen, you are now the

20      jury in this case.  Good morning.

21                    THE JURORS:  Good morning.

22                    THE COURT:  In a minute I'm going to give you some

23      preliminary instructions regarding the case, but I want to

24      take care of some housekeeping matters first, and turning

25      first to some introductions of the court personnel.  First of
```

1    all, my name is Jon Levy.  I'm the Chief United States

2    District Judge for the District of Maine, and I'll be the

3    judge who is presiding during this trial.

4         I'm assisted by several people.  Our case manager to my

5    right, right over there, is Teagan Snyder.  Again, she's the

6    case manager responsible for this case.  The court reporter,

7    who is seated right in front of me right here, is Lori Dunbar.

8    And Ms. Dunbar is going to be making a record of everything

9    that is said and happens here in the courtroom.  I'm also

10   assisted by my law clerk, who is to my far left.  Her name is

11   Suzy Dowling.  And of course we have several court security

12   officers.  These are the men and women in the gray slacks and

13   navy blazers, and they will be assisting us and you throughout

14   the day.

15        Let me talk a bit about the schedule for this trial.  We

16   anticipate that the trial will take two days.  We will begin

17   here at 8:30.  We ask that you arrive no later than 8:15

18   tomorrow.  I should say that that time might change.  I'll

19   make a judgment about that later today and I'll let you know.

20   But it's very important that you be here when we ask you to be

21   here so that we can start promptly.

22        Typically we'll be taking two breaks during the course

23   of the day.  We'll take a morning break at 10:30 and then

24   we'll take -- that will be a 15-minute break, and then we'll

25   take a lunch break at 12:30.  And then we will go until

 1   approximately 2:45 when we will finish for the day today.

 2   I'll -- at the end of the day today I'll give you further

 3   instructions about what to anticipate in terms of tomorrow's

 4   schedule.

 5        Now, it's very important that throughout the trial

 6   you're able to hear everything that goes on during the trial.

 7   So if you're having any difficulty at all hearing, please

 8   raise your hand or stand up and catch my attention.  Again, I

 9   don't want you to have to strain to hear.  Or for that matter

10   if you can't see something that you're trying to see, let me

11   know that as well.

12        If you're in need for a bathroom break before we have a

13   scheduled break, don't hesitate to let me know.  Stand up,

14   that happens of course, so don't be shy about that.  Just get

15   my attention or get the attention of our court security

16   officer, and we will take a break as needed.

17        I now want to turn to your preliminary jury

18   instructions.  And I'm going to talk first about your duties

19   as the jury.

20        As I mentioned a moment ago, you are now the jury in

21   this case.  So I will take a few minutes to tell you about

22   your duties as jurors and give you some instructions.  Now, at

23   the end of the trial I will give you more detailed

24   instructions.  Those instructions will control your

25   deliberations.  It will be your duty to decide from the

1    evidence what the facts are.  You and you alone are the judges

2    of the facts.  You will hear evidence, decide what the facts

3    are, and then apply those facts to the law as I give it to

4    you.  That is how you will reach your verdict.  Now, in doing

5    so you must follow the law whether you agree with it or not.

6        The evidence will consistent of the testimony of

7    witnesses, documents, and other things received into evidence

8    as exhibits and any facts on which the lawyers agree or which

9    I may instruct you to accept as true.  You should not take

10   anything I may say or do during the trial as indicating what I

11   think of the believability or significance of the evidence or

12   of what your verdict should be.

13       Now, I want to talk now about the nature of the

14   indictment in this case and the presumption of innocence.

15   This is a criminal case.  It's been brought by the United

16   States Government.  I will sometimes refer to the Government

17   as the prosecution.  The Government is represented at this

18   trial by an Assistant United States Attorney, Craig Wolff --

19   Mr. Wolff, if you could just stand for a moment, please -- as

20   well as Assistant U.S. Attorney Johnathan Nathans.  Thank you

21   both.

22       The defendant is Brian Dennison, who is seated off to my

23   left.  Mr. Dennison, you can stand, thank you.  And he is

24   represented by Attorney Tom Hallett -- Mr. Hallett, if you'll

25   stand, thank you -- and Attorney Jordan Ramharter, Attorney

1    Ramharter, thank you.

2         Brian Dennison is charged with committing one violation

3    of federal law.  He is charged with one count of transmitting

4    threatening interstate communication.  The charge against

5    Brian Dennison is contained in the indictment.  The indictment

6    is simply the description of the charge against Mr. Dennison.

7    It is not evidence of anything.  Brian Dennison pleaded not

8    guilty to the charge and denies committing the crime.  He is

9    presumed innocent and may not be found guilty by you unless

10   all of you unanimously find that the Government has proven his

11   guilt beyond a reasonable doubt.

12        Now, in order to help you follow the evidence you'll

13   hear during the trial, I will give you a brief summary of the

14   elements that the Government must prove beyond a reasonable

15   doubt to make its case.  In Count 1 of the indictment, Mr.

16   Dennison is charged with transmitting threatening interstate

17   communication.  To convict Brian Dennison of this charge, the

18   Government must prove beyond a reasonable doubt, first, that

19   Brian Dennison knowingly sent the communication in interstate

20   commerce; second, that Brian Dennison knowingly and willfully

21   intended to send the communication as a threat or knew that it

22   would be perceived as a threat; and third, that the content of

23   the communication contained a true threat to injure the person

24   of another.

25        You should understand that what I have just given you is

1   a preliminary outline.  At the end of the trial I will give

2   you a final instruction on these matters.  If there's any

3   difference between what I just told you and what I tell you in

4   the instruction I give you at the end of the trial, the

5   instructions given at the end of the trial govern.

6       Now, I've mentioned the word evidence.  Evidence

7   includes the testimony of witnesses, documents, and other

8   things received as exhibits and any facts that have been

9   stipulated, that is, formally agreed to by the parties.  There

10  are rules of evidence that control what can be received into

11  evidence.  When a lawyer asks a question or offers an exhibit

12  into evidence and a lawyer on the other side thinks that it is

13  not permitted by the rules of evidence, that lawyer may

14  object.  This simply means that the lawyer is requesting that

15  I as the judge make a decision on a particular rule of

16  evidence.

17      Sometimes it's necessary for me to talk with the lawyers

18  out of the hearing of the jury, either by having a bench

19  conference while you're present in the courtroom or by calling

20  a recess.  When we conduct bench conferences, that is a

21  discussion in the courtroom just between me and the lawyers.

22  We employ this device, a headset, it allows us to communicate

23  in hushed voices so that we won't be heard, so you'll see us

24  put these headsets on and off from time to time.  As I also

25  mentioned on some occasions I might conclude that it would be

1    best for you to be excused from the courtroom and return to

2    the jury room while I discuss with the lawyers any objection

3    that's been raised.  Please understand that while we are

4    speaking and while you are waiting, we are working.  The

5    purpose of these conferences is to decide how certain evidence

6    is to be treated under the rules and to avoid confusion and

7    error.  We will of course do what we can to keep the number

8    and length of those conferences to a minimum.

9         Now, certain things are not evidence, and I will list

10   those things for you now.  One, the statements, arguments,

11   questions, and comments by the lawyers representing the

12   parties in the case, that's not evidence.

13        Two, objections are not evidence.  As I've told you,

14   lawyers have a duty to their client to object when they

15   believe something is improper under the rules of evidence.

16   You should not be influenced by the objection.  If I sustain

17   an objection, you must ignore the question or exhibit and must

18   try not to guess what the answer might have been or the

19   exhibit might have contained.  If I overrule the objection,

20   the evidence will be admitted but not -- but do not give it

21   special attention because of the objection.

22        Third, testimony that I strike from the record or tell

23   you to disregard is not evidence and must not be considered.

24        Four, anything that you see or hear about this case

25   outside of this courtroom is not evidence unless I

1    specifically tell you otherwise during the trial.

2         In addition, a particular item of evidence is sometimes

3    received for a limited purpose; that is, it can only be used

4    by you only for a special or particular purpose and not for

5    any other purpose.  I will tell you when that occurs and

6    instruct you on the purposes for which the item can and cannot

7    be used.

8         Finally, some of you may have heard the terms direct

9    evidence and circumstantial evidence.  Direct evidence is

10   testimony by a witness about what the witness personally saw

11   or heard or did.  Circumstantial evidence is indirect

12   evidence; that is, it is proof of one or more facts from which

13   one can find or infer another fact.  You may consider both

14   direct and circumstantial evidence.  The law permits you to

15   give equal weight to both.  But it is for you to decide how

16   much weight to give to any evidence.

17        I now want to discuss with you witnesses.  In deciding

18   what the facts are, you may have to decide what testimony you

19   believe and what testimony you do not believe.  You may

20   believe everything a witness has said -- a witness says or

21   only part of it or none of it.  In deciding what to believe,

22   you may consider a number of factors, including the following:

23        One, the witness's ability to see or hear or know the

24   things the witness testifies to.  Two, the quality of the

25   witness's memory.  Three, the witness's manner while

1    testifying.  Four, whether the witness has an interest in the

2    outcome of the case or any motive, bias, or prejudice.  Five,

3    whether the witness is contradicted by anything the witness

4    said or wrote before trial or by other evidence.  And six, how

5    reasonable the witness's testimony is when considered in light

6    of the other evidence which you choose to believe.

7         I now want to turn to your conduct as jurors.  To ensure

8    fairness, you as jurors must obey the following rules:

9         First, do not talk among yourselves about this case or

10   about anyone involved with it until the end of the case when

11   you go to the jury room to decide on your verdict.  So until

12   then, you're not to discuss the case in any way among

13   yourselves or with anyone else.

14        Second, as I just said, don't talk about the case with

15   anyone else or about anyone that has anything to do with it

16   until the trial has ended and you've been discharged as

17   jurors.  When I say anyone else, that includes members of your

18   family and your friends.  You may tell them that you are a

19   juror, but do not tell them anything about the case until

20   after you have been discharged by me.

21        Third, do not let anyone talk to you about the case or

22   about anyone who has anything to do with it.  If someone

23   should try to talk to you about the case, please report it to

24   me immediately.

25        Fourth, during the trial do not talk with or speak to

1   any of the parties, lawyers, or witnesses involved in this

2   case.  You should not even pass the time of day with any of

3   them, in other words, not even any casual talk or polite talk,

4   nothing at all.  It is important not only that you do justice

5   in this case but that you also give the appearance of doing

6   justice.  And so if a person from one side of the case sees

7   you talking to a person from the other side of the case, even

8   if it is to simply pass the time of day or to be polite, an

9   unwarranted and unnecessary suspicion about your fairness

10  might be raised.  If a lawyer, party, or witness does not

11  speak to you when you pass in the hall or ride the elevator or

12  the like, understand that it's because they're not supposed to

13  talk or visit with you in any way.

14       Fifth, do not read any news stories or articles about

15  this case or about anyone involved with it or listen to any

16  radio or television reports about the case or about anyone

17  involved with it.

18       Sixth, do not do any research on the Internet about

19  anything in this case or having to do with this case or

20  consult blogs or dictionaries or other reference materials,

21  and do not make any investigation about the case on your own.

22  I want to repeat that because it is particularly important.

23  Do not do any research on the Internet about anything having

24  to do with this case, any person having to do with this case,

25  anything at all.  Do not consult any blogs or dictionaries or

1   other reference materials, and do not in any way make any

2   investigation about the case on your own.

3       Seventh, do not discuss the case or anyone involved with

4   it or your status as a juror on any social media or look up

5   any of the participants there.  Again, you are to have no

6   interaction on social media in any way about your role as a

7   juror, about this case, or anything having to do with anything

8   with it.

9       Eighth, if you need to communicate with me at any time,

10  simply give a signed note to the court security officer or to

11  the jury administrator and they will give it to me.

12      And ninth, don't make up your mind about what the

13  verdict should be until after I have authorized the jury to

14  deliberate.  At that point you'll have gone to the jury room

15  to decide the case, and it's at that point that you and your

16  fellow jurors will have the opportunity to discuss the

17  evidence.  So don't make up your mind in any way.  Keep an

18  open mind at all times.

19      Now, regarding note taking, you are permitted to take

20  notes in this case, and you should have received pencils and

21  pads for your use.  I take it you do have them, yes?  Good.  I

22  want to give you a couple warnings about taking notes.

23      First of all, don't allow your note taking to distract

24  you from listening carefully to the testimony that's being

25  presented.  If you would prefer not to take notes at all but

1    to simply listen, feel free to do so.  Please also remember

2    from some of your grade school experience, perhaps, that not

3    everything that you write down is necessarily what was said,

4    so when you return to the jury room to discuss the case, don't

5    assume simply because something appears in somebody's notes

6    that it necessarily took place in court.  Instead, it is your

7    collective memory that must control as you deliberate on the

8    verdict.

9        Now, please take your notes to the jury room at every

10   recess.  I will have the courtroom deputy collect them at the

11   end of the day and we'll place them in the court's vault.

12   They will then be returned to you in the morning, and when the

13   case is over your notes will be destroyed.  These steps are in

14   line with my earlier instruction to you that it's important

15   that you not discuss the case with anyone or permit anyone to

16   discuss the case with you.

17       I now want to give you an outline of how the trial will

18   unfold.  The first step in the trial will be the lawyers'

19   opening statements.  The Government in its opening statement

20   will tell you about the evidence that it intends to put before

21   you so that you will have an idea of what the Government's

22   case is going to be.  Just as the indictment is not evidence,

23   neither is the opening statement.  Its purpose is only to help

24   you understand what the evidence will be and what the

25   Government will try to prove.  After the Government's opening

1    statement, Mr. Dennison's attorney may make an opening

2    statement.  At this point in the trial no evidence has been

3    offered by either side.  So, again, the purpose of the opening

4    statement is to help you understand what the evidence will be

5    in this case.

6        Next, after the opening statements the Government will

7    offer its evidence that it says will support the charge

8    against Mr. Dennison.  The Government's evidence in this case

9    will consist of testimony of witnesses, and it may include

10   documents and other exhibits.  After the Government's

11   evidence, Mr. Dennison's lawyer may present evidence on his

12   behalf but he's not required to do so.  I remind you that Mr.

13   Dennison is presumed innocent and the Government bears the

14   burden at all times to prove the guilt of Mr. Dennison by

15   proof beyond a reasonable doubt.  Mr. Dennison does not have

16   to prove his innocence.  He is presumed to be innocent.

17       After you've heard all the evidence on both sides, the

18   Government and defense will each be given time for their final

19   arguments.  Now, I told you -- just told you that the opening

20   statements by the lawyers are not evidence.  The same applies

21   to the closing arguments.  They are not evidence either.  In

22   their closing arguments, the lawyers will attempt to summarize

23   and help you understand the evidence that was presented.

24       The final part of the trial occurs when I instruct you

25   about the rules of law that you are to use in reaching your

1    verdict.  After hearing my instructions, you will then leave

2    the courtroom together to make your decisions.  Your

3    deliberations will be secret.  You will never have to explain

4    your verdict to anyone.

5         With those preliminary instructions, members of the

6    jury, at this time I'm pleased now to turn to the opening

7    statement phase of the trial.  And I will turn first to the

8    United States.  Attorney Nathans?

9         MR. NATHANS:  Thank you, Your Honor.

10    May it please the Court, may I proceed?

11         THE COURT:  Please.

12         MR. NATHANS:  Thank you, Your Honor.

13    I'm going to kill Jews with my AR-15 tomorrow.  This was

14    the Tweet that retired FBI investigative specialist Frederick

15    Rick Witt observed on Twitter profile @Ma1lus on

16    September 8th, 2021.  Mr. Witt works for Intellabridge, a

17    company that contracts with the FBI, and another company

18    called C-T Watch.  These companies monitor social media to

19    detect domestic and international threats.  Mr. Witt observed

20    the Tweet after software used by C-T Watch picked up on the

21    word bomb in another Tweet sent by the same Twitter profile,

22    @Ma1lus, that said building a pipe bomb.  You will hear from

23    Mr. Witt that after the software identifies a key word an

24    alert is sent to him or another analyst at C-T Watch, and then

25    it is his job to determine if the post constitutes a possible

1    threat or not.

2         In this instance, after Mr. Witt received the notice on

3    September 8th, 2021, he did what he was trained to do.  He

4    located the Twitter profile, and that is where he observed the

5    Tweet, I'm going to kill Jews with my AR-15 tomorrow.  He also

6    observed the Tweet, building a pipe bomb.  Mr. Witt then

7    captured screenshots of the Tweet to preserve them in case the

8    user or the platform itself deleted the content.  You will

9    hear that Mr. Witt believed the posts were threatening and

10   forwarded the threat to the FBI National Threat Operation

11   Center, also known as NTOC, for follow-up investigation.

12        Next you will hear from FBI intake research specialist

13   Jordan Holt, who works at NTOC.  I anticipate that Ms. Holt

14   will tell you that as a research specialist part of her job is

15   to review the Threat Intake Process System or TIPS each day to

16   determine if there are any active threats that need to be

17   followed up on.

18        The evidence will show that at approximately 9:46 a.m.

19   on September 8th, 2021, Ms. Holt received the TIPS alert that

20   Mr. Witt had sent her earlier in the morning.  During

21   Ms. Holt's review of the material uploaded to the TIPS system

22   by Mr. Witt, she learned that the threat involved the social

23   media platform Twitter.

24        In addition to reviewing the matter that was forwarded

25   by Mr. Witt, Ms. Holt went to the @Ma1lus Twitter account to

1    capture additional screenshots of the reported posts but the

2    posts had been taken down, deleted.  However, she was able to

3    recover other screenshots of the @Ma1lus Twitter profile and

4    other images posted on the account.

5        Ms. Holt then sent a letter to Twitter asking them to

6    preserve the data for @Ma1lus profile in case the account

7    itself was deleted.  She then submitted an emergency

8    disclosure request, an EDR, to Twitter for subscriber

9    information and IP addresses associated with the account.  The

10   evidence will show that based on the EDR Ms. Holt received a

11   response from Twitter that included e-mail address, telephone

12   number, and IP addresses associated with the account.

13       You will hear that Ms. Holt was then able to request

14   information from Spectrum, who is the parent company for

15   Charter Communications.  Spectrum was subsequently able to

16   identify the subscriber of one of the IP addresses as Florice

17   Dennison, who lived at 86 Fogg Road, Buxton, Maine.  After

18   identifying a person associated with the IP address that had

19   accessed Twitter, Ms. Holt then forwarded the information she

20   obtained from Twitter and Spectrum or Charter and the

21   information forwarded to her by Mr. Witt to the FBI Boston

22   field office.  You will hear from Ms. Holt that any referral

23   that involves a threat to life requires her to call the field

24   office to alert them of the referral.  You will hear that a

25   little after 12:00 p.m. on September 8th, 2021, Ms. Holt did

1    just that.

2         You will also hear from FBI agents that the telephone

3    number associated with the @Ma1lus Twitter account was

4    assigned to TextMe, which is an application that allows mobile

5    phone users to make free calls and texts using a phone number

6    that TextMe provides.  You will hear that information provided

7    by TextMe showed that the telephone number was assigned to

8    user name briandennison93707 using a Gmail account or Google

9    account, also associated with the name Brian Dennison.

10        The evidence will show that after Ms. Holt forwarded the

11   threat to life notification to the FBI Boston field office,

12   FBI Task Force Officer Jonathan Duquette took over the

13   investigation.  You will hear from TFO Duquette that once he

14   learned that the IP address used to log into Twitter account

15   was assigned to Florice Dennison at 86 Fogg Road in Buxton, he

16   and other agents headed to that address.

17        You will hear that TFO Duquette and others arrived at 86

18   Fogg Road sometime between 4:00 and 4:30 on September 8th and

19   met with Florice Dennison.  You will also hear that after

20   agents informed Ms. Dennison why they were there responding to

21   a threatening Tweet, she asked if they wanted to speak to her

22   son, Brian Dennison.  You will hear from agents that after a

23   brief encounter with the defendant they applied for a search

24   warrant for the garage apartment at 86 Fogg Road.

25        You will hear about how after obtaining a search warrant

1    late in the evening on September 8th agents executed that

2    warrant the next day.  During the search of the apartment

3    agents observed a large amount of ammunition and seized an

4    Apple iPhone, computers, and other electronic devices, as well

5    as other items of interest that belonged to the defendant.

6    You will hear that later that day agents returned to the

7    defendant's residence and executed another search warrant to

8    seize the ammunition that they observed earlier in the day.

9        You will hear from agents that after seizing the

10   electronic devices FBI Task Force Officer Maurice Drouin

11   copied the contents of those devices and TFO Duquette began

12   the process of reviewing the contents of those devices seized.

13   You will hear from TFO Duquette that during his review of the

14   defendant's phone and computer TFO Duquette found evidence of

15   the defendant's hatred of Jews and how he utilized the Twitter

16   profile @Ma1lus that posted both I'm going to kill Jews with

17   my AR-15 tomorrow and building a pipe bomb.

18       You will hear that on October 21st, 2021, agents

19   obtained and executed a third search warrant at the

20   defendant's residence and the area surrounding 86 Fogg Road.

21   You will hear that during that search agents recovered an

22   AR-15 style rifle that was hidden under leaves and brush.  In

23   addition to the AR rifle, agents recovered more ammunition and

24   a drum magazine with additional ammunition.

25       Ladies and gentlemen, at the conclusion of this trial

1    you will have the opportunity to hear from my colleague,

2    Assistant United States Attorney Craig Wolff.  At that time he

3    will ask you to return the only verdict consistent with the

4    law and the evidence, a verdict of guilty to one count of the

5    indictment as charged, a verdict consistent with the true

6    threat that the defendant made on September 8th, 2021, that he

7    was going to kill Jews with his AR-15 tomorrow.  Thank you.

8            THE COURT:  Thank you, Attorney Nathans.

9        And for Mr. Dennison, Attorney Hallett?

10           MR. HALLETT:  Thank you, Your Honor.  Your Honor,

11   I'd like to put the Tweets, which is Government's Exhibit

12   No. 1, up as a chalk here.

13           THE COURT:  This is Government 1?  Attorney Hallett?

14           MR. HALLETT:  Government 1.

15       Good morning, folks.  On your screens you should see the

16   screenshots of Tweets that were issued.  We can all agree that

17   the Tweet particularly at the top of that, I'm going to kill

18   Jews with my AR-15 tomorrow, is hateful.  I'm going to suggest

19   to you that the information that's provided by the Government

20   and the evidence presented by the Government, statements made

21   by my client to some of his friends, images that were obtained

22   from my client's computer, all hateful.  My client behaved

23   hatefully on September 8, 2021.  But hate is not a crime, and

24   your job is to determine whether a crime occurred.

25       Now, I'm scared, I'm going to be perfectly honest, I'm

1    scared because the hate in this case has a huge amount of

2    noise.  And it's going to be difficult to get through that

3    noise to understand a case that is somewhat nuanced.  It is my

4    job to present the defense for my client, Brian Dennison, and

5    I am scared.  Why am I scared?  I'm scared because people may

6    just look at the Tweet and shut down.  I know people that

7    would.  Some of you might look at the evidence here and shut

8    down, and I know people that would.  And some people might

9    simply look at the anti-Semitism displayed here and shut down,

10   and I know people that would.  So I'm asking you -- and I have

11   hope and I believe you can do this -- to at least not hear the

12   constant drumbeat of the noise from the hate involved in this

13   case and look at it from an evidentiary perspective.

14       There are two defenses that will be presented in this

15   case.  One, the First Amendment.  The First Amendment

16   specifically protects hate speech.  The second is intent.  Did

17   my client intend to issue what they call a true threat.  A

18   true threat here is not just a threat.  A true threat is

19   something that is different.  A true threat is where a speaker

20   directs a threat to a person or group of persons with the

21   intent of placing the victim in fear of bodily injury or

22   death.  Those are the two defenses that will be presented to

23   you, and I trust that you will hear them.

24       Let me introduce you a little bit to my client,

25   currently 25 years old, 24 years old at the time of the Tweet,

1    working at ON Semiconductor, grew up in Buxton, and apparently

2    at some point began harboring anti-Semitic beliefs.

3         The real subject matter here, however, is Twitter.  And

4    what is Twitter?  Now, some of you may use Twitter.  We'll

5    have someone come in and testify and explain Twitter to a

6    certain extent to you.  It's alleged that at 9:09 in the

7    morning these Tweets went out.  If you look at the bottom

8    Tweet, building a pipe bomb, went out and that was captured 12

9    minutes later, apparently by Mr. Witt.  And then I'm going to

10   kill Jews with my AR-15 tomorrow went out at 10 -- 10

11   minutes -- was captured within 10 minutes.

12        Twitter is a -- has 6,000 Tweets per second, 5 million

13   Tweets per minute, and 250 billion Tweets a year.  Twitter is

14   the biggest purveyor of 280 character statements in the world.

15   Twitter has certain guidelines and certain processes that

16   follow.  So I just want to take you through it quickly because

17   therein lie clues that you need to look at as to -- to

18   determine whether there was intent and whether there was a

19   true threat.

20        So the Government is going to contend that my client

21   sent out a true threat that would be observed by people who

22   would be offended and scared by that threat.  We need to look

23   to Twitter and see where Twitter goes.  Twitter doesn't go to

24   everyone.  Twitter goes to the followers on Twitter.  The

25   Government will show that -- will not show any evidence that

1    there was a follower on Twitter that was offended in any way.

2    The Government will not show that there was anyone offended in

3    any way because there's such a thing called eTips where people

4    who are offended can report it.

5         So once you post a Tweet, it goes into the Twitter

6    stream, and the Twitter stream keeps rolling along and the

7    Tweet goes further and further down into the Twitterverse.

8    Unless a person is on the account, their Twitter account, and

9    a follower of Mr. Dennison, @Ma1lus, at the time the Tweet

10   goes out they don't see it.  A limited number of people see

11   it.  In this case we know of three, two really.  And if you

12   look at the top of the screen you'll see, I'm going to kill

13   Jews with my AR-15 tomorrow, and two people liked it.  That's

14   the only people we know that saw it, except for the FBI,

15   because the FBI has search engines that go through every

16   single statement that is made on Twitter and is made on social

17   media.  Every single one.  They found it, but they didn't find

18   it because of that Tweet, I'm going to kill Jews with my AR-15

19   tomorrow; they found it because of the building a pipe bomb

20   Tweet, and that triggered some kind of alarm and that was sent

21   to Mr. Witt.

22        So there are certain ways that my client could make sure

23   that that Tweet got out to other people.  And the evidence

24   will show that you could do a hashtag and you could hashtag

25   certain words.  You've probably all seen this from news,

1    whatever, or use of Twitter.  And that hashtag would allow

2    people that do the hashtag and put in search engine words into

3    their computer to get all of the Tweets involving that hashtag

4    and then a set couple of words.  There is no hashtag.  My

5    client didn't intend for it to go out further.  You can do an

6    at symbol that will tag on to your followers.  That is not

7    present.  My client didn't intend that it go further.  Right

8    here before you, this evidence right here suggests that.

9        What also suggested that he did not intend to threat --

10   to create a true threat or issue a true threat?  Well, the

11   very term, I'm going to kill Jews with my AR-15 tomorrow, I'm

12   not denying it's a hateful Tweet.  I am saying, what does Jews

13   mean?  Is that really a threat?  Jews -- and there's a --

14   you'll find -- you'll hear evidence or there's stipulated

15   evidence that there are 15 million Jewish people in the world.

16   Is that a true threat?  You'll have to find -- you'll have to

17   determine that.  It's like saying I'm going to kill a

18   Californian, I'm going to kill a New Yorker, I'm going to kill

19   a child.  Those aren't true threats.  If he had wanted to

20   create a true threat where he wanted to threaten someone, he

21   could have identified a person, as is suggested for a true

22   threat, or he could have identified a location, as is

23   suggested by a true threat.  He could have included specifics.

24   He didn't.  There is no identifiable target.  He didn't intend

25   to create a true threat.

1          By 9:46 the evidence will show that the Tweet was

2     deleted.  Both Tweets were deleted.  There will be evidence

3     that my client had been banned from Twitter on a number of

4     occasions.

5          Here's another clue.  The first Tweet that went out,

6     building a pipe bomb.  Apparently my client decided to make an

7     outrageous Tweet.  Why would he do that?  A fellow who's been

8     banned a number of times from Twitter.  Maybe to play a game?

9     Games with Twitter?  See if he can get banned again, see if he

10    gets banned.  And then two minutes later when he hadn't, I'm

11    going to kill Jews with my AR-15 tomorrow, a more outrageous

12    statement, and then the Tweets were taken down.

13         Twitter has protocols, they have rules of the road that

14    have to be followed, and those protocols include hateful

15    conduct.  If -- and we'll have some evidence with respect to

16    that.  We can all agree, this is hateful conduct.  Twitter

17    says it takes down Tweets that are hateful conduct.  These

18    Tweets were taken down 30 minutes after they went out or

19    thereabouts.  We don't know exactly when they were taken down.

20         My client had been banned before.  He didn't intend for

21    anyone to see these Tweets.  He intended to get banned again.

22    And that is not criminal.  And that Tweet itself, although

23    offensive and hateful, is not criminal.  It is hate speech.

24    It is protected speech.  Because without an identifiable

25    target, there is no distress on the part of an individual.

```
 1         So I thank you in advance for keeping your ears open and
 2    your minds open, and despite the fact that evidence will come
 3    in that my client had an AR-15, that my client had a fair
 4    amount of ammunition, 2,000 rounds, I ask you to keep an open
 5    mind because there is no evidence, and this case is not about
 6    my client shooting Jews.  That's specifically what this case
 7    is not about.  And there is no evidence that there was ever
 8    that intent.  This case is specifically about the Twitter
 9    Tweet which was issued, and that's what I ask you to keep your
10    attention on.  Thank you very much.
11         THE COURT:  Thank you, Attorney Hallett.
12         And with that the Government may call its first witness.
13         MR. NATHANS:  Thank you, Your Honor.  The Government
14    calls Frederick Witt.
15         THE CLERK:  Please raise your right hand.  Do you
16    solemnly swear that the testimony you shall give in the cause
17    now in hearing shall be the truth, the whole truth, and
18    nothing but the truth, so help you God?
19         THE WITNESS:  I do.
20         THE CLERK:  Please be seated.
21         THE WITNESS:  Thank you.
22         THE CLERK:  Please state and spell your first and
23    last names for the record.
24         THE WITNESS:  My name is Frederick E. Witt, Jr.,
25    F-R-E-D-E-R-I-C-K, middle initial E, Witt, W-I-T-T.
```

```
 1                    THE COURT:  Please proceed.

 2                    MR. NATHANS:  Your Honor, may the witness remove his

 3     mask?

 4                    THE COURT:  Was he tested this morning?

 5                    MR. NATHANS:  No, he was not.

 6                    THE COURT:  Then he may not.

 7                    MR. NATHANS:  Thank you, Your Honor.

 8                              DIRECT EXAMINATION

 9     BY MR. NATHANS:

10     Q.    Mr. Witt, good morning.

11     A.    Good morning.

12     Q.    Where are you currently employed?

13     A.    I'm employed at C-T Watch in McLean, Virginia.

14     Q.    Okay.  Where else have you been employed other than at

15     C-T Watch in Virginia?

16     A.    I retired from the FBI after 36 years.

17     Q.    And what was your role with the FBI?

18     A.    I was an FBI analyst.

19     Q.    Okay.  And what sort of cases did you work on when you

20     were in the FBI?

21     A.    Worked criminal, drugs, white collar, pretty much the

22     whole gamut.

23     Q.    How long have you been with C-T Watch?

24     A.    I have been with C-T Watch for approximately two years

25     under contract.  I am actually employed by a company called
```

1    Intellabridge as a senior intel analyst.

2    Q.    And what does Intellabridge do?

3    A.    Intellabridge provides government contractors to

4    federal agencies to provide assistance in their day-to-day

5    operations.

6    Q.    And what does C-T Watch do?

7    A.    C-T Watch is a 24/7, 365-day-a-year command center.

8    And our primary responsibility is to monitor and identify

9    potential threats throughout the United States and the world.

10   Q.    And what is your role at Intellabridge or C-T Watch?

11   A.    I'm an analyst and my job involves monitoring and

12   identifying those potential threats.

13   Q.    I want to direct your attention to September 8th, 2021.

14   Do you recall if you were working at Intellabridge that day?

15   A.    I was working at C-T Watch on behalf of Intellabridge,

16   yes, sir.

17   Q.    Okay.  And do you recall if you received any alerts

18   that day?

19   A.    I did.

20   Q.    All right.  Do you recall what alert you received that

21   day?

22   A.    I received many alerts that day during the course of my

23   responsibilities.  One in particular I do remember was a

24   threat received approximately 9:00 o'clock that morning from a

25   Twitter user, and that information was provided to us from a

1    cloud-based software program that we utilize to alert us of

2    threats that are posted on social media.

3    Q.    And do you recall what the alert was that was sent to

4    you?

5    A.    The alert was building a bomb.

6    Q.    Okay.  And do you remember who or what that building a

7    bomb was associated with, what social media platform?

8    A.    It was a Twitter page.

9    Q.    And do you recall what the profile for that Twitter

10   was?

11   A.    I believe the name of the user was @Ma1lus.

12   Q.    And after you received this alert from the @Ma1lus

13   Twitter profile or related to the Twitter profile, what did

14   you do next?

15   A.    The way that these cloud-based software is designed is,

16   not only does it provide us with the alert of the potential

17   threat, it also provides us with the URL address for that

18   particular Twitter account.  So I was able to access the

19   Twitter account by using the URL provided.  I was able to

20   review that Twitter page.

21   Q.    And do you need some sort of special program to access

22   Twitter?

23   A.    No, sir.

24   Q.    So how did you access Twitter?

25   A.    I was able to cut and paste the URL into a Google

1    search and was able to obtain the Twitter page that way.

2    Q.    So that was a publicly available Internet --

3    A.    Yes, sir.

4    Q.    Okay.  Where were you specifically when you accessed

5    the Twitter account?

6    A.    I was sitting at my desk at C-T Watch in McLean,

7    Virginia.

8    Q.    And what did you see when you accessed the @Ma1lus

9    profile on Twitter?

10   A.    I actually observed the Twitter post from which we had

11   received the alert.  Additionally, further review of the

12   Twitter page I was able to obtain another post that I felt was

13   threatening in nature.

14   Q.    And what was that?

15         MR. HALLETT:  Objection, Your Honor.

16         THE COURT:  Pardon me?

17         MR. HALLETT:  Objection.

18         THE COURT:  Basis?

19         MR. HALLETT:  Conclusion, expert.

20         THE COURT:  Overruled.  Please continue.

21   A.    The post I observed was, I am going to kill Jews with

22   my AR-15 tomorrow.

23   BY MR. NATHANS:

24   Q.    What did you do after reviewing those Tweets?

25   A.    Our standard protocol is to immediately obtain a

 1   snapshot of those posts.

 2   Q.    And what do you mean by obtain a snapshot?

 3   A.    I actually took a picture of those posts or took a

 4   snippet.

 5   Q.    Okay.

 6   A.    And saved those posts to a folder.  Because it's been

 7   our experience that there are -- there are cases where the

 8   Twitter post may have been taken down before we were actually

 9   able to get those posts, so it's standard protocol for us if

10   we can to take a snapshot of the post.

11   Q.    I want to show you what has been marked as Government's

12   Exhibit 1.

13           MR. NATHANS:  May I approach, Your Honor?

14           THE COURT:  You may.

15           MR. NATHANS:  Thank you.

16   BY MR. NATHANS:

17   Q.    Do you recognize this document?

18   A.    I do.

19   Q.    What is it?

20   A.    Those are the snapshots of the posts that I obtained

21   from the Twitter page.

22   Q.    Does this screenshot or snippet that you are holding

23   fairly and accurately depict the Tweets that you observed on

24   the @Ma1lus account on September 8th, 2021?

25   A.    Yes, sir.

1    Q.    Has this screenshot been altered in any way?

2    A.    No, sir.

3          MR. NATHANS:  Your Honor, I offer Government's

4    Exhibit 1 for the admission of evidence.

5          THE COURT:  Any objection?

6          MR. HALLETT:  Authentication, Your Honor.

7          THE COURT:  Authentication.

8          MR. NATHANS:  Your Honor, this is not a business

9    record.  This is merely a photograph that the defendant has

10   been able to authenticate as one that he took and has not been

11   altered.

12         THE COURT:  Exhibit 1 is admitted.

13         MR. NATHANS:  Thank you, Your Honor.  Could I have

14   Government No. 1 published, please?

15   BY MR. NATHANS:

16   Q.    After capturing the screenshots, what did you do?

17   A.    Once I captured the screenshots, it's standard practice

18   for us to confer with our watch commander to let him know that

19   we had discovered a potential threat on the social media page

20   and were going to take the next course of action, which would

21   be to submit the information to our National Threat Operations

22   Center through their portal.

23   Q.    How do you forward this threat to the National Threat

24   Operations Center?

25   A.    Their portal is designed for us to fill out a short

1    narrative of the events pertaining to the information that I

2    am submitting, which would be the snapshots obtained from the

3    Twitter account.  It also allows us to provide them with the

4    URL address for that account.  Once that information is

5    provided I hit submit, and it is forwarded to the National

6    Threat Operations Center for additional follow-up.

7    Q.    Do you forward every alert that you receive to NTOC?

8    A.    If it's a threat to life alert or one we deem to be a

9    threat to life.

10   Q.    So if it doesn't -- if you don't deem it to be a threat

11   to life you don't send it to NTOC?

12   A.    Their protocol is threat to life alerts are to be sent

13   directly to them.

14   Q.    And why did you forward this one?

15   A.    I forwarded this particular Tweet due to the fact it

16   specifically states, I'm going to kill Jews with my AR-15

17   tomorrow, which is a threat to life.

18   Q.    Thank you.

19            MR. NATHANS:  If I may have a moment, Your Honor?

20            THE COURT:  Yes.

21   BY MR. NATHANS:

22   Q.    You used the term URL.  Could you explain that to the

23   jury, what a URL is?

24   A.    That would be like you do a Google search and it would

25   usually start with HTTPS colon backslash backslash or maybe

1    HTTP colon backslash backslash.  It's the address that's

2    linked to the individual's account.  That's how they identify

3    them through their computer.

4              MR. NATHANS:  Thank you.

5              THE COURT:  Attorney Hallett?

6              MR. HALLETT:  Yes.

7                        CROSS-EXAMINATION

8    BY MR. HALLETT:

9    Q.    Good morning, Mr. Witt.

10   A.    Good morning, sir.

11   Q.    You indicated that you were able to locate the Tweet or

12   the Tweets in question by going on Google and entering the

13   URL?

14   A.    Yes, sir.

15   Q.    Okay.  And so you could do that -- you could access

16   that Twitter account only by accessing it using the URL,

17   correct?

18   A.    Using the information I had provided, yes, sir.

19   Q.    So that Twitter -- that Tweet wasn't just popping up on

20   your screen.

21   A.    I received the alert.

22   Q.    I understand that.  But then you had to go find the

23   account.

24   A.    Yes, sir.

25   Q.    Okay.  Do you know what time it was that you took those

1    screenshots?

2    A.    Approximately 9:08 in the morning on September the 8th.

3    Q.    And the reason you took screenshots was because you

4    know from past experience that Twitter will frequently take

5    down or remove a -- a threat, right?

6    A.    On occasion.

7    Q.    Excuse me?

8    A.    On occasion.

9    Q.    Okay.  Well, it's your policy to take a screenshot

10   because of that.

11   A.    Yes, sir.

12   Q.    Is that for all social media?

13   A.    I'm sorry, I did not understand.

14   Q.    Is that for all social media, not just Twitter?

15   A.    Any social media where we deem there's a credible

16   threat, yes, sir.

17   Q.    What social media is observed by this software?

18   A.    All social media is observed.

19   Q.    And all accounts are observed in social media?

20   A.    Sir, I'm not an expert in that area.  I can only tell

21   you that we receive alerts from social media posts whether

22   they be Twitter, Facebook, or other social media.

23   Q.    Okay.  And you receive a lot of those alerts, right?

24   A.    We receive a lot of alerts, yes, sir.

25   Q.    You received a lot of alerts that day, right?

1    A.    Sir, I don't remember.  On any given day we could

2    receive 300, 400, depends on what may be taking place that

3    particular day.

4    Q.    Okay.  And how does it happen that a -- when you say

5    you were alerted, what is that -- how does that happen?  What

6    is the actual thing that you get alerted to?

7    A.    The alerts are designed to be sent to us based on key

8    words, based on algorithms, shooting, gun, bomb, things of

9    that nature.

10   Q.    Okay.  And so you were alerted to --

11         MR. HALLETT:  We can put up Government 1 again --

12   Teagan, could you switch it to defense?  Thank you.

13   BY MR. HALLETT:

14   Q.    So you were alerted to, as you see it on the screen

15   there, building a pipe bomb, right?

16   A.    Yes, sir.

17   Q.    And once you receive -- do you receive an alert each

18   time they look and find a threat?

19   A.    Do we receive an alert each time there's a specific

20   threat?

21   Q.    Okay.

22   A.    Based on one of those key words?

23   Q.    Okay.

24   A.    Yes, sir, we will receive an alert based on the threat

25   using those key words, and there are many other key words that

1    are in the algorithm.  I just mentioned a few.

2    Q.    Right.  So there are all sorts of words in the

3    algorithm that are designed to ferret out any type of real --

4    of a threat, right?

5    A.    Any alert that is deemed to be a threat, they will

6    forward that information to us.

7    Q.    Okay.  And you received one alert that day.

8    A.    I received the initial alert, yes, sir.

9          MR. HALLETT:  Nothing further, thank you.

10         THE COURT:  Thank you.  Attorney Nathans?

11         MR. NATHANS:  Nothing further, Your Honor.  Thank

12   you.

13         THE COURT:  Thank you.  Mr. Witt, thank you.  You

14   can step down.

15         THE WITNESS:  Thank you.

16         MR. NATHANS:  Your Honor, may this witness be

17   excused finally?

18         THE COURT:  I can't hear you.

19         MR. NATHANS:  May this witness be excused finally?

20         THE COURT:  Any objection?

21         MR. HALLETT:  No objection.

22         THE COURT:  Thank you, yes, Mr. Witt may be excused.

23   Thank you.

24         MR. WOLFF:  Your Honor, may we confer with the Court

25   via sidebar?

```
 1              THE COURT:  Yes.

 2                        (Sidebar)

 3              THE COURT:  All right, can everyone hear me?

 4              MR. WOLFF:  Yes, Your Honor.

 5              THE COURT:  Please proceed.

 6              MR. WOLFF:  Thank you, Your Honor.  Your Honor, the

 7    parties have entered into three different stipulations in this

 8    case, and one of them is a stipulation as to the admissibility

 9    of certain business records.  Two of those exhibits are going

10    to be discussed during the testimony of Ms. Holt, who's the

11    next witness.  I thought this would be the appropriate time to

12    bring the stipulation to the attention of the Court.  I don't

13    believe, unless Mr. Hallett feels differently, that it's a

14    stipulation that needs to be read to the jury.  It really goes

15    to the admissibility and the Court's decision on the

16    admissibility of evidence.  So at this time if I may read the

17    stipulation to the Court?

18              THE COURT:  Yes, please.

19              MR. WOLFF:  It states that the parties stipulate

20    that Exhibits 4, 5, and 6 are true and correct copies of

21    records produced by custodians of records of Twitter, Charter

22    Communications, and TextMe respectively and are admissible

23    business records as defined in Federal Rule of Evidence

24    803(6).  The defendant reserves the right to present any

25    objection to the admission of these exhibits other than a
```

1       hearsay objection under Rule 803(6) or an authentication

2       objection under Rule 902(11), and it's signed by myself and by

3       Mr. Hallett, and it's been marked as Government Exhibit

4       No. 49, Your Honor.

5               THE COURT:  Mr. Hallett, is that your client's

6       stipulation?

7               MR. HALLETT:  Yes, it is, Your Honor.

8               THE COURT:  Do you anticipate having other

9       objections to 4, 5, and 6?

10              MR. HALLETT:  I really don't, no, thank you.

11              THE COURT:  So can we deem them admitted at this

12      time?

13              MR. HALLETT:  4 is fine, Your Honor.  5 is fine,

14      Your Honor.  6 is fine, Your Honor.

15              THE COURT:  All right, 4, 5, and 6 are admitted

16      without objection.  Anything else?

17              MR. WOLFF:  No, Your Honor.

18              THE COURT:  All right, thank you.  Please call your

19      witness.

20                           (Open court)

21              MR. NATHANS:  Your Honor, the Government calls

22      Jordan Holt.

23              THE COURT:  Stand by the witness chair, please.

24      Remain standing and raise your right hand.

25              THE CLERK:  Do you solemnly swear that the testimony

1    you shall give in the cause now in hearing shall be the truth,

2    the whole truth, and nothing but the truth, so help you God?

3              THE WITNESS:  Yes.

4              THE CLERK:  Please be seated.  Please state and

5    spell your first and last name for the record.

6              THE WITNESS:  Jordan Holt, J-O-R-D-A-N, last name

7    H-O-L-T.

8              MR. NATHANS:  May I proceed?

9              THE COURT:  Please proceed.

10             MR. NATHANS:  Thank you, Your Honor.

11                      DIRECT EXAMINATION

12   BY MR. NATHANS:

13   Q.    Ms. Holt, good morning.

14   A.    Hi.

15   Q.    How are you currently employed?

16   A.    I'm with the FBI.

17   Q.    And where do you work with the FBI?

18   A.    Clarksburg, West Virginia.

19   Q.    And do you have a specific division you work in with

20   the FBI?

21   A.    I am with the social media exploitation team with the

22   National Threat Operations Center.

23   Q.    Is that also known as NTOC?

24   A.    Yes.

25   Q.    Okay.  How long have you been working at NTOC?

1    A.    For three years.

2    Q.    What is your current position with NTOC?

3    A.    I am an intake research specialist.

4    Q.    What does an intake research specialist do?

5    A.    So on the social media team we review threats that have

6    happened online and we identify and locate the subject.

7    Q.    Have you always been an intake research specialist at

8    NTOC?

9    A.    No.  I used to be a threat intake examiner, and I took

10   phone calls from the public.

11   Q.    What's the difference between a research specialist and

12   a threat intake examiner, if you could explain that to the

13   jury?

14   A.    With the intake research specialist job we have extra

15   online training with social media companies.

16   Q.    Can you describe some of the training that you received

17   when you became a threat intake examiner?

18   A.    So it was open source training.  We reviewed

19   what social media companies have what type of profiles, and

20   from there we just figure out like what a user name is, what

21   an IP address is, and the basics.

22   Q.    How long was this training?

23   A.    For the threat intake examiner?

24   Q.    Yes.

25   A.    It was about 60 days.

1    Q.    And as a research specialist did you have additional

2    training?

3    A.    Yes, we had two weeks for open source training.

4    Q.    What job did you have at NTOC in September of 2021?

5    A.    I was a threat intake examiner, but I was still on the

6    social media exploitation team.

7    Q.    Can you describe for the jury what a typical day for

8    you would look like at NTOC as an intake research specialist

9    in 2021?

10   A.    We have an online portal where anyone from the public

11   can submit online tips to us, and so from there we will just

12   see if there's a transaction in the bucket to work.  And if

13   there isn't then we review the regular tips from the public.

14   Q.    When you say bucket, what do you mean by that?

15   A.    It's just a queue that says whether or not there's a

16   transaction for us to review.

17   Q.    I want to draw your attention to September 8th of 2021.

18   Do you remember if you were working on any eTip referrals that

19   day?

20   A.    Yes, I was.

21   Q.    Do you remember any specific threats that you received

22   or tips that you received about bombs?

23   A.    Yes.

24   Q.    Okay.  Do you remember about what time you received

25   that referral?

1    A.     I do not.

2    Q.     Do you remember what that threat involved?

3    A.     Yes, it was a threat on Twitter about building a pipe

4    bomb and shooting Jewish individuals with an AR-15.

5    Q.     And do you know what social media platform that was on?

6    A.     It was on Twitter.

7    Q.     Where did you receive that threat from?

8    A.     On our online website.

9    Q.     After reviewing this tip, what did you do next?

10   A.     After reviewing this tip I went to the Twitter profile

11   to see if the threats were still there, and I went through the

12   posts online to see if I could identify the individual that

13   posted them.

14   Q.     How were you able to access this profile?

15   A.     I just went to Twitter.com and then put a slash

16   followed by the user name.

17   Q.     And what was the user name that you were searching?

18   A.     M-A-1-L-U-S.

19   Q.     And once you located the @Ma1lus profile, is that

20   correct, what did you do?

21   A.     I just went through the profile to see if I could find

22   the original threat that was reported to us and see if there

23   were any additional threats or any indicators of who or where

24   this person was.

25   Q.     Did you find any indicators of additional threats?

1   A.     I did see a picture of an individual holding an AR-15.

2   Q.     Did you find any -- I think you said biological

3   information that you were looking for?

4   A.     No, I could not.

5   Q.     Okay.  Any other identifying information related to the

6   @Ma1lus profile?

7   A.     No.

8   Q.     Okay.  You said that you had found additional

9   information on the @Ma1lus profile.  Were there additional

10  posts that you were able to observe?

11  A.     There were additional posts, but the only other

12  threatening one I could find was the one with the picture of

13  the gun.

14  Q.     What else did you see on this profile?

15  A.     Not a lot.  There was just a cartoon character profile

16  picture.

17  Q.     After you observed this profile, what did you do next?

18  A.     So since I could not find any identifiers on the

19  individual, I submitted a preservation letter to Twitter so

20  that the information could not be deleted, and I also

21  submitted a voluntary emergency disclosure request to obtain

22  basic subscriber information, such as a name, telephone

23  number, e-mail address, and IP logs.

24  Q.     Did you do anything to the account itself for

25  preservation?

1    A.    I took a few screenshots.

2    Q.    Okay.  I want to show you what's been marked previously

3  as Government Exhibit 2 and Government Exhibit 3.

4         MR. NATHANS:  Your Honor, if I may approach?

5         THE COURT:  You may.

6         MR. NATHANS:  Thank you.

7  BY MR. NATHANS:

8    Q.    Do you recognize Government's Exhibit 2 and

9  Government's Exhibit 3?

10    A.    Yes.

11    Q.    How are you able to do so?

12    A.    Because these are the screenshots I took of the

13  profile.

14    Q.    So when you say screenshots, do you mean -- are these

15  pictures?

16    A.    Yes.

17    Q.    Okay.  Do these screenshots fairly and accurately

18  depict the profile you observed on September 8th, 2021?

19    A.    Yes.

20    Q.    Have they been altered in any way?

21    A.    No.

22         MR. NATHANS:  Your Honor, I move for the admission

23  into evidence Government's Exhibits 2 and 3.

24         MR. HALLETT:  Your Honor, same objection,

25  authentication, based on the account has not been

1    authenticated.

2           THE COURT:  The objection's overruled, so the

3    Government's 2 and 3 are admitted.

4           MR. NATHANS:  Thank you, Your Honor.  Your Honor, I

5    would ask Government Exhibit 2 to be published to the jury.

6           THE COURT:  Please do.

7    BY MR. NATHANS:

8    Q.    Ms. Holt, can you see Government's Exhibit 2 up there

9    on the screen?

10   A.    Yes.

11   Q.    Okay.  What's the -- where is the profile name?

12   A.    It is underneath the profile picture.

13   Q.    And what is it?

14   A.    @Ma1lus.

15   Q.    And is there a date on there?

16   A.    Yes, it says that the account was created on August

17   2021.

18   Q.    And there's -- there's other information on there about

19   following and followers.  Do you know what that is?

20   A.    So following is how many people follow this Twitter

21   profile and -- I'm sorry, following is how many they follow

22   and the followers are how many follow them.

23          MR. NATHANS:  I would ask the Court to publish

24   Government's Exhibit No. 3, Your Honor.

25          THE COURT:  Please do.

1    BY MR. NATHANS:

2    Q.    And what are we looking at here?

3    A.    This is the additional post that I found on the

4    profile.

5    Q.    And do you know who posted this?

6    A.    The @Ma1lus Twitter profile posted it.

7            MR. NATHANS:  You can take that down.

8    BY MR. NATHANS:

9    Q.    Other than the Twitter profile for @Ma1lus, did you

10   look anywhere else for information about the user of that

11   profile?

12   A.    I tried to search the user name in other social media

13   buckets, but I could not find any additional information.

14   Q.    So I think earlier you testified that you sent off a

15   preservation letter to Twitter; is that correct?

16   A.    Yes.

17   Q.    Why did you do that?

18   A.    Just so that if the account was deleted they would

19   still retain all the records.

20   Q.    And how did you go about sending that request off to

21   Twitter?

22   A.    Twitter has an online portal that law enforcement can

23   use to submit the request.

24   Q.    Did you send any other requests to Twitter?

25   A.    Yes, a voluntary emergency disclosure request.

1    Q.    And what is that?

2    A.    So a voluntary emergency disclosure request is so that

3    if there is a threat or an immediate danger a company can

4    provide basic subscriber information.

5    Q.    And what is basic subscriber information?

6    A.    Name, telephone number, e-mail address, and IP logs.

7    Q.    What are IP logs?

8    A.    An IP log is the Internet access that your computer,

9    your phone can access.

10   Q.    And what does it tell you?

11   A.    It'll say who the Internet company is providing the

12   information to, like a residential home.

13   Q.    So like location?

14   A.    Yes.

15   Q.    Okay.  Did you receive any information from Twitter in

16   response to your emergency disclosure request?

17   A.    Yes.

18   Q.    Okay.  I want to show you what's been marked as

19   Government's Exhibit 4.

20        MR. NATHANS:  Your Honor, I believe this has already

21   been admitted.

22        THE COURT:  Four has been admitted.

23   Attorney Nathans, I'm advised that the witness was

24   tested and tested negative.  She can remove her mask if you'd

25   like.

1          MR. NATHANS:  Thank you, Your Honor.  May I

2    approach?

3          THE COURT:  You may.

4          MR. NATHANS:  Thank you.  If we could publish

5    Exhibit No. 4, Government's Exhibit 4.

6    BY MR. NATHANS:

7    Q.   Looking at Government's Exhibit 4, Page 1, what do we

8    see here at the top of this page?

9    A.   So this page has the creation date that the Twitter

10   account was made, as well as the e-mail address that was used.

11   Q.   What's the creation date?

12   A.   8/26 of 2021.

13   Q.   And what was the e-mail associated with that?

14   A.   Wernersbad@Gmail.com.

15   Q.   And is there any other information about the account

16   itself?

17   A.   I do have the account ID at the very top and the user

18   name down at the bottom.

19   Q.   And what is the user name?

20   A.   @Ma1lus followed by an emoji.

21   Q.   And is user name different than account display name?

22   A.   Yes.

23   Q.   Why is that?

24   A.   The account display name you can enter different emojis

25   and characters, but the user name you have to use regular

1    characters.

2    Q.    Turning to Page 2 of Government's Exhibit No. 4.

3    Again, what are we looking at here?

4    A.    This is the IP address that was accessed whenever the

5    Twitter account was created.

6    Q.    And where do you see the IP address on this callout

7    here?

8    A.    At the very bottom.

9    Q.    And could you read that off?

10   A.    74.78.139.48.

11   Q.    And how do you know that this is the IP address that

12   was used or that -- that was used the day that the account was

13   created?

14   A.    Because it says user creation IP.

15   Q.    Turning to Page 3 of Government's Exhibit No. 4, the

16   top portion.  What are we looking at here?

17   A.    This was the most recent IP address that was accessed

18   by the Twitter account whenever the voluntary EDR was made.

19   Q.    And how do you know that?

20   A.    From the date.

21   Q.    And what's the date on that creation?

22   A.    9/8 of 2021.

23   Q.    And is that the same login that was used to create the

24   ID?

25   A.    Yes.

1   Q.   And there is what appears to be some sort of time stamp

2  after the created at date.  What is that?

3  A.   14:31:27 Zulu Time.

4  Q.   Can you explain Zulu Time?

5  A.   Zulu Time is just a standard time that most companies

6  use so that they don't have to break it off into Eastern

7  Standard Time or Mountain Standard Time.

8  Q.   So is it different than Eastern Standard Time or

9  Mountain Standard Time?

10  A.   Yes.

11  Q.   On that same page, the next box down, what are we

12  looking at here?

13  A.   A previous IP address that was accessed by the Twitter

14  account.

15  Q.   And is that the same one that was mentioned before that

16  had created the account?

17  A.   Yes.

18  Q.   And what is the created at?  Is there a different date

19  or is this the same date?

20  A.   Same date but a different time.

21  Q.   Okay.  And if we go down to the next box on that same

22  page, what are we looking at here?

23  A.   Another previous IP address that was accessed by the

24  Twitter account.

25  Q.   And is this the same IP address that was used to create

1    the account?

2    A.    No.

3    Q.    Okay.  What does that mean to you?

4    A.    That they were in a different location, accessing a

5    different wifi or Internet whenever they got onto Twitter.

6    Q.    So somebody could access the same Twitter account just

7    from a different location?

8    A.    Yes.

9    Q.    Okay.  And what's the date on that as well?

10   A.    This is 9/8 of 2021.

11   Q.    Turning to Page 4 of Government's Exhibit No. 4, second

12   box we have -- what do we have here?

13   A.    Another previous IP address accessed.

14   Q.    Is this a third different IP address?

15   A.    Yes.

16   Q.    Okay.  And turning to Page 5, what are we looking at

17   here?

18   A.    This is the telephone number that is associated with

19   the Twitter profile.

20   Q.    And how do you know that?

21   A.    Because it says phone number.

22   Q.    Okay.  And what does device above it mean to you, if

23   anything?

24   A.    That it's a mobile device.

25   Q.    Okay.  After reviewing the information from Twitter,

1   what did you do next?

2   A.    I tried to perform open source queries to identify

3   where and who the subject was again.

4   Q.    And how did you do that?

5   A.    I went through the telephone number and I had a few

6   results, but I couldn't pin it down to exactly who it was.  So

7   from there I submitted another emergency disclosure request

8   for the IP address.

9   Q.    Which IP address?

10  A.    The most recent one.

11  Q.    Is that the same one that was used to create the

12  account?

13  A.    Yes.

14  Q.    Okay.  How were you able to determine what the Internet

15  service provider for that IP address was?

16  A.    There is an open source website that anyone can use

17  called whatismyipaddress.com.

18  Q.    So you've used this term open source a couple times.

19  What does that mean?

20  A.    It just means that it's something that's open for the

21  public, anyone can access it.

22  Q.    So you don't need to be -- have special FBI credentials

23  to go to this?

24  A.    No.

25  Q.    Okay.  I want to show you Government's Exhibit No. 5,

1    and I believe that's already been admitted.  Could we publish

2    that, please?  What are we looking at here?

3    A.    This is the subscriber information that I received from

4    the Internet company.

5    Q.    And was that Charter Communications?

6    A.    Yes.

7    Q.    Okay.  And what information did you submit to Charter

8    to receive this information back?

9    A.    I submitted to them that there was a threat posted on

10   Twitter and the IP address that was accessed, as well as the

11   date and time with that IP.

12   Q.    And what information did you learn as a result of

13   providing them with the IP address?

14   A.    They provided me the name and the residential address.

15   Q.    And who is the name of the individual associated with

16   this IP address?

17   A.    Florice Dennison.

18   Q.    And what was the address?

19   A.    86 Fogg Road, Buxton, Maine.

20   Q.    And did that mean anything to you?

21   A.    Just gave me a name and a location.

22   Q.    And did it mean anything to you with respect to the --

23   the @Ma1lus account?

24   A.    Just that they were more than likely at that residence

25   whenever they were on their account.

1    Q.    Meaning their -- person that created the @Ma1lus

2    account was at that residence?

3    A.    Yes.

4    Q.    After you received the information from Charter, what

5    did you do next?

6    A.    After receiving this information, I ran queries to make

7    sure that the individual was still at that address, and then I

8    drafted a report and sent it off to the field office

9    responsible.

10   Q.    Does that report have a specific name?

11   A.    Yes, it's called a Guardian.

12   Q.    What's a Guardian?

13   A.    It's basically just a write-up explaining to whatever

14   agent is investigating the situation.

15   Q.    And along with this write-up did you send any other

16   additional information?

17   A.    Yes, I sent an e-mail notifying them that they had a

18   Guardian headed their way, and I also called their field

19   office.

20   Q.    Okay.  Did you attach any documents with your Guardian?

21   A.    Yes, I attached the screenshots and the subscriber

22   information.

23   Q.    And when you say screenshots, what do you mean by that?

24   A.    The pictures I took of the Twitter profile.

25   Q.    Okay.  And did you -- did you see any of the Tweets

1    that had been posted on that @Ma1lus profile that had

2    triggered the initial alert?

3    A.    Yes.

4    Q.    Okay.  And were those forwarded as well?

5    A.    Yes.

6    Q.    As part of the Guardian?

7    A.    Yes.

8    Q.    Okay.  And you said you sent it off to the field

9    office.  What does that mean?

10   A.    The field office is just a headquarters, basically, for

11   a state that will handle the transaction.

12   Q.    And where did you send this Guardian off to?

13   A.    This one went to Boston.

14   Q.    Why did you send the Guardian to the Boston office?

15   A.    It was the closest one for that area of responsibility.

16   Not every state has its own field office.

17   Q.    Do all tips, inquiries, require you to send an

18   emergency disclosure request?

19   A.    No.

20   Q.    Which ones do?

21   A.    The ones that prove a threat or imminent danger where

22   we cannot identify the individual.

23   Q.    Have you ever sent an emergency disclosure request to a

24   company and been denied?

25   A.    Yes, all the time.

1    Q.    Who decides if a company will respond to the emergency

2    disclosure request for information?

3    A.    The company itself.

4            THE COURT:  One moment.

5            MR. HALLETT:  Objection, hearsay.  We're delving

6    into people we don't know about who are making decisions, and

7    I think that's beyond the --

8            THE COURT:  Attorney Nathans?

9            MR. NATHANS:  If she has personal knowledge as to

10   who is denying her request, I think it's appropriate and

11   relevant.

12           THE COURT:  It seems to me the question is

13   specifically you asked who would respond to the emergency

14   disclosure request, not a statement; is that correct?  Does

15   she know who will respond; is that what you're asking?

16           MR. NATHANS:  I asked who decides if a company will

17   respond.

18           THE COURT:  The objection is overruled.  You can

19   respond.

20   A.    The company itself determines whether or not they're

21   going to provide subscriber information.

22   BY MR. NATHANS:

23   Q.    If the emergency disclosure request is denied by the

24   company, what do you do then?

25   A.    If it is denied and I don't know where or who the

1    subject is, then the information gets submitted to wherever

2    the company is headquartered out of.

3    Q.    In this case, since it involved Twitter, if you had not

4    received an emergency disclosure request that provided

5    information, where would you have referred it to?

6    A.    It would have gone to San Francisco.

7    Q.    And why is that?

8    A.    Because that's where Twitter is headquartered out of.

9    Q.    Was there anything about the specific threat that had

10   been forwarded to you that made you believe that an emergency

11   disclosure request was appropriate?

12   A.    Yes, they said that they were going to kill Jewish

13   individuals and they also stated tomorrow.

14   Q.    I want to turn your attention back to the Guardian that

15   you submitted to the Boston field office.  After you submitted

16   it, what did you do next?

17   A.    After I submitted the Guardian to the Boston field

18   office I called them and notified them that the report was on

19   its way, and then I also sent a follow-up e-mail.

20   Q.    And why did you do that?

21   A.    Just so that they knew to look out for it and it would

22   not get overlooked.

23   Q.    Do you do that in every circumstance?

24   A.    Only with threat to life Guardians.

25   Q.    After you've made that phone call and sent the e-mail,

1    what's your responsibility to this after that?

2    A.    I let a supervisor know so that they can officially

3    send it out, but then I don't have any interaction with it.

4              MR. NATHANS:  If I may have a moment, Your Honor.

5              THE COURT:  You may.

6    BY MR. NATHANS:

7    Q.    When an individual posts a Tweet on Twitter, are they

8    necessarily using the Internet to do so?

9    A.    Yes.

10             MR. NATHANS:  Thank you.  Nothing further.

11             THE COURT:  Thank you.  Attorney Hallett?

12             MR. HALLETT:  Yes, thank you, Your Honor.

13                         CROSS-EXAMINATION

14   BY MR. HALLETT:

15   Q.    Good morning, Ms. Holt.

16   A.    Good morning.

17   Q.    As I understand it, you received a tip from Frederick

18   Witt; is that correct?

19   A.    Yes.

20   Q.    And that was the eTip you referred to?

21   A.    Yes.

22   Q.    The eTip is available to the public; is it not?

23   A.    Anyone can submit a tip to the FBI, yes.

24   Q.    Okay.  And there's a specific website where you can go

25   on and if you're offended by anything or you think a crime has

1    been committed you can report it to the FBI; is that right?

2    A.    Yes.

3    Q.    You didn't receive any tips from the public that they

4    were offended by this specific Tweet; did you?

5    A.    No.

6    Q.    So it was through Mr. Witt, and did Mr. Witt send you

7    the screenshots he had taken?

8    A.    He put it to the website that we access.

9    Q.    And then you went online, correct?

10   A.    Yes.

11   Q.    And you searched out this account, right?

12   A.    Yes.

13   Q.    And this account would not pop up on your screen, your

14   Twitter screen, for example, unless you searched it out,

15   right?

16   A.    Yes.

17   Q.    And so you entered in @Ma1lus on Twitter?

18   A.    Twitter.com/Ma1lus.

19   Q.    And up popped his account.

20   A.    Yes.

21   Q.    And the two Tweets that we've been talking about were

22   not there, right?

23   A.    Yes, they had been deleted.

24   Q.    And did it say deleted?

25   A.    No, they just didn't appear.

1   Q.    But you knew they had been deleted.

2   A.    From past experience, yes.

3   Q.    And your past experience suggests that Twitter deletes

4   violent Tweets, right?

5   A.    I don't know if Twitter deleted it or if they deleted

6   it.

7   Q.    So either Twitter could do it or the user could do it,

8   right?

9   A.    Usually if Twitter deletes a Tweet it says that the

10  Tweet has violated their terms.

11  Q.    Okay.  So it might be that the user had deleted it in

12  this case?

13  A.    Correct.

14  Q.    And you understand that Twitter has a hateful conduct

15  policy, right?

16  A.    Yes.

17  Q.    And that that policy, if they were to find conduct

18  hateful, would then notify the person that issued the Tweet?

19  A.    I don't know how their system works.

20  Q.    But what you do know is that the Tweets had been

21  deleted by the time you looked on the account.

22  A.    Yes.

23  Q.    And that was at approximately 9:46 in the morning.

24  A.    Yes.

25  Q.    Now, you indicated -- if we could have Government

1     Exhibit 1 put up again -- strike that.

2           If we could have the Government's Exhibit 3 put up,

3     please.  And this is the screenshot that you -- one of the

4     screenshots you took, right?

5     A.    Yes.

6     Q.    And if you look at it, I think you indicated -- excuse

7     me, I apologize.  I believe it's Government's Exhibit 2.  So

8     if we go to 2, what is this again?

9     A.    This is the Twitter profile itself.

10    Q.    Okay.  And that's the one dated August of 2021, which

11    means that's when this @Ma1lus joined Twitter, right, got an

12    account?

13    A.    Yes.

14    Q.    And then that account has been following 226 accounts,

15    right?

16    A.    Yes.

17    Q.    And then that account as of the time you took this

18    screenshot was 172 followers; is that right?

19    A.    Yes.

20    Q.    Does that go up and down?

21    A.    Depending, yes.

22    Q.    All right.  So it could be fewer earlier or more, you

23    just don't know.

24    A.    Yes.

25    Q.    That's that moment in time when you took that

 1   screenshot.

 2   A.     Correct.

 3   Q.     That's a very small number of followers; would you

 4   agree?

 5   A.     Yes.

 6   Q.     I mean, Twitter accounts number into the millions,

 7   right, followers?

 8   A.     Sometimes.

 9   Q.     Those are celebrities, the like?

10   A.     Yes.

11   Q.     And then other accounts -- so it -- they all vary,

12   right, but this is at the lowest end of the range, right?

13   A.     I mean, I've seen accounts with zero followers.

14   Q.     Okay.  But this is certainly at the lower end of the

15   range.

16   A.     Yes.

17   Q.     You were going through Zulu Time and you lost me.

18   What's the time difference between Zulu Time and Eastern

19   Standard Time?

20   A.     I'm not exactly sure.

21   Q.     All right.

22          MR. HALLETT:  Thank you very much.  Nothing further.

23          THE COURT:  Thank you.  Attorney Nathans?

24          MR. NATHANS:  Nothing further, Your Honor.

25          THE COURT:  All right.

```
 1              MR. NATHANS:  May this witness be finally excused?

 2              THE COURT:  Any objection to the witness being

 3    excused?

 4              MR. HALLETT:  No objection, Your Honor.

 5              THE COURT:  Thank you very much, you can step down.

 6    You are excused.

 7              MR. WOLFF:  Your Honor, the Government calls

 8    Jonathan Duquette, and I wonder -- while Mr. Duquette is

 9    coming to the courtroom I wonder if we could confer with the

10    Court via sidebar.

11              THE COURT:  Yes.

12                          (Sidebar)

13              THE COURT:  Is everyone on?  Attorney Hallett?

14              MR. HALLETT:  Yes.

15              THE COURT:  Okay.  Please proceed.

16              MR. WOLFF:  Your Honor, this is the witness who will

17    be introducing photographs and then also physical evidence of

18    ammunition and the rifle.  I just wanted to give Mr. Hallett

19    the opportunity whether he's going to ask for any sort of

20    limiting instruction or cautionary instruction.  Rather than

21    doing it in the middle of the testimony I wanted to flag the

22    issue for the Court and for Mr. Hallett prior to starting the

23    examination.

24              MR. HALLETT:  I think, Judge, you had indicated

25    earlier that you were reserving ruling with respect to the
```

```
 1    introduction of the gun following October '21 and the proffer
 2    agreement with respect to that.  I do want to be heard on the
 3    proffer itself, and so I will present that now to you if you
 4    like, Your Honor.
 5              THE COURT:  Please do.
 6              MR. HALLETT:  Should -- it might take a bit.  I'd
 7    like to give you the documents so maybe we ought to break for
 8    a morning break.
 9              THE COURT:  One moment.  Attorney Wolff, I'd like to
10    take the break -- morning break at 10:30.  That's about 20
11    minutes.  Can you use this witness -- have this witness
12    testify to other matters other than the guns so we can then
13    reserve argument for during the morning break?
14              MR. WOLFF:  There are other aspects of his
15    examination that could probably get us to the 10:30 break,
16    Your Honor, yes.
17              THE COURT:  That's my question.
18              MR. WOLFF:  Yes.
19              THE COURT:  That's not prejudicial to the
20    Government?
21              MR. WOLFF:  It's not.
22              THE COURT:  Let's do it in that fashion, then.
23    We'll take that up as soon as the jury is excused for the
24    10:30 break.
25              MR. WOLFF:  Thank you.
```

```
 1                         (Open court)
 2              THE CLERK:  Please raise your right hand.  Do you
 3    solemnly swear that the testimony you shall give in the cause
 4    now in hearing shall be the truth, the whole truth, and
 5    nothing but the truth, so help you God?
 6              THE WITNESS:  I do.
 7              THE CLERK:  Please be seated.  Please state and
 8    spell your first and last name for the record.
 9              THE WITNESS:  Jonathan Duquette, J-O-N-A-T-H-A-N,
10    Duquette, D-U-Q-U-E-T-T-E.
11              MR. WOLFF:  May I proceed, Your Honor?
12              THE COURT:  Please proceed.
13              MR. WOLFF:  Thank you.
14                       DIRECT EXAMINATION
15    BY MR. WOLFF:
16    Q.    Good morning.
17    A.    Good morning.
18    Q.    Could you start off by telling us where you work,
19    please?
20    A.    I'm employed by the U.S. Border Patrol and assigned to
21    the FBI task force here in Portland.
22    Q.    Let's start with the Border Patrol.  How long have you
23    been with U.S. Border Patrol?
24    A.    Since December 2009.
25    Q.    What position do you currently hold with the Border
```

1    Patrol?

2    A.    Border Patrol agent, intelligence.

3    Q.    You are currently assigned to the FBI; is that correct?

4    A.    That's correct.

5    Q.    And in what capacity?

6    A.    As a task force officer.

7    Q.    And how long have you been a task force officer with

8    the FBI?

9    A.    Initially since June of 2015 in a different division,

10   in Boston division since January of 2018.

11   Q.    Can you give us a sense of what your duties are as a

12   task force officer?

13   A.    As a task force officer I'm treated as a case hearing

14   agent, no restrictions.  Essentially I just -- my supervisor

15   treats me as if I'm an FBI agent.

16   Q.    So you investigate possible criminal violations?

17   A.    Yes.

18   Q.    And have you been involved in the case that brought us

19   to court here today?

20   A.    I have.

21   Q.    Did -- at some point did you become aware of the Tweets

22   that made their way from -- from the NTOC to FBI Boston?

23   A.    I was.

24   Q.    How did you become aware of that information?

25   A.    So I was -- I was alerted by my supervisor that the

1    Guardian in question had been assigned to me between --

2    sometime after 2:00 p.m. on September 8th.

3    Q.    And were you assigned to be the agent to work the

4    investigation from that point forward?

5    A.    I was.

6    Q.    Did you review the Guardian information that had been

7    provided by NTOC?

8    A.    I did, yes.

9    Q.    And did that include the -- the screenshots of the

10    actual Tweets themselves?

11    A.    Yes.

12    Q.    Did you also review the subscriber information that had

13    been obtained from Twitter which has been admitted as

14    Government Exhibit No. 4?

15    A.    I did, yes.

16    Q.    I'm going to put up actually -- yeah, if I may, put up

17    on the screen Exhibit No. 4.  Thank you very much.

18          So, Mr. Duquette, I'm turning to Page 5 of

19    Exhibit No. 4, and we've heard previously that the phone

20    number associated with the Twitter account in question was

21    this 508 number that you see on the screen; is that correct?

22    A.    Yes.

23    Q.    Did you learn through your investigation what company

24    that phone number was assigned to?

25    A.    I did.

1    Q.    And what company was that?

2    A.    TextMe.

3    Q.    And what sort of -- what sort of service does TextMe

4    provide?

5    A.    TextMe allows a user to obtain a number that's assigned

6    by TextMe.  It's a way to obtain an additional telephone

7    number for a device where you can text and call.

8    Q.    Did you -- finding that out about this 508 number, that

9    it was assigned to TextMe, did you attempt to obtain

10   information from TextMe?

11   A.    We did, yes.

12   Q.    And who made the initial request for information from

13   TextMe?

14   A.    So I had originally obtained the information and I -- I

15   was on the road towards Buxton, so I asked one of my fellow

16   task force officers to assist.

17   Q.    Now, you said you were already on your -- on the way to

18   Buxton.  Based on what information were you heading to Buxton

19   at that time?

20   A.    From the information that had been provided by Charter

21   in the emergency disclosure that -- the address of 86 Fogg

22   Road and the subscriber of Miss Dennison.

23   Q.    What was your intent in going to 86 Fogg Road at that

24   time?

25   A.    Logical investigation and that was to try to interview

1    the -- somebody at the residence.

2    Q.    Now, at what point did you -- so your colleague

3    Mr. Borges asked for information from TextMe; is that correct?

4    A.    Correct.

5    Q.    And at what point in your travels did you obtain that

6    information?

7    A.    Mr. Borges e-mailed it to me at a later date that day,

8    but I didn't really -- I didn't -- I didn't receive the

9    records, read the records, until approximately 6:00 p.m.

10   Q.    Okay.  So I'll ask -- we'll sort of keep going in

11   sequence and I'll ask what you did next and then we can talk

12   about the TextMe information.

13            At what time, approximately, did you get to 86 Fogg

14   Road in Buxton on the 8th of September?

15   A.    Sometime between 4:00 and 4:30 p.m., I believe.

16   Q.    And was there anybody at the home when you got there?

17   A.    So as myself and another FBI agent parked,

18   Mrs. Dennison, the -- one of the owners of the house, was

19   parking as well.  She was returning from work.

20   Q.    I'm going to show you what have been marked for

21   identification as Government Exhibits 7 and 8.

22            MR. WOLFF:  Your Honor, may I approach?

23            THE COURT:  You may.

24   BY MR. WOLFF:

25   Q.    Mr. Duquette, handing you Exhibits 7 and 8, do you

 1   recognize those?

 2   A.    I do.

 3   Q.    And what are those two documents?

 4   A.    Those are photographs that were taken of the house

 5   located at 86 Fogg Road in Buxton.

 6   Q.    And were those photos taken on the 8th of September or,

 7   I'm sorry, the following day, the 9th of September?

 8   A.    On the 9th of September.

 9   Q.    Do those photographs fairly and accurately depict when

10   you saw on the 8th of September?

11   A.    Yes.

12         MR. WOLFF:  Your Honor, I move to admit Government

13   Exhibit 7 and 8.

14         THE COURT:  Any objection?

15         MR. HALLETT:  No objection.

16         THE COURT:  7 and 8 are admitted.

17   BY MR. WOLFF:

18   Q.    So you told us a moment ago that Ms. Dennison was

19   arriving around the same time you were; is that right?

20   A.    Yes.

21   Q.    Did you have a conversation with her at that point?

22   A.    We did.

23         MR. WOLFF:  If I may publish Government Exhibit

24   No. 7, Ms. Snyder.

25   Q.    And do you see Exhibit 7 on the screen, Mr. Duquette?

 1    A.    I do, yes.

 2    Q.    All right, thank you.  The lag on the big screen is

 3    what's crossing me up here.

 4          So Exhibit 7 is the exterior of the home at 86 Fogg

 5    Road; is that right?

 6    A.    Yes.

 7    Q.    And is that where you encountered Ms. Dennison?

 8    A.    In the driveway, yes.

 9    Q.    Okay.  Did you explain to her why you were there?

10    A.    We did.

11    Q.    Including the nature of the threat and that sort of

12    thing?

13    A.    Yes.

14    Q.    At some point in the conversation did Ms. Dennison ask

15    you if you wanted to speak with her son, Brian?

16    A.    She did, yes.

17    Q.    And what was your response?

18    A.    Yes, please.

19    Q.    So at that point what happened?

20    A.    Mrs. Dennison attempted to retrieve Brian from the

21    right-hand side of the garage.  There's a set of stairs.  She

22    wasn't able to rouse him there, so she came back downstairs,

23    went into the front of the house, came out a few moments later

24    through the -- on the right-hand side stairway with her son

25    identified by -- as Brian.

1   Q.   So up on the screen we still have Exhibit 7, and you

2   mentioned a stairway on the right side.  Is that the stairway

3   that we can just sort of barely see on the right side of the

4   house?

5   A.   Yes.

6   Q.   I'll put up on the screen, if I may, Exhibit 8.  Is

7   that a -- is that looking at the stairway you've been

8   describing?

9   A.   Yes.

10  Q.   And is that where Ms. Dennison initially went up to

11  retrieve Brian?

12  A.   Yes.

13  Q.   So at some point did you encounter Mr. Dennison?

14  A.   We did.

15  Q.   And where did that take place?

16  A.   Basically at the bottom of the stairs in the driveway.

17  Q.   Did you also tell Mr. Dennison the purpose for you

18  being at the residence?

19  A.   We did.

20  Q.   Do you see the person that Ms. Dennison brought down

21  from the upstairs of the residence and with whom you spoke on

22  the 8th of September?

23  A.   I do.

24  Q.   Could you point him out for us, please?

25  A.   He's the defendant, Brian Dennison.

1    Q.    Who is standing at the moment?

2    A.    Yes.

3    Q.    Thank you.  At that point did you leave the residence?

4    A.    Yes, after just a couple more -- few questions from

5    Mrs. Dennison, we answered those questions, and then we

6    departed.

7    Q.    Okay.  What was your plan after you left the residence

8    at that point on the 8th?

9    A.    I started making phone calls to my supervisor and to

10   the U.S. Attorney's Office.

11   Q.    All right.  So now, before we go any further, I will

12   put up on the screen Government Exhibit No. 6, which has

13   previously been admitted.  And what I will do as well --

14        MR. WOLFF:  Your Honor, may I approach?

15        THE COURT:  You may.

16   BY MR. WOLFF:

17   Q.    Just so you have this with you as well, Mr. Duquette,

18   Exhibit 6, is that the information that you obtained or your

19   colleague obtained from TextMe?

20   A.    Yes, it is.

21   Q.    And that included -- well, what -- what does that

22   information show?

23   A.    So that was the results of the emergency disclosure to

24   TextMe.  It shows a user ID, a user name of

25   briandennison93707, no first name, no last name.  Shows the

1    display name is the same as the user name.  Shows the signup

2    date, January 14th, 2021, last login September 8th, 2021.

3    Shows a birth date, gender, and e-mail of

4    BrianDennison9@Gmail.com.  Then it goes through some other --

5    shows a model of an iPhone 11, of the device, and then it

6    shows a couple of -- it shows an IP on signup.

7    Q.    Now, you had mentioned a few moments ago that TextMe

8    provides phone numbers to individuals who can -- who then can

9    use that number to use their service; is that right?

10   A.    Yes.

11   Q.    And there are two phone numbers at the bottom of that

12   document, Exhibit No. 6.  Are those phone numbers that were

13   provided by TextMe to this account?

14   A.    Yes.

15   Q.    And you said that the -- it also identified the model

16   of the device as an iPhone 11?

17   A.    Yes.

18   Q.    All right.  So sort of jumping back into our sequence

19   here, you were putting information together to obtain search

20   warrants; is that correct?

21   A.    Yes.

22   Q.    When you left was -- were there any FBI personnel who

23   were left at the residence after you left?

24   A.    There were.

25   Q.    Can you explain to us why that was?

1    A.    We were concerned about the threat had been made and we

2    were not -- we were unable to mitigate that threat at the

3    time.  So we -- we felt that we needed to keep -- it wasn't

4    just my decision, it was made by my supervisor and his

5    supervisors that we wanted to keep FBI personnel in the area

6    to try to prevent anything that could happen.

7    Q.    Later that day, did you obtain search warrants for --

8    for property at 86 Fogg Road in Buxton?

9    A.    We did around 9:30 p.m.

10   Q.    What locations at 86 Fogg Road did you obtain search

11   warrants for?

12   A.    We had obtained a search warrant for an apartment

13   that's above the garage.

14   Q.    Was there also a second search warrant you obtained at

15   that time as well?

16   A.    Yes, for the person of Brian Dennison.

17   Q.    When did you execute those search warrants that you

18   obtained on the evening of September 8th?

19   A.    Around 7:45 on September 9th, the next morning.

20        MR. WOLFF:  Your Honor, this may be a good time to

21   break, if the Court would be willing to do that.

22        THE COURT:  All right, thank you.

23        Members of the jury, we're about to take our first

24   break, and I want to remind you of some of the instructions

25   that I gave you earlier.  First, until the trial is over

1   you're not to discuss the case with anyone, including your

2   fellow jurors, members of your family, people involved in the

3   trial, or anyone else.  Second, if anyone approaches you and

4   tries to talk to you about the case, do not tell your fellow

5   jurors but advise me about it immediately through the jury

6   officer.  Third, if you -- you have not heard all the

7   evidence.  Remember, you have to keep an open mind until all

8   the evidence has been received and you've heard the views of

9   all your fellow jurors, and that will only occur once you are

10  authorized to begin deliberations.

11      I may not repeat these instructions to you before every

12  break that we take, but keep them in mind throughout the

13  trial.  And so at this time we will take our morning break.

14  The jury may leave.

15          (Jury excused.  Time noted:  10:25 a.m.)

16          THE COURT:  Counsel, I want to remind you that under

17  the court's COVID protocols witnesses who are vaccinated and

18  have taken a test and received a negative result the day of

19  their testimony are permitted to remove their masks if they

20  wish to.  That's up to them.  But I ask, counsel, that you

21  inform witnesses of that if you want them to remove their

22  masks.

23          MR. WOLFF:  Yes, Your Honor, and I apologize.  We

24  were under a misimpression that witnesses would be able to

25  remove them regardless of status, and so that's our fault for

1     not realizing what the policy was.

2             THE COURT:  All right.  So as I understand now I'm

3     going to entertain argument, and can the witness step down at

4     this time?

5             MR. WOLFF:  Yes, Your Honor.

6             THE COURT:  Sir, you can step down, thank you.

7             THE WITNESS:  Thank you, sir.

8             THE COURT:  I'm going to receive argument now

9     regarding the admissibility, as I understand it, of the

10    exhibits that include the firearm and ammunition; is that

11    correct?

12            MR. HALLETT:  Primarily the firearm and the

13    ammunition that was found with it, Your Honor, yes.

14            THE COURT:  You can remove your mask now if you'd

15    like.

16            MR. HALLETT:  Excuse me.  Can we go to -- we're

17    going to put up the proffer so you can see it, Judge.  So we

18    can switch.

19        So, Your Honor, this is a standard proffer agreement

20    which was entered into with respect to a proffer that was

21    given by my client in October of 2021.

22            THE COURT:  Mr. Hallett, why don't you pull your

23    microphone closer to you.

24            MR. HALLETT:  Yes, sir.

25            THE COURT:  Thank you.

1          MR. HALLETT:  That was -- that occurred in I think

2    October of 2021.  The purpose of that proffer was the --

3    exclusively to provide information with respect to the

4    location of the gun in question.  That was the entire purpose

5    of it.  Now, the language of the proffer, and I think it's in

6    the third -- can you help me out here, Craig -- Paragraph 3,

7    Your Honor.

8          THE COURT:  Is the proffer agreement a marked

9    exhibit in this case?

10         MR. WOLFF:  It is not, Your Honor.  We certainly can

11   make it so, though.  I have the original proffer -- signed

12   proffer agreement here.

13         THE COURT:  Any reason that should not be marked as

14   an exhibit?

15         MR. HALLETT:  No, it should be, Your Honor.

16         THE COURT:  All right.

17         MR. WOLFF:  If I may just staple it to make sure we

18   have all pages, Your Honor.

19         THE COURT:  Thank you.

20         MR. WOLFF:  And, Your Honor, if I may just -- we can

21   make it Government Exhibit No. 52.

22         THE COURT:  This is being marked so that it will be

23   identified in the record and I can consider it.  It's not

24   being admitted at this time, correct?

25         MR. WOLFF:  Correct, Your Honor.

```
 1              THE COURT:  All right.  Thank you.

 2              MR. WOLFF:  May I approach and provide it to the

 3      Court?

 4              THE COURT:  Please.  Okay, Attorney Hallett, please

 5      proceed.

 6              MR. HALLETT:  So under Paragraph 2, Your Honor, of

 7      this document says in any prosecution against client by this

 8      office, except as provided below, the Government will not

 9      offer in evidence in its case-in-chief or in connection with

10      any sentencing proceeding for the purposes of determining an

11      appropriate sentence any statements made by client at the

12      meeting except in a prosecution for false statement.

13          It was clear that the meeting involved solely the issue

14      of the location of the gun.  That was the purpose of the

15      meeting.  We did not have the gun with us at that time, Judge,

16      because, quite frankly, I determined I shouldn't go get it

17      because -- for a number of reasons, including tampering with

18      evidence or whatever it was that I was concerned with at the

19      time.  Had I gone and gotten it, I would have put it on the

20      table and, therefore, they would have had it and I think that

21      would clearly exclude them at this point from introducing the

22      gun in evidence because it was part of the proffer.

23          The statements were made, I believe, are the equivalent

24      of that, Judge.  They used the statements that we had -- that

25      were provided, the exact location of the gun.  They then got a
```

1    search warrant, and now I suspect they're trying to go with a

2    derivative use of other evidence.  This was not other

3    evidence.  This was the evidence, Judge.  So it's our position

4    that the gun is included in the proffer and the gun should not

5    be introduced because it is protected under the terms of the

6    proffer.

7         THE COURT:  Thank you.  Attorney Wolff?

8         MR. WOLFF:  Your Honor --

9         THE COURT:  You can remove your mask if you'd like.

10        MR. WOLFF:  Sorry.

11        THE COURT:  Thank you.

12        MR. WOLFF:  Your Honor, I mean, the proffer

13   agreement I submit is perfectly clear in this point.  It's

14   certainly true that we may not use Mr. Dennison's statements

15   against him and we have no intention of doing that.  But

16   Paragraph 3 of the agreement that the Court can see in front

17   of it states that, notwithstanding Item 2 above, the

18   Government may use information derived directly or indirectly

19   from the meeting for the purpose of obtaining leads to other

20   evidence, which evidence may be used in any prosecution of

21   client by the Government.  So other evidence means evidence

22   other than Mr. Dennison's statements.

23        There was nothing -- there was nothing, no

24   representations made about what was -- what use was going to

25   be made of this information.  I think it's fair to say, I

1    mean, certainly that that topic just wasn't discussed.  I

2    mean, certainly the purpose for the meeting, as Mr. Hallett

3    describes it, was to attempt to find out where this firearm

4    was and get it into law enforcement custody.  But the -- the

5    language of the agreement is clear on this point, Your Honor,

6    the derivative use of the statements Mr. Dennison made at the

7    meeting that would lead to physical evidence, we can use that

8    physical evidence.

9              THE COURT:  Thank you.  Anything else?  Yes?

10             MR. HALLETT:  Yes, Your Honor.  I mean, the language

11   is clear, leads to other evidence.  This is not other

12   evidence; this is the evidence which was discussed

13   specifically at the proffer.  It is not leading to other

14   evidence.  It is the evidence.

15             THE COURT:  All right.  Thank you.

16        I'm going to reserve ruling until the conclusion of the

17   morning break.  That way I can sit down and read the document

18   carefully before I rule, so I'll advise you of my ruling when

19   I return to the bench, which will be in approximately 12

20   minutes.  Anything else we need to address in the meantime?

21             MR. WOLFF:  No, Your Honor.

22             THE COURT:  Thank you.  And I want to make sure that

23   we're all just crystal clear on this, that Government's

24   Exhibit 52 has been marked and is received.  It has not been

25   admitted and it's certainly not to go to the jury in this

1    case.  All right.  With that we will be in recess for

2    approximately 12 minutes.

3              (A recess was taken from 10:33 a.m. to 10:46 a.m.)

4              THE COURT:  I've had the opportunity to read the

5    proffer agreement, which is Government's Exhibit 52, in its

6    entirety.  The two key provisions, as the attorneys noted, are

7    Paragraphs 2 and 3.  Paragraph 2 specifically provides, in any

8    prosecution brought against client by this office, except as

9    provided below, the Government will not offer in evidence in

10   its case-in-chief or in connection with any sentencing

11   proceeding for the purpose of determining an appropriate

12   sentence any statements made by the client at the meeting

13   except in a prosecution for false statements, obstruction of

14   justice, or perjury, and other possibilities that don't apply

15   here.

16        The next paragraph, 3, indicates in relevant part,

17   notwithstanding Item 2 above, A, the Government may use

18   information derived directly or indirectly from the meeting

19   for the purpose of obtaining leads to other evidence, which

20   evidence may be used in any prosecution of client by the

21   Government.

22        As I understand, the Government intends to seek to

23   introduce evidence, physical evidence, that was obtained as a

24   consequence of the -- of a search warrant that followed the

25   proffer agreement.  The physical evidence obtained pursuant to

 1    a search warrant it seems to me is plainly permitted under the

 2    provisions of Paragraph 3 as information -- the information

 3    resulting in the search warrant, information derived directly

 4    or indirectly from the meeting for the purpose of obtaining

 5    leads to other evidence, which evidence may be used in any

 6    prosecution of client by the Government.  That physical

 7    evidence has been described, of course, it hasn't been

 8    presented yet, I haven't seen it yet, but has been described

 9    as evidence obtained through the search warrant and therefore

10    I see it as authorized plainly under Paragraph 3 of this

11    proffer agreement.  So to that extent the defendant's

12    objection to the admission of those exhibits is denied.

13         Anything further on that point, Attorney Wolff?

14         MR. WOLFF:  Not on that point, Your Honor.  The only

15    other issue, as I had mentioned previously, with respect to

16    the weapon and ammunition is whether the defense is requesting

17    any sort of limiting instruction or cautionary instruction.  I

18    just wanted to flag that as well.

19         THE COURT:  Attorney Hallett?

20         MR. HALLETT:  I would, Your Honor.

21         THE COURT:  I didn't hear you.

22         MR. HALLETT:  I would limit -- I would request a

23    limiting objection -- objection, that this in no way is

24    directed towards the use of this weapon, but that the Tweet is

25    the charge that he's being charged with, not possession of a

1    weapon.  And the jury should not infer from that that he

2    intended to carry out any act.

3            MR. WOLFF:  Your Honor, I -- I think I respectfully

4    disagree with that last sentence.

5            THE COURT:  One moment, please.  I'll -- we'll come

6    back to that in a moment.

7            MR. WOLFF:  Yes.

8            THE COURT:  All right.  I propose instructing the

9    jury as follows:  The defendant is not charged in connection

10   with his possession of a weapon or for his use of a weapon;

11   rather, as the lawyers explained in their opening statements,

12   the charge in this case relates to an alleged threat.  I will

13   instruct you more fully about the elements of the alleged

14   crime at the conclusion of the evidence.  Attorney Wolff?

15           MR. WOLFF:  Your Honor, the only other thing, and

16   I've seen this in other cases, is the Court -- other Courts

17   have specifically said, this evidence is admitted for the

18   limited purpose of determining whether the defendant had the

19   requisite intent to transmit a true threat, and I certainly

20   would have no objection to including that language.  I think

21   that's consistent with the Court's rulings as to why this

22   evidence is being admitted.

23           THE COURT:  And so, Attorney Wolff, let me repeat

24   that back.  The evidence is introduced for the limited purpose

25   of determining whether the defendant intended to make a true

```
 1    threat.
 2              MR. WOLFF:  Yes, Your Honor.  If that's acceptable
 3    to the defense, it is to the Government.
 4              THE COURT:  Attorney Hallett?
 5              MR. HALLETT:  It is, Your Honor.
 6              THE COURT:  Very good.  And, Attorney Wolff, do you
 7    propose that I provide the jury this instruction upon their
 8    return from the break or at some point during your
 9    examination?
10              MR. WOLFF:  Your Honor, it will be a little -- a few
11    minutes until we get to the point where I'll actually be
12    seeking to introduce that evidence, so perhaps at the time the
13    evidence is introduced.
14              THE COURT:  That sounds sensible, thank you.  Please
15    summons the jury.
16              THE CLERK:  Judge?
17              THE COURT:  Yes.
18              MR. HALLETT:  I have one other issue, Your Honor.
19              THE COURT:  One moment.
20                 (The clerk conferred with the Court.)
21              THE COURT:  I'd like to speak with counsel at
22    sidebar, so please don your headsets.
23                              (Sidebar)
24              THE COURT:  Can everyone hear me?
25              MR. HALLETT:  Yes.
```

1          MR. WOLFF:  Yes, Your Honor.

2          THE COURT:  I received a note that Mr. Duquette

3    tested positive.  The question then becomes whether under the

4    Court's general orders he's permitted to testify with a mask.

5          It seems to me that, first of all, the Court's general

6    orders don't anticipate a situation like this.  And I'm

7    required to weigh not only the interests of the court

8    generally in terms of the protection of the public but also

9    the interests of the defendant and the Government at stake

10   during the course of this trial.

11         Knowing that we can isolate Mr. Duquette physically,

12   everyone can keep ample distance from him, it seems to me

13   there is very low risk associated with having him testify

14   wearing a mask.  And so I'm inclined to permit him to continue

15   to testify, even though we received this report.  I'll hear

16   from the parties on this issue, Attorney Wolff.

17         MR. WOLFF:  Your Honor, I -- I agree that testifying

18   does seem appropriate and that it can be done safely.  The

19   only other issue that I see is that Mr. Duquette is our case

20   agent, and I believe under the Court's general orders it

21   sounds like as soon as he leaves the courthouse he's not

22   allowed to come back in, which obviously would pose a

23   significant problem for the Government, given his role in this

24   case.

25         THE COURT:  Attorney Hallett?  I can't hear you.

 1    You're not on.  You're not turned on.

 2          MR. HALLETT:  Excuse me, I'm sorry.  I perceive this

 3    as a real problem primarily because I'm seated next to

 4    Mr. Duquette, close enough anyway, and I have very good

 5    reasons to -- I have a daughter who's eight and a half months

 6    pregnant.  So I'm not sure how the Court wants to handle this.

 7      It's a difficult situation.  I think I need to speak to

 8    my client about it.  You know, if Mr. Duquette is -- leaves

 9    and then he can't be called back, that's if he needs to be,

10    and I have no idea if he does, I just think we need to think

11    about all of the potential ramifications.

12          THE COURT:  Attorney Hallett, why don't you take the

13    time, then, to speak to your client.

14          MR. HALLETT:  Thank you.

15          THE COURT:  And then I'll discuss it with you

16    further.

17          MR. HALLETT:  Thank you.

18          THE COURT:  Go ahead.

19            (Defendant conferred with counsel.)

20          THE COURT:  Attorney Hallett, go ahead.

21          MR. HALLETT:  For obvious reasons, Judge, we

22    certainly wish to go forward with this trial.  We're in the

23    middle of it.

24      I would note that Mr. Duquette's not wearing a

25    particularly good mask.  I think he needs to get an N95 mask

1    or equivalent thereto.  I would ask that he not be seated

2    right with all of us.  Certainly when he's up at -- on the

3    witness stand that will be -- I don't know how -- how that

4    impacts his status here as being the primary officer on the

5    job; so, Craig, I'll let you speak to that.  But we are not

6    adverse to going forward as long as steps are taken to

7    insulate people.

8              THE COURT:  Thank you.

9              MR. HALLETT:  And I also have a Rule 403 objection,

10   Your Honor, which I don't want to forget.

11             THE COURT:  Attorney Wolff?

12             MR. WOLFF:  Judge, thinking about it some more, if

13   the -- if the Court finds it acceptable for Mr. Duquette to

14   finish his testimony, I think we certainly agree that that's

15   the way to go and I think, thinking about it some more, we --

16   we should be able to find somebody who can step into the role

17   of case agent to -- I mean, we are -- obviously, as you know,

18   the Government's evidence is only scheduled to take until the

19   end of today, hopefully; and I think we can -- we can do what

20   it takes to keep this case going despite -- and so if

21   Mr. Duquette testified and then frankly left I think that -- I

22   think we could continue.

23             THE COURT:  All right.  Counsel, I want to give this

24   additional thought.  I'll be back to you.

25                  (The Court conferred with the clerk.)

```
 1            THE COURT:  This is a -- can you all hear me?
 2            MR. HALLETT:  Yes.
 3            THE COURT:  This is an unexpected turn, to say the
 4   least.  It seems to me I want to give it additional thought.
 5   So we're going to take an additional recess of approximately
 6   10 minutes so that I can contemplate it further.  We'll be in
 7   recess.
 8            MR. HALLETT:  Thank you.
 9                       (Open court)
10            THE COURT:  Court will be in recess for 10 minutes.
11       (A recess was taken from 11:02 a.m. to 11:19 a.m.)
12                         (Sidebar)
13            THE COURT:  Can everyone hear me?
14            MR. WOLFF:  Yes, Your Honor.
15            MR. HALLETT:  Yes.
16            THE COURT:  So let me summarize where I understand
17   we are at, that is, that the FBI case agent in the case who's
18   currently testifying, Mr. Duquette, I'm told -- and, Attorney
19   Wolff, you can correct me if this is not correct -- I'm told
20   that he arrived late this morning and therefore was not
21   available to be tested when the clerk's office provided
22   testing before the onset of the trial today.  I'm also told
23   that during the break that we took, the recess, he went and
24   obtained a test, and that's the test result that is
25   negative -- I'm sorry, is positive, rather, has come back
```

 1    positive.

 2         So let me pause there.  Is that your understanding,

 3    Attorney Wolff?

 4              MR. WOLFF:  Your Honor, I don't know that

 5    Mr. Duquette arrived late.  I think frankly, because of the

 6    misapprehension that we had, we believed that witnesses would

 7    be able to remove their masks regardless of status, so we

 8    didn't ask him to be tested.  But when the Court pointed out

 9    that that was the case then that is when he went downstairs to

10    be tested.

11              THE COURT:  I see.  So the reason that he wasn't

12    tested when he arrived first thing in the morning is more

13    likely that he had understood because the Government had

14    understood that witnesses had to remain masked and therefore

15    they didn't need to be tested?

16              MR. WOLFF:  Or actually I -- well, at least my

17    misapprehension was that witnesses could take off their masks

18    while they were testifying, which obviously was not the case.

19              THE COURT:  In any event, I take it that you did not

20    understand that witnesses in order to remove their masks had

21    to be tested first?

22              MR. WOLFF:  That's correct, Your Honor.

23              THE COURT:  Okay.  So that's I think the source of

24    the problem.

25         I also understand from your concluding comments before I

1    left the bench that both sides wish to proceed,

2    notwithstanding this information.

3            MR. WOLFF:  Yes, Your Honor.

4            THE COURT:  Is that right?

5            MR. HALLETT:  Yes, Your Honor.

6            THE COURT:  Now, the -- having the witness testify

7    knowing that he is possibly infected because of a positive

8    test is contrary to the Court's general orders, and it seems

9    to me that it would be necessary for the Court to inform all

10   of the persons in the courtroom, and in particular the jurors,

11   of what we know, and that is that this witness tested

12   positive, which could be a source of some concern for one or

13   more of the jurors.  And so it seems to me that it's important

14   to weigh the effect that that might have on this trial with --

15   against the effect of or the value of simply proceeding.

16       I don't think that it's appropriate to not inform the

17   jurors of what we know about Mr. Duquette or, for that matter,

18   the individuals who are in the courtroom.  So they will be

19   informed.  It also seems to me that it is not, although I've

20   considered this possibility, wise to give the choice -- the

21   jurors the personal choice of continuing to serve or being

22   excused based upon their receipt of the information regarding

23   Mr. Duquette.  Even if 12 or more were to indicate a

24   willingness to continue, I remain concerned, first of all,

25   that there is some health risk of us all continuing to proceed

1     in a courtroom with an infected person, known to be infected,

2     and that also this is the type of question which is upsetting

3     for many people and could cause them upon reflection perhaps

4     to change their mind about continuing to participate.  So

5     continuing with the trial under these conditions it seems to

6     me is fraught with the possibility of complexity.

7          Of course, I have to weigh this against Mr. Dennison's

8     rights.  The trial's begun; our resources have been expended;

9     Attorney Hallett's indicated his client would like to continue

10    notwithstanding this information.  And that also of course it

11    seems to me is extremely important.

12         As I've weighed this, counsel, I've concluded

13    tentatively that the most just way to respond to this unusual

14    set of circumstances is to declare a mistrial.  The rule

15    provides that before ordering a mistrial the Court is to give

16    each side, the defendant and the Government, the opportunity

17    to comment on the propriety of the order, to state whether the

18    party consents or objects, and to suggest alternatives.  And

19    so that's where we are at this moment.

20         I'll hear first from the Government.  Actually I'll hear

21    first from the defendant if the defendant wishes to go first

22    because the defendant's name appears first in Rule 26.3.

23              MR. HALLETT:  If I could look at that rule for a

24    second?

25              THE COURT:  You may.

```
 1              MR. HALLETT:  Embarrassingly, Your Honor, what rule

 2   are you looking at?

 3              THE COURT:  26.3 of the Rules of Criminal Procedure.

 4              MR. HALLETT:  Yes, thank you.

 5         Your Honor, our general position is as previously

 6   stated, and that is that we would like this case to move

 7   forward.  I have been informed by my client that he does not

 8   wish to put anyone at risk, so I'm bringing that to the

 9   attention of the Court.  With that said, from defense

10   counsel's perspective, we would wish to continue.  We

11   understand what the Court is saying but let me just lodge that

12   objection.

13              THE COURT:  Thank you.  Attorney Wolff?

14              MR. WOLFF:  Your Honor, obviously we wish to

15   continue as well.  This is a difficult question.  From sort of

16   a partisan viewpoint I do worry that -- and I think it would

17   be appropriate for the Court to notify the jurors, but I do

18   think we do then run the risk of having jurors who are not at

19   all focusing on the testimony and frankly perhaps holding it

20   against the Government for putting a witness up who could

21   possibly infect them.  So I do think that is fraught with --

22   with difficulty.

23         So I -- at the end of the day I guess I defer to the

24   Court on this, Your Honor, because I do think that there are

25   some serious concerns about proceeding if we notify the
```

1    jurors, which I think would be appropriate.

2            THE COURT:  Attorney Wolff, I take it Mr. Duquette

3    is still here?

4            MR. WOLFF:  He is in the courthouse, Your Honor, is

5    my understanding.

6            THE COURT:  And I would like to inform the jurors

7    that Mr. Duquette tested positive, and even though I don't

8    think that his consent is required, it seems to me as a

9    courtesy to him I would like you to speak with him; and if he

10   has any specific objection to that information being made

11   public you'll communicate that to me.

12           MR. WOLFF:  Yes, Your Honor.

13           THE COURT:  Is that something you can do now?

14           MR. WOLFF:  I can, yes.

15           THE COURT:  Is he right out in the hallway?

16           MR. WOLFF:  I believe so.

17           THE COURT:  I'll wait for you, then.

18           MR. WOLFF:  Thank you.

19                        (Pause)

20           MR. WOLFF:  Your Honor, Mr. Duquette does not have

21   any objection to making the jurors aware of that.

22           THE COURT:  Thank you.  Counsel, anything further

23   before I summons the jury and inform them of my decision?

24           MR. WOLFF:  Nothing from the Government, Your Honor.

25           MR. HALLETT:  Nothing from the defendant.

1          THE COURT:  Thank you.

2                      (Open court)

3          THE COURT:  Please summons the jury.

4                      (Sidebar)

5          MR. HALLETT:  Your Honor, one of the things here is

6    that obviously the defense has opened in this case, has

7    disclosed its case.  To the extent that the prosecution can

8    now go out and plug holes in the case as a result of the

9    defense that's been stated in opening, that's another reason

10   why we need to go forward with this, because I think that

11   would be fundamentally unfair.

12         THE COURT:  All right.  Certainly now the record

13   reflects that argument.

14         MR. HALLETT:  Thank you.

15         THE COURT:  I'm satisfied under the circumstances at

16   this point the -- of course the defense has not presented any

17   evidence, that that does not outweigh the reasons I've already

18   cited counseling in favor of a mistrial, but thank you.

19                (Jury entered.  Time noted:  11:32 a.m.)

20         THE COURT:  Members of the jury, our break took much

21   longer than I anticipated because of some information that I

22   received that required my attention and I want to discuss with

23   you.

24      I'm sure that you're aware, I know that you're aware,

25   that the Court has adopted various protocols and rules to be

 1    able to continue to operate the court in the time of COVID-19.

 2    It's why you're all wearing masks right now; it's why all the

 3    people who are sitting in the gallery are wearing masks.

 4         In addition, we have various protocols regarding the

 5    participants.  When I say the participants I mean people

 6    speaking, the judge, the lawyers, the witnesses, under which

 7    if they're fully vaccinated and they are tested when they

 8    arrive and they test negative then they can speak without

 9    masks on.

10         However, there's one overriding protocol that we have

11    that actually is most central to what I'm about to tell you,

12    and that is the protocol that if someone is positive for

13    COVID-19 they're not permitted to be in the courthouse.  And

14    unfortunately I've learned that someone is positive for

15    COVID-19.  That individual is Mr. Duquette, who was just

16    testifying.  We were unaware that he was positive for COVID-19

17    because he had not received a test this morning when he

18    arrived, as is the practice, but instead was tested during the

19    recess.  You'll recall that Mr. Duquette, who's not in the

20    courtroom at the moment, was wearing a mask at all times, both

21    when he was seated at table and when he was testifying.

22         I can say from my general and specific knowledge

23    regarding COVID-19 and the operation of courts that the

24    protocols that we have in place are -- are the standard of the

25    art or I should say are really among the best I'm aware of;

1    that is, this court has not had a single known transmission of

2    COVID-19 among people in the courthouse since the pandemic has

3    started, and that's because of the protocols that we follow on

4    the advice of an expert virologist who works with us.

5        But we are now in the first day of a trial in which a

6    key witness has tested positive for COVID-19, and that

7    requires me as the judge to weigh various things in deciding

8    whether or not it is sensible to proceed, notwithstanding the

9    fact that we've had a witness testified as positive and

10   frankly would continue to testify, because his testimony is

11   far from complete in this case.

12       I've discussed this at some detail with the attorneys

13   for both sides.  There are good arguments to be made that it

14   is -- it would be sensible to continue on with the trial,

15   given all the time and resources that have been dedicated to

16   this, all of the time, of course, and inconvenience that

17   you've already experienced just serving as a juror, having to

18   take off from your daily lives and be here.  But I've

19   concluded that the better judgment in this case is to declare

20   a mistrial of this trial.  The -- the thought of continuing

21   the trial knowing that we've all now been having very, very

22   indirect exposure -- and let me emphasize that.  I don't have

23   any real concern, serious concern, that there's been direct

24   exposure, but of course it can't be ruled out.

25       But I've concluded, weighing of course all the interests

1   that I have to weigh as a judge, that the best judgment is to

2   declare a mistrial in this case.  Now, what that means is that

3   this trial has ended today, ends now.  You've completed your

4   jury service and you will not be subject to recall immediately

5   as a consequence of that.

6        Unfortunately, you will not get to finish your jury

7   service in the sense of hearing all the evidence and then

8   taking on the incredibly important responsibility as a United

9   States citizen of deliberating and entering a verdict one way

10  or the other in an important case such as this.  So even

11  though I'm excusing you now without you completing the task, I

12  want to emphasize that you have now fulfilled what is perhaps

13  the most important duty that U.S. citizens have under our

14  Constitution.  The right to trial by jury dates back to the

15  13th century.  It was a major reason why the colonists decided

16  to declare their independence from Great Britain.  It is

17  enshrined in our Bill of Rights, and the idea that we bring

18  together a cross-section of the community, people who don't

19  know each other and are not lawyers typically, to resolve

20  disputes such as this is a hallmark of American justice and of

21  democracy.

22       So even though we're not concluding the trial today, you

23  have done your duty, you have lived up to your constitutional

24  responsibilities, and for that I express my profound thanks

25  and I know the thanks of the attorneys and all of the parties

 1   to this case.

 2       With that, I'm going to ask you to go back to the jury

 3   room.  Our jury administrator will give you her final

 4   instructions today.  But as I've said, you've completed your

 5   jury service.  Thank you very much.  The jury may retire at

 6   this time.

 7               (Jury excused.  Time noted:  11:38 a.m.)

 8               THE COURT:  And so the Court declares a mistrial.

 9   Attorney Wolff, anything further from the Government?

10               MR. WOLFF:  No, Your Honor.

11               THE COURT:  Attorney Hallett, anything further from

12   the defense?

13               MR. HALLETT:  Nothing, thank you, Your Honor.

14               THE COURT:  All right.  I want to thank counsel for

15   their efforts.  We will make a point of having a conference to

16   discuss rescheduling in this matter.  And to the members of

17   the public who are present I simply will rest on whatever I

18   told the jurors with regard to any potential exposure in the

19   courtroom today.  Just be mindful of the information I shared

20   with you.  With that we now stand adjourned.

21               (Time noted:  11:40 a.m.)

22

23

24

25

**C E R T I F I C A T I O N**

I, Lori D. Dunbar, Registered Merit Reporter, Certified

Realtime Reporter, and Official Court Reporter for the United

States District Court, District of Maine, certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

Dated:  June 10, 2022

                    /s/ Lori D. Dunbar

                    Official Court Reporter