UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA

v.

BRIAN DENNISON

CASE NO: 2:21-cr-00149-JDL

MOTION TO DISMISS

**Preliminary Statement**

On May 24, 2022, the court entered its Order declaring a mistrial in the above-captioned matter. This case is currently scheduled for trial in July 2022. Through this motion, Defendant Brian Dennison now asserts his Fifth Amendment right against twice being prosecuted for the same crime. It is the defendant's position that there was no manifest necessity to declare a mistrial because (1) the court failed to adequately investigate possible jury contamination; (2) there was no essential witness unavailability as required for a mistrial, because there was no evidence Border Patrol Agent Jonathan Duquette ("Agent Duquette") was an essential witness; (3) any witness unavailability was caused by the negligence of the government; and (4) the court did not adequately investigate an alternative to a mistrial, as required by double jeopardy jurisprudence.

**Pertinent Facts Giving Rise to the Court's *sua sponte* Order of Mistrial**

On May 24, 2022, after two prosecution witnesses testified, one masked and one unmasked, a third prosecution witness, Agent Duquette, provided testimony while masked. (ECF No. 128; Trial Transcript pages 74:1-84:19) (hereinafter T. ___). During that testimony, the court advised counsel that Agent Duquette tested positive for Covid on a test he took at the courthouse during the morning break. (ECF No. 128; T. 95:1-4). The court pointed out that the Court's General Orders regarding Covid did not anticipate a situation like this, and that the question "…becomes

1

whether under the Court's General Orders he's permitted to testify with a mask." (ECF No. 128; T. 95:1-13). The court subsequently stated:

> …it seems to me that there is very low risk associated with having him testify wearing a mask. And so I'm inclined to permit him to continue to testify, even though we've received this report.

(ECF. No. 128; T. 95:12-16)

The court invited comment from counsel. AUSA Wolff agreed to continue with Agent Duquette's masked testimony but noted that if Agent Duquette left the Courthouse, he would not be able to return under the Court's General Order 2021-6 (last Amended May 20, 2022) ("General Order") and suggested that would pose a "significant problem" because Agent Duquette was the "case agent." (ECF No. 128; T. 95:17-24).

Defense counsel noted concern about Agent Duquette's positive test, the fact that Agent Duquette was not wearing a compliant mask and requested that Agent Duquette not be seated at counsel table, which was close to prosecution and defense participants in the trial. Defense counsel then stated that the defense wished "to go forward with this trial. We're in the middle of it." (ECF No. 128; T 96:2-6-97:7). Defense counsel questioned whether Agent Duquette needed to be called back once he left the courthouse. (ECF No. 128; T. 96:8-11).

AUSA Wolff then stated that if Agent Duquette finished his testimony, the government would be able to find someone else to fulfill the "case agent" role. (ECF No. 128; T. 97:12-20) There was no discussion of whether Agent Duquette's further testimony was "necessary" or "essential" to the prosecution. There was no discussion of the length of Agent Duquette's anticipated testimony. The court then took a recess to give this "unexpected turn…additional thought." (ECF No. 128; T. 98:3-7).

2

Seventeen minutes later, the judge returned and advised counsel that he understood Agent Duquette had arrived late the day of the trial and therefore had not taken a Covid Test as required to testify without a mask. (ECF No. 128; T. 98:16-22). AUSA Wolff then explained that in fact it was AUSA Wolff who had "misapprehended" and not understood that witnesses had to wear masks unless they tested negative for Covid earlier that day and therefore that he had not advised Agent Duquette to be tested that morning before court. (ECF NO. 128; T. 99:4-22).

The court stated his understanding that the parties wished to continue with the trial, and counsel confirmed that to be accurate. (ECF No. 128, T. 99:25-10:1-5) The court then issued his reasoning for declaring a mistrial:

> THE COURT: Now, the -- having the witness testify
> knowing that he is possibly infected because of a positive
> test is contrary to the Court's general orders,
> …
> I don't think that it's appropriate to not inform the
> jurors of what we know about Mr. Duquette or, for that matter,
> the individuals who are in the courtroom. So they will be informed.
> It also seems to me that it is not, although I've
> considered this possibility, wise to give the choice -- the
> jurors the personal choice of continuing to serve or being
> excused based upon their receipt of the information regarding
> Mr. Duquette.
> …
> So continuing with the trial under these conditions it seems to
> me is fraught with the possibility of complexity.
> Of course, I have to weigh this against Mr. Dennison's
> rights. The trial's begun; our resources have been expended;
> Attorney Hallett's indicated his client would like to continue
> notwithstanding this information. And that also of course it
> seems to me is extremely important.
> As I've weighed this, counsel, I've concluded
> tentatively that the most just way to respond to this unusual
> set of circumstances is to declare a mistrial.
> …
> MR. HALLETT: Yes, thank you.
> Your Honor, our general position is as previously
> stated, and that is that we would like this case to move
> forward.

3

> …
> We understand what the Court is saying but let me just lodge that objection.
> THE COURT: Thank you. Attorney Wolff?
> MR. WOLFF: Your Honor, obviously we wish to continue as well. This is a difficult question. From sort of a partisan viewpoint I do worry that -- and I think it would be appropriate for the Court to notify the jurors, but I do think we do then run the risk of having jurors who are not at all focusing on the testimony and frankly perhaps holding it against the Government for putting a witness up who could possibly infect them. So I do think that is fraught with -- with difficulty.
> So I -- at the end of the day I guess I defer to the Court on this, Your Honor, because I do think that there are some serious concerns about proceeding if we notify the jurors, which I think would be appropriate.
> …
> THE COURT: Thank you. Counsel, anything further before I summons the jury and inform them of my decision?
> …
> MR. HALLETT: Your Honor, one of the things here is that obviously the defense has opened in this case, has disclosed its case. To the extent that the prosecution can now go out and plug holes in the case as a result of the defense that's been stated in opening, that's another reason why we need to go forward with this, because I think that would be fundamentally unfair.
> THE COURT: All right. Certainly now the record reflects that argument.
> MR. HALLETT: Thank you.
> THE COURT: I'm satisfied under the circumstances at this point the -- of course the defense has not presented any evidence, that that does not outweigh the reasons I've already cited counseling in favor of a mistrial, but thank you.
> (Jury entered. Time noted: 11:32 a.m.)

(ECF No. 128; T. 100:6-104:19).

The court then brought the jury in and explained: (1) that because Agent Duquette tested positive for Covid he was not allowed in the courthouse (ECF No. 128; T. 105:10-16); (2) that the safety Covid protocols in place at the Portland Federal District Court are "standard of the art," and there has not been a "single known transmission" at the Courthouse, (ECF No. 128; T. 105:22-25-

4

106:1-4); and (3) that allowing Agent Duquette to testify further was against "his better judgment" and dismissed the jury. (ECF NO. 128; T. 106:5-25-107:1-5).

General Order 2021-6, titled "General Order Regarding Masks, Courthouse Entry and Physical Distancing Requirements" (last Amended May 20, 2022) sets forth the proper masking protocols for jury trials in Federal District Court in Portland. That General Order, *inter alia* provides for a 10-day period between testing positive for Covid and entry into the Courthouse, Section 3(b), as well as masking requirements for jury trials under Section 2(h), which states:

2. Mask Requirements.

> h. When masks are required pursuant to subsection 2(a) or 2 (b), every attorney, party, witness, or other person who will have a speaking role and who wishes to remove their mask while speaking:
>
>> (i) Must be fully vaccinated and must take a rapid antigen test and test negative the day of the court proceeding.. *If the circumstances permit, the test should be taken at least one hour before the court proceeding. Attorneys shall inform their clients and witnesses of this requirement. (emphasis added)*
>>
>> (ii) Persons with a speaking role who fail to comply with the test requirements are not permitted to remove their masks when speaking during a court proceeding.

On May 24, 2022, at 11:38 am this court then declared and entered a mistrial.

ARGUMENT AND AUTHORITY

**Manifest Necessity is Required to Declare a Mistrial**

The Double Jeopardy Clause of the Fifth Amendment, protects a criminal defendant from being "…twice put in jeopardy of life or limb." United States Constitutional Amendment 5 ("Double Jeopardy Clause"). This protection includes the constitutional right to have the defendant's trial "completed by a particular tribunal," *United States v. Jorn,* 400 U.S. 470, 484-85 (1971), and is "entitled to the deepest respect." *United States v. Diaz,* 494 F.3d 221, 227 (1st Cir.

2007). A mistrial, therefore, is to be of "last resort, implemented only if the taint is ineradicable." *United States v. Lara-Ramirez,* 519 F.3d 76, 82 (1st Cir. 2008), *quoting United States v. Sepulveda,* 15 F.3d 1161, 1184 (1st Cir. 1993).

Upon objection by the defendant the Court must find "manifest necessity" to declare the mistrial.[1] *United States v. DiPietro,* 936 F.2d 6, 9 (1st Cir. 1991). In assessing manifest necessity, a case-specific analysis must be conducted by the court. Although there can be no "mechanical checklist", a court is guided by three "interrelated factors:" (1) exploring and exhausting alternatives to a mistrial; (2) giving counsel an opportunity to be heard; and (3) a decision being reached after adequate reflection. *Lara-Ramirez,* 519 F.3d at 84; *United States v. Toribio-Lugo,* 376 F.2d 33, 39 (1st Cir. 2004). Where the court declares a mistrial, *sua sponte* the burden of justifying the mistrial is on the government to establish the required manifest necessity. *United States v. Garsky,* 939 F.3d 321, 328 (1st Cir. 2019). That is a heavy burden where the government opposed the mistrial at the time.

Agent Duquette's positive Covid test gave rise to two specific mistrial issues: (1) possible jury contamination and (2) essential witness unavailability.

**Possible Jury Contamination Requires a Painstaking Investigation by the Court.**

In *Lara-Ramirez* a court reporter observed a large Bible in the jury room during a read-back for a deliberating jury. Upon being notified of the presence of the Bible the court discussed his concerns with counsel. The court then questioned the foreperson with counsel present and discovered that a juror brought the Bible with him to court during deliberations and wanted other

---

[1] The defendant, through counsel objected to the mistrial. First, defense counsel articulated a desire, along with the court and the government to proceed forward after discovery of the positive test result. (ECF No. 128, T. 96:2-11). Following the court's "tentative mistrial" declaration, defense counsel again stated the desire to go forward with the trial and specifically objected to a mistrial, (ECF No. 128; T. 102:5-12). Defense counsel then articulated his belief that not proceeding would be fundamentally unfair given that the defendant's defense was laid out in the opening statement of counsel. (ECF No. 128; T. 104:5-11).

jurors to consider "what God says in the Bible." 519 F.3d at 79. The court again discussed its concerns about possible jury contamination with counsel, this time including discussion on possible jury *deliberation* contamination. The prosecution requested a mistrial. Defense counsel suggested either a curative instruction or individual questioning of the jurors to assess any impact. The trial court concluded that the Bible, and the juror, had contaminated jury deliberations and ordered a mistrial over the defendant's objection.

The First Circuit found that double jeopardy applied because the trial court failed to conduct an adequate investigation to assess whether (1) a "taint producing event" had occurred, and (2) if it had, whether there was any "resultant prejudice." *Id.* at 86. Even where both are found, a mistrial is appropriate only as a matter of last resort. *Id.* Before declaring a mistrial the court must consider "the extent to which prophylactic measures such as the discharge of particular jurors or the pronouncement of curative instruction will suffice to alleviate prejudice." *Id., quoting United States v. Bradshaw,* 281 F. 3d 278, 289 (1st Cir. 2002). This "painstaking" investigatory process protects the defendant's right to an unbiased jury, and the "valued right to have his trial completed by a particular tribunal." *Id.* at 85, *quoting Jorn, supra* at 689. In fact, "... the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *Id.* at 89, *quoting Jorn, supra*. "The investigation is also critical in creating a sufficient record to permit meaningful appellate review of the district court's manifest necessity determination." *Id. a*t 85.

The First Circuit contrasted the facts in *Lara-Ramirez* with those of *United States v. Bradshaw,* 281 F.3d 278, 291 (1st Cir. 2002). In *Bradshaw,* an indictment charging the defendant with three serious criminal counts, not then before the jury, was found in the jury room. The court

7

conducted individual juror voir-dire twice, and then issued a curative instruction. The appeals court determined that the investigation, and record, were sufficient to allow the case to go to the jury despite the obvious taint and possible prejudice. *Lara-Ramirez* at 86. Lacking an adequate record in *Lara-Ramirez* the First Circuit held: "[w]e cannot assume, as the district court apparently did, that individual voir dire of the jurors and a curative instruction would not have eradicated the risk of prejudice in this case." *Id., citing Toribio-Lugo,* 376 F.3d at 39 ("where there is a viable alternative to a mistrial and the district court fails to adequately explore it a finding of manifest necessity cannot stand.")

As in *Lara-Ramirez* this court *assumed* that Agent Duquette's continued masked testimony might be upsetting to the jury, and that therefore moving forward with the trial was "fraught with the possibility of complexity." (ECF No. 128; T. 101:23-25-102:1-7). A Bible incorporated into jury deliberations is also "fraught with the possibility of complexity." An inadequate record precluded the First Circuit from assessing that "possibility" and whether it met manifest necessity requirements in *Lara-Ramirez*. The "possibility of complexity" does not relieve the court from the requirement that it investigate thoroughly whether there is any "resultant prejudice" from Agent Duquette's past or future masked testimony and if so, how best to address the issue. All that exists without an investigation is a possibility and an assumption of resultant prejudice. Neither this court nor the First Circuit can establish from the record, that any of the jurors were in fact prejudiced, in either a psychological or emotional context, so that they could not continue on and render an impartial verdict.[2]

---

[2] By the time of the trial, more than two (2) years had passed since Covid appeared on or about March 2020. Jurors sat through two days of jury selection and were advised on both of those days that the District Court had a sophisticated HVAC system which made the courtroom as safe as possible. There is no reason to believe that questioning each juror individually would lead to any of the jurors disqualifying themselves. Additionally, there were four alternate jurors, which when combined with a 2 day trial this should have allayed any concern that 12 jurors would be available after questioning.

The aura of Covid overlays this case. The court initially conferred briefly with counsel after receiving the positive result and all agreed that the case should go forward. The court noted that the court's General Order on Covid did not "anticipate a situation like this." Indeed, the General Order does not address a person who tests positive for Covid while testifying in a criminal matter. *See* Exhibit 1 §§ (2)(h) and (3). What did anticipate such a situation however were the state-of-the-art courtroom modifications dealing with the possibility of Covid infected persons in the Courthouse.

Covid modifications as set forth in the April 13, 2021, *Plan for Resuming Trials* Section III "Modifications to Courtrooms," include: (1) plexiglass barriers on witness stands and counsel table, (2) air purifiers located at the witness stand and counsel tables, (3) HVAC "maximum air changes per hour," and (4) "MERVE-14 filtration." *Id.* Section II(a). These "standard of the art" air quality protections led the court to conclude that "it seems to me there is *very low risk* associated with having him testify wearing a mask," (ECF No. 128; T. 95:12-14), and indeed the Court specifically did not consider the risk of infection from Agent Duquette testifying further in the mistrial equation.[3]

The court took a total of seventeen minutes to arrive at the conclusion that a mistrial was warranted. Counsel was not involved at all during that period and was not privy to the court's analysis or factors relied upon in reaching that decision. In contrast, when faced with a previously unknown conflict of interest between defense counsel and a witness he had previously represented, the trial court in *United States v. Simonetti* held chambers conferences, discussed remedies

---

[3] The court has clarified its position regarding the effect of Covid on its mistrial analysis in its June 7, 2022 Order (ECF No. 126) on Defendant's *Motion to Obtain Photographs/Measurements and Air Circulation Information for Federal Courthouse Courtroom #2*. In denying that motion the court stated that the mistrial was not based on a finding of risk of Covid infection from further testimony of Agent Duquette, rather "…[t]he decision was based on the requirements of the Court's General Orders regulating the conduct of jury trials in the District of Maine during the COVID-19 pandemic, as well as the possible psychological or emotional effects on jurors and trial participants of being required to remain in the presence of a case agent/witness who had tested positive." *Id.*

including dismissal, mistrial or a continuance for the defendant to obtain new counsel, gave counsel time to research the issues, and discussed them repeatedly with counsel over a matter of days, before declaring a mistrial. The First Circuit in *Simonetti* concluded that the trial court spent "ample time" considering the issue presented. 998 F.2d 39, 41-2(1st Cir. 1993). In another First Circuit case on the issue of manifest necessity the appellate court found dispositive that "[a]t each step in the deliberative process, the judge went to great lengths to meet with the attorneys, solicit their views, and share his thoughts with them. Prior to making critical decisions, he afforded both lawyers an opportunity to be heard and considered their insights." *United States v. Keene*, 287 F.3d 229, (1st Cir. 2002). *See also Lara-Ramirez,* 519 F.2d at 79-80 (court had repeated exchanges with counsel at some length before declaring a mistrial); *United States v. Brown,* 426 F.3d 32, 32-34 (1st Cir. 2005) (trial court repeatedly discussed a "course of action" in a juror hold out case). Here, counsel understood that the trial was moving forward when the judge left the bench, and then was advised to the contrary when the court returned after the court deliberated for less than 17 minutes.

When the court returned, for the first time it asserted that the General Order had been violated by Agent Duquette testing positive.[4] Despite the court's initial conclusion that the court's General Orders did not address the issues presented, the court concluded that the General Orders prohibited Agent Duquette from testifying further. Given the numerous General Orders concerning Covid, and even more numerous amendments to those orders, counsel could not meaningfully address such a conclusion unless counsel was privy to the General Orders invoked by the court or given the opportunity to research the language contained in those Orders. This could only have happened if prosecution and defense counsel had been part of the process during the 17-minute

---

[4] The General Order precludes a person from entering the courthouse within 10 days of a positive test. It is silent as to what happens if a person has a positive test result after being tested in the courthouse. It is also silent as to whether a person must be removed from the courthouse following a positive test result while in the middle of testimony. *See* General Order (2)(h) and (3)(h).

10

break, and privy to the court's analysis of those General Orders. As the record reflects, the court did not cite any specific General Order but made an overall generalization precluding meaningful review of that determination.

The court also concluded that the jurors were to be advised of the positive test. (ECF No. 128; T. 100:16-19). The court raised and rejected the idea of questioning jurors or that they be given the choice of continuing to serve or being excused. The court foreclosed that option by stating "[e]ven if 12 or more were to indicate a willingness to continue," the court would still be concerned that a juror might later change their mind. The court concluded that because of those factors continuing with the trial was "…fraught with the possibility of complexity." (ECF No. 128; T. 101:4-6). The court then determined that "the most just way"[5] was to declare a mistrial. (ECF No. 128; T. 101:12-14).

When the court asked for comments from counsel in accordance with F.R. Crim. P 26.3, defense counsel stated its objection to a mistrial, that it wished to continue with the trial and advised the court that it would be fundamentally unfair to declare a mistrial. The government also stated that it wished to proceed with the trial but acknowledged the risk of continuing with jurors who were notified of the positive test and deferred to the court on that issue. (ECF No. 128; T. 102:14-103:1).

Thus, even after the court proposed declaring a mistrial *both* the government and the defendant stated their desire to proceed forward with the trial. It is entirely reasonable to believe

---

[5] The court three times articulated the standard it was using to assess and weigh the various factors in its mistrial analysis. The first was "the most just way", the second was "that the better judgment" and third, "that the best judgment" was used for the mistrial analysis. (ECF No. 128; T. 101, 106). These statements sought a "fairness" test in balancing the government's, the court's and the defendant's varying interests. A manifest necessity analysis is not about what is fair to the prosecution or the court. The manifest necessity requirement protects the defendant's constitutional rights. Manifest necessity ensures that mistrial is a "remedy of last resort," *Lara-Ramirez, supra* at 736. Any doubt "must be resolved in favor of the citizen…" *Id.* The test is not a balancing of the interests, in "the most just way," it is whether there are no other reasonable options.

11

that after two years of Covid, 1-2 days of jury selection during which they were told of the safety measures taken by the Courthouse to protect jurors from Covid, and in that extraordinarily well-protected courtroom setting that at least a significant number of jurors would have agreed to continue for the duration of a two-day trial. The jurors could see the plexiglass on the witness box. The court advised them of the "standard of the art" HVAC system. Had the court individually inquired, or had jurors fill out a simple questionnaire, the "possibility of complexity" moving forward could have been ascertained, and a record made for appellate review of the need for a mistrial. Since the purpose of such an investigation is to protect the defendant's double jeopardy rights, the failure to do so triggers the double jeopardy clause in this case.

Using the *Toribio-Lugo* three-pronged mistrial analysis, (1) the court did not undergo the thorough investigation necessary to explore and exhaust alternatives to a mistrial; (2) counsel was given limited and inadequate information and time to process the court's decision-making; and (3) the court did not engage in adequate reflection in arriving at its declaration of a mistrial. 376 F.3d at 39.

**Double Jeopardy Applies Where Government is Culpable for a Witness's Unavailability**

At its heart, this mistrial is about witness unavailability. Despite both parties wishing to continue with the trial, the court concluded that it could not allow Agent Duquette to testify after testing positive. Since Agent Duquette was a prosecution witness *Downum v. United States,* 372 U.S. 734 (1963) is the seminal case dealing with that issue. *Downum* involved a prosecutor allowing a jury to be sworn, knowing an essential witness had not yet been served a subpoena. The court discharged the sworn jury at the prosecution's request. Two days later a second jury was empaneled, sworn and the defendant was convicted over his double jeopardy assertion.

The Supreme Court vacated the conviction on double-jeopardy grounds finding that the discretion to discharge a jury before reaching a verdict is to be exercised "…only in very extraordinary and striking circumstances." *Id.* at 737. The Court also held that for purposes of necessary witness unavailability double jeopardy analysis, government culpability is to be taken into account.[6] *Id.*

The first witness unavailability hurdle which the government cannot clear is whether Agent Duquette was an *indispensable witness*. If not, the court should have instructed the jury to disregard Agent Duquette's testimony and proceeded forward with other witnesses. There is no evidence in the record that Agent Duquette was indispensable. This is not the usual case where the prosecutor is moving for a mistrial because an indispensable witness is unavailable. Rather, the court *sua sponte* assumed that Agent Duquette was a necessary witness, and thus, that his further testimony was required. The record does not support that assumption.

The case is a straightforward criminal threatening case with defense counsel admitting during opening that his client posted the allegedly threatening tweet. (ECF No. 128; T. 28:22-24). Although Agent Duquette was the case agent, the government acknowledged that they could replace him as such. (ECF No. 128; T. 97:16-22). The "tweet" itself was introduced into evidence by the two earlier witnesses. According to AUSA Wolff Agent Duquette was to testify to, *inter alia* "photographs, ammunition, and the rifle." (ECF No. 128; T. 72:16-8). He testified for fifteen minutes before the morning break, beginning around 10:10 am and ending at 10:25 am. (ECF No. 128; T. 73:9-13, 85:15).

---

[6] Not only is government culpability part of the double jeopardy analysis for witness availability, but on review by an appellate court, the "strictest scrutiny is appropriate when the basis of the mistrial is the unavailability of *critical prosecution evidence.*" See United States v. Stevens, 177 F. 3d 579, 582 (6th Cir. 1999), (government witness' refusal to testify did not create manifest necessity for mistrial), citing *Arizona v. Washington,* 434 U.S. 497, 508 (1978).

13

During that 15-minute period Agent Duquette testified to certain preliminary matters, all primarily addressed by the two earlier witnesses and then testified as to what he saw at 86 Fogg Road, Buxton, Maine. He also testified that he was accompanied by an FBI agent at 86 Fogg Rd. (ECF No. 128; T. 78:17). Photographs of 86 Fogg Road were introduced without objection. (ECF No. 128; T. 79:12-16). Both he and the other FBI Agent spoke to the defendant's mother briefly, saw the defendant and left. (ECF No. 128; T. 80:7-18). Presumably, this all could have been testified to by "the other FBI agent" to the extent it was necessary evidence. It is not, however, the defendant's burden to persuade this court that additional witnesses could have covered Agent Duquette's testimony.

It is the government's burden to prove on the record before this court that Agent Duquette's testimony was necessary to obtain a conviction. *Downum v. United States,* 372 U.S. at 736. Since there is nothing in the record establishing that Agent Duquette's testimony was essential, and indeed because it was not, an "essential witness unavailability" argument is unavailing and the failure to finish his testimony cannot justify the mistrial in this case.

Second, even if the record established that Agent Duquette was an essential witness, the prosecution's negligence was responsible for Agent Duquette's unavailability. The government's lead counsel acknowledged to the court that he mistakenly believed that witnesses could testify without masks at trial, and without being tested. (ECF No. 128; T. 85:23-86:1; 99:4-10, 16-18). That was very clearly not the case. Counsel themselves were tested that morning *in order to speak without being masked.* (ECF No. 128; T. 98:16-22). General Order 2021-6 clearly articulated the test criteria, and the March 2022 version of General Order 2021-6 contained the same testing requirements. Exhibits 1 and 2, respectively.

14

The government was also aware that having Agent Duquette submit to covid testing during morning break carried with it significant risk. The earlier negligent misunderstanding of the necessary testing and masking protocols was compounded by the subsequent ill-advised decision to test Agent Duquette during the morning break. Covid is unpredictable, positive test results are unpredictable. While no query was made of Agent Duquette's symptoms, it was well established that Covid carriers can display no symptoms. Simply put, the government "took two chances". *See Downum, supra* at 736 ("when the district attorney empaneled the jury without first ascertaining whether or not his witnesses were present, *he took a chance."*) *(emphasis added).* The prosecution took a chance in not properly testing Agent Duquette and again when they had Agent Duquette tested after the trial and his testimony began. (ECF No. 128; T. 95:2). Despite governmental culpability, both prosecution and defense requested that the trial continue with masked testimony from Agent Duquette. Given this court's reasonable belief that he could do so safely, a mistrial was unnecessary.

Under certain circumstances manifest necessity can be found where a witness becomes too ill to testify after the trial starts, but in those cases the testimony must be essential to the case, and not occasioned by government misfeasance. *Stevens,* 177 F. 3d at 591 (J. Kennedy dissenting) ("manifest necessity may be found where an *essential* witness becomes unavailable, the unavailability was a surprise, arose after the trial begin, and was *not due to the fault of the government."*) (*emphasis added*). This case does not meet those requirements.

Finally, when assessing essential witness unavailability, a court must consider all options available, and a failure to explore all options, including a continuance, is fatal to a manifest necessity finding. *See United States v. Rivera,* 384 F. 3d 49, 56, 58 (3rd Cir. 2004). There, the key prosecution witness was unavailable due to a broken leg. The prosecution requested a delay to

15

establish the prognosis for the witness' return. The court instead declared a mistrial in part to manage its docket. The Third Circuit found no manifest necessity, both because managing the court's docket is not grounds for a mistrial, but also because the court failed to properly consider a reasonable alternative to a mistrial, determining the witness's unavailability before declaring a mistrial. *Id.* at 57.

There were several unexplored options available in this case. First, the court could have stricken the testimony of Agent Duquette and continued with the trial. Second, the court could have continued the case for 10 days or more, allowing Agent Duquette to meet the 10-day waiting period under the General Orders. *See United States v. Coversup,* 2020 U.S. LEXIS 131302; 2020 WL 4260519 (court denied motion for mistrial where juror informed the court on the second day of trial that she was exposed to Covid, and court instead continued the case for two weeks). There was no discussion on the record about having Agent Duquette finish his testimony live by video from another location.[7]

Accordingly, there was no exploration or exhaustion of alternatives to a mistrial; counsel were not engaged throughout the process to meaningfully explore such alternatives; and the record does not include "adequate reflection" by the court in arriving at its decision. For these and the other above-enumerated reasons, Double Jeopardy Clause protections apply and preclude further prosecution of the defendant. *See Toribio-Lugo* at 39.

**Conclusion**

For the above-stated argument and authority, the defendant respectfully states that his constitutional double jeopardy protections apply and that, as a result of those protections, this case must be dismissed.

---

[7] The court could also have requested that Agent Duquette obtain a PCR Test to determine if the antigen test was a false positive.

16

Dated June 29, 2022, in Portland, Maine.

        Respectfully submitted,

        */s/ Thomas F. Hallett*

        _____
        Thomas F. Hallett
        *Attorney for Defendant*
        HALLETT WHIPPLE WEYRENS
        6 City Center, Suite 208
        P.O. Box 7508
        Portland, Maine 04112-7508
        PH: 207-775-4255
        *thallett@hww.law*

## CERTIFICATE OF SERVICE

      I, Thomas F. Hallett, Esq., hereby certify that I have caused the above *MOTION TO DISMISS* to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to counsel of record.

      Dated June 29, 2022, in Portland, Maine.

      Respectfully submitted,

*/s/ Thomas F. Hallett*

———————————————————
Thomas F. Hallett
*Attorney for Defendant*
HALLETT WHIPPLE WEYRENS
6 City Center, Suite 208
P.O. Box 7508
Portland, Maine 04112-7508
PH: 207-775-4255
*thallett@hww.law*