## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **2:21-cr-00149-JDL-1** |
| | ) | |
| **BRIAN DENNISON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER ON DEFENDANT'S MOTION TO DISMISS

Brian Dennison is charged in a single-count indictment (ECF No. 17) with transmitting a threatening interstate communication in violation of 18 U.S.C.A. § 875(c) (West 2022).  Dennison's jury was empaneled on May 3, 2022, and the jury was sworn and the trial began on May 24, 2022.  Approximately three hours after the start of the trial, a mistrial was declared after the Court learned that one of the witnesses, the Government's case agent, had tested positive for COVID-19 during the morning recess, which was held after he had begun his testimony.  On June 29, 2022, Dennison moved to dismiss the indictment (ECF No. 132), asserting that a retrial would violate his right under the Double Jeopardy Clause of the Fifth Amendment not to be tried twice for the same crime.  Dennison contends that there was no manifest necessity to declare a mistrial, and that double jeopardy bars a second trial. The Government argues that manifest necessity supported the declaration of the mistrial, and double jeopardy does not apply.  After careful consideration, I deny Dennison's motion.

## I.  BACKGROUND

Throughout the COVID-19 pandemic, the U.S. District Court for the District of Maine has operated in accordance with a series of General Orders intended to protect public health and safety in connection with the Court's ongoing operations. One such order, General Order 2021-6, sets forth the District's Courthouse protocols regarding masking, testing, entry, and physical distancing requirements in effect during the period relevant to Dennison's case.  *See* General Order 2021-6, *General Order Regarding Masks, Courthouse Entry, and Physical Distancing Requirements* (amended May 20, 2022), available at https://www.med.uscourts.gov/active-general-orders-regarding-covid-19-pandemic.  Specifically, the General Order requires that all persons involved in jury trials wear a qualifying face mask but that a party, attorney, or witness may remove their mask while speaking during the trial if they are fully vaccinated and receive a negative result from a rapid antigen test taken on the day of the proceeding.  General Order 2021-6(2)(b), (h).  In addition, the General Order provides that individuals who have tested positive for COVID-19 within the previous ten days are not permitted to enter the Courthouse while they are required to isolate per CDC guidance.  General Order 2021-6(3)(b).  The General Order does not mandate COVID-19 testing as a condition for entering the Courthouse.

Brian Dennison was charged with transmitting a threatening interstate communication, 18 U.S.C. § 875(c), after he allegedly posted on Twitter that he was "going to kill jews with [his] ar15 tomorrow."  ECF No. 17 at 1.  Dennison's trial was specially scheduled for a three-day period beginning Monday, May 23, 2022, to be held in two of the three courtrooms in the Courthouse in Portland, with the trial itself

to be held in one courtroom, and the second courtroom serving as the jury's assembly and deliberation room.  At that time, as a COVID-19 precaution, the Courthouse's third courtroom and its three jury deliberation rooms were closed and not being used.[1] Dennison's jury trial was specially scheduled by the Court on April 11, 2022, to begin on May 23, 2022, and to be held over three days.  *See* ECF No. 57.  The Notice of Hearing issued on April 11 directed that "Counsel should review Amended General Order 2021-6 regarding Masks, Courthouse Entrance Protocols, Social Distancing and Testing." *Id.*  A case management conference was held on April 20, 2022, at which time counsel for both sides reiterated that the trial would be completed in three days. No changes were made to the trial schedule. Prospective jurors were informed that the trial was estimated to take three days, and Dennison's jury was empaneled on May 3, 2022.  A second Notice of Hearing was issued May 17, 2022, which again directed that "Counsel should review Amended General Order 2021-6 regarding Masks, Courthouse Entrance Protocols, Social Distancing and Testing."  ECF No. 90.

On Sunday, May 22, the Government sent an email to the Court requesting that the presentation of evidence be delayed from Monday, May 23, until Tuesday, May 24, because its first witness was experiencing travel difficulties.  Dennison consented to the delay.  On Monday, May 23, 2022, counsel for both parties affirmed that the trial could be completed in two days rather than the three originally estimated.  I then reminded counsel that the case would need to be fully tried during the two remaining allotted days, emphasizing:  "I will say it again.  We have two solid

---

[1] At the time, the Court had requested and was awaiting the results of an evaluation of the Courthouse's air filtration systems from the U.S. General Services Administration.

days for trial, and this case will be tried in two solid days." ECF No. 127 at 36:24-37:1.

The next morning, the jurors were sworn, and the trial began with opening statements, followed by the testimony of the Government's two out-of-state witnesses. The Government's third witness was U.S. Border Patrol Agent Jonathan Duquette. Agent Duquette was assigned to the FBI as a Task Force Officer and, as the case agent responsible for the case, was present in the courtroom at counsel table from the start of the trial. In his opening statement, the prosecutor had represented that Duquette would testify to several important matters, including his conversation with Dennison, the execution of three search warrants, the discovery of evidence of anti-Semitism and of the Twitter threat at Dennison's residence, and the seizure of ammunition and electronic devices from Dennison's residence. The prosecutor had also indicated that the Government would introduce its exhibits, including photographs and physical evidence—which included rounds of ammunition and a rifle—through Duquette.

Duquette wore a mask throughout the morning, including when he assumed the witness stand to testify. Approximately fifteen minutes after the start of his testimony, the trial was recessed for a fifteen-minute morning break. After the jurors left the courtroom, I reminded counsel "that under the court's COVID protocols witnesses who are vaccinated and have taken a test and received a negative result the day of their testimony are permitted to remove their masks if they wish to. That's up to them. But I ask, counsel, that you inform witnesses of that [alternative] if you want them to remove their masks." ECF No. 128 at 85:16-22. In response, the

prosecutor explained that Duquette had not been tested and, as a result, had worn his mask while testifying because "[w]e were under a misimpression that witnesses would be able to remove them regardless of status, and so that's our fault for not realizing what the policy was."  ECF No. 128 at 85:23-86:1.

After the recess and having resumed the bench, I ruled on an evidentiary objection that the attorneys had argued prior to the recess.   I was then notified by the Clerk's Office that Duquette had taken a rapid antigen test during the recess and had tested positive for COVID-19.  I informed counsel and explained that "first of all, the Court's general orders don't anticipate a situation like this.  And I'm required to weigh not only the interests of the court generally in terms of the protection of the public but also the interests of the defendant and the Government at stake during the course of this trial."  ECF No. 128 at 95:5-10.  I then observed that "[k]nowing that we can isolate Mr. Duquette physically, everyone can keep ample distance from him, it seems to me there is very low risk associated with having him testify wearing a mask.  And so I'm inclined to permit him to continue to testify, even though we received this report."  ECF No. 128 at 95:11-15.  I then invited the parties to be heard on the issue.

Both the Government and Dennison confirmed that they wished to proceed, but the prosecutor noted that, under the Court's General Orders, Duquette would not be permitted to re-enter the Courthouse once he departed, "which obviously would pose a significant problem for the Government given his role in this case" as the Government's case agent.  ECF No. 128 at 95:22-24.  Defense counsel then stated, "I perceive this as a real problem primarily because I'm seated next to Mr. Duquette,

close enough anyway, and I have very good reasons to -- I have a daughter who's eight and a half months pregnant.  So I'm not sure how the Court wants to handle this." ECF No. 128 at 96:2-6.  Defense counsel also raised the same potential problem with the Court's General Order that the prosecutor had referred to:  "You know if Mr. Duquette is --leaves and then he can't be called back, that's if he needs to be, and I have no idea if he does, I just think we need to think about all of the potential ramifications."  ECF No. 128 at 96:8-11.  After Dennison and his attorney conferred, the defense attorney stated that "we certainly wish to go forward with this trial" because "[w]e're in the middle of it," and he suggested that Duquette be required to wear an N95 mask or equivalent and not be seated near others, and he concluded: "But we are not adverse to going forward as long as steps are taken to insulate people."   ECF No. 96:21-22, 97:5-7.   The prosecutor also confirmed that the Government wished to proceed and that they could continue in Duquette's absence even though he was the case agent, so long as Duquette was permitted to finish testifying.  I then announced that we would take a recess "to give this additional thought."  ECF No. 128 at 97:23-34.

Following the recess, and after having weighed the circumstances in relation to the Court's General Orders and Rule 26.3 of the Federal Rules of Criminal Procedure, which addresses mistrials, I again summarized the events surrounding Duquette's positive COVID-19 test.  I confirmed that he had not been tested in the morning prior to testifying because the Government had misunderstood the testing and masking protocol for witnesses.  Both the Government and Dennison again confirmed that they wished to proceed with the trial.  Then, after considering the

6

parties' stated positions, I explained the reasons for my tentative decision to declare a mistrial based on Duquette's unexpected unavailability and the impact that his physical presence could have on the jurors if the trial were to resume with him physically present:

> [H]aving the witness testify knowing that he is possibly infected because of a positive test is contrary to the Court's general orders, and it seems to me that it would be necessary for the Court to inform all of the persons in the courtroom, and in particular the jurors, of what we know, and that is that this witness tested positive, which could be a source of some concern for one or more of the jurors.  And so it seems to me that it's important to weigh the effect that that might have on this trial with -- against the effect of or the value of simply proceeding.
>
> I don't think that it's appropriate to not inform the jurors of what we know about Mr. Duquette or, for that matter, the individuals who are in the courtroom. So they will be informed. It also seems to me that it is not, although I've considered this possibility, wise to give the choice -- the jurors the personal choice of continuing to serve or being excused based upon their receipt of the information regarding Mr. Duquette. Even if 12 or more were to indicate a willingness to continue, I remain concerned, first of all, that there is some health risk of us all continuing to proceed in a courtroom with an infected person, known to be infected, and that also this is the type of question which is upsetting for many people and could cause them upon reflection perhaps to change their mind about continuing to participate. So[,] continuing with the trial under these conditions . . . is fraught with the possibility of complexity.
>
> Of course, I have to weigh this against Mr. Dennison's rights. The trial's begun; our resources have been expended; Attorney Hallett's indicated his client would like to continue notwithstanding this information. And that also of course . . .  is extremely important.
>
> As I've weighed this, counsel, I've concluded tentatively that the most just way to respond to this unusual set of circumstances is to declare a mistrial. The rule provides that before ordering a mistrial the Court is to give each side, the defendant and the Government, the opportunity to comment on the propriety of the order, to state whether the party consents or objects, and to suggest alternatives. And so that's where we are at this moment. I'll hear first from the Government. Actually I'll hear first from the defendant if the defendant wishes to go first because the defendant's name appears first in Rule 26.3.

ECF No. 128 at 100:6-101:22.

After the defense attorney examined Federal Rule of Criminal Procedure 26.3, he responded that Dennison objected to the declaration of a mistrial, but he did not suggest any additional alternative approaches for the court to consider, nor did he request that the jurors be questioned.  He stated:

> Your Honor, our general position is as previously stated, and that is that we would like this case to move forward. I have been informed by my client that he does not wish to put anyone at risk, so I'm bringing that to the attention of the Court. With that said, from defense counsel's perspective, we would wish to continue. We understand what the Court is saying but let me just lodge that objection.

ECF No. 128 at 102:5-12.  The prosecutor indicated that the Government wished to continue with the trial as well, but then stated his concern that if the trial continued, "we do then run the risk of having jurors who are not at all focusing on the testimony and frankly perhaps holding it against the Government for putting a witness up who could possibly infect them.  So I do think that is fraught with . . . difficulty."  ECF No. 128 at 102:18-22.  Ultimately, the prosecutor stated that the Government would "defer to the Court on this, Your Honor, because I do think that there are some serious concerns about proceeding if we notify the jurors, which I think would be appropriate."  ECF No. 128 at 102:23-103:1.  Defense counsel then offered the additional argument that because he had already made his opening statement, "the prosecution can now go out and plug holes in the case as a result of the defense that's been stated in opening, that's another reason why we need to go forward with this, because I think that would be fundamentally unfair."  ECF No. 128 at 104:5-11.  I considered and rejected this as a basis for not declaring a mistrial, explaining: "I'm

satisfied under the circumstances at this point the -- of course the defense has not presented any evidence, that that does not outweigh the reasons I've already cited counseling in favor of a mistrial, but thank you." ECF No. 128 at 104:15-18.

After considering the parties' positions, I ultimately decided to declare a mistrial. The jury was then dismissed after I informed the jurors in open court that under the Court's COVID-19 protocols "if someone is positive for COVID-19 they're not permitted to be in the courthouse" and that Duquette, a key witness, had tested positive for COVID-19 during the morning break. ECF No. 128 at 106:12-13. I also explained that, having heard from both sides on whether the trial should proceed, I had concluded "that the better judgment in this case is to declare a mistrial." ECF No. 128 at 106:19-20.

Dennison subsequently moved to dismiss the indictment on double jeopardy grounds (ECF No. 132).

## II. LEGAL ANALYSIS

### A. Legal Standard

The Double Jeopardy Clause of the Fifth Amendment provides that no person may be tried more than once "for the same offence." U.S. Const. amend. V. "These safeguards attach once a criminal jury is sworn." *United States v. Garske*, 939 F.3d 321, 328 (1st Cir. 2019). "As a part of this protection against multiple prosecutions, the Double Jeopardy Clause affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal.'" *Oregon v. Kennedy*, 456 U.S. 667, 671-72 (1982) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)). However, when unforeseen events arise during trial that make it impossible for the trial to be

completed by a particular tribunal, "a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Illinois v. Somerville*, 410 U.S. 458, 470 (1973) (quoting *Wade*, 336 U.S. at 688-89)). Thus, double jeopardy does not always bar reprosecution when a mistrial is declared before the jury returns its verdict. *United States v. Toribio-Lugo*, 376 F.3d 33, 38 (1st Cir. 2004).

"[W]hen a mistrial is declared without the defendant's consent, the permissibility of a new trial depends upon the 'manifest necessity' for the mistrial declaration." *United States v. Lara-Ramirez*, 519 F.3d 76, 82 (1st Cir. 2008) (quoting *United States v. DiPietro*, 936 F.2d 6, 9 (1st Cir. 1991)). "[M]anifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *United States v. Jorn*, 400 U.S. 470, 485 (1971). The Government carries the burden "to show manifest necessity for the district court's decision to declare a mistrial." *Garske*, 939 F.3d at 330.

The First Circuit has described the manifest necessity inquiry as being "case-specific" and has noted that it "cannot be discharged by resort to a mechanical checklist." *Lara-Ramirez*, 519 F.3d at 84 (quoting *United States v. Brown*, 426 F.3d 32, 36 (1st Cir. 2005)). In *Lara-Ramirez*, the Court discussed three interrelated factors that guide the inquiry: "(i) whether alternatives to a mistrial were explored and exhausted; (ii) whether counsel had an opportunity to be heard; and (iii) whether

the judge's decision was made after sufficient reflection." *Id.* at 84-85 (quoting *Toribio-Lugo*, 376 F.3d at 39).

## B.   The Parties' Arguments

In support of his motion to dismiss, Dennison contends that the circumstances presented by Duquette's positive COVID-19 test do not support the required finding of manifest necessity.   Citing *United States v. Toribio-Lugo*, 376 F.2d at 39, he contends that the process that was employed, in the face of his opposition to a mistrial, was deficient because the jurors were not individually questioned; the process was not sufficiently thorough and failed to fully explore the available alternatives; and the decision to declare a mistrial was too expedited and, therefore, did not demonstrate adequate reflection or give counsel sufficient time to process the decision.   Dennison also argues that Duquette was not shown to be an essential witness, and that even if he was, his unavailability was the product of the Government's negligence. Specifically, Dennison points to the Government's acknowledgement that the prosecutor mistakenly understood at the onset of the trial that witnesses could testify without a mask without having been tested for COVID-19, and, consequently, the Government did not have Duquette tested on the morning of May 24 before the start of his testimony.   Only after the parties were reminded, moments before the morning recess, of the mask and testing requirements for witnesses did Duquette seek and receive a rapid antigen test.   Dennison thus argues that the Government was responsible for Duquette's unavailability because it was aware that having him submit to a COVID-19 test during the morning break carried with it the risk that he would test positive and be unavailable to testify.

11

In response, the Government argues that manifest necessity for a mistrial was established due to Duquette's unexpected unavailability, along with the psychological and emotional effect that Duquette's positive test would likely have on the jurors once they were informed of the result; that the parties were afforded a sufficient opportunity to be heard; and that the process that the Court employed to arrive at the mistrial declaration was sufficiently deliberate. The Government also contends that the record establishes that Duquette, as the case agent and primary investigator who had obtained the three search warrants issued in the case, was an essential witness. Further, the Government disclaims any culpability associated with the circumstances giving rise to Duquette's unavailability, noting that the Court's General Orders do not require persons to be tested for COVID-19 as a condition to entering the Courthouse, nor do they require a masked witness to be tested for COVID-19. Because Duquette was asymptomatic, the Government contends that it did not expect and had no reason to anticipate that he would test positive for COVID-19 once he took a COVID-19 test during the morning break. Finally, the Government argues that Dennison cannot claim that the Court did not adequately consider alternatives because none of the alternatives suggested by Dennison in his motion to dismiss were raised by him during the trial.

## C.    Discussion

A mistrial declaration is subject to the requirements of Fed. R. Crim. P. 26.3, which provides: "Before ordering a mistrial, the court must give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives." The process

employed here in response to Duquette's positive COVID-19 test was true to these requirements. The Government and Dennison had the opportunity to address the propriety of a mistrial, to state whether they consented or objected, and to suggest alternatives. Ultimately, neither the Government nor Dennison suggested any alternative to a mistrial apart from the alternative I initially suggested of resuming the trial and permitting Duquette to testify while wearing a mask. Neither party suggested that the jurors be questioned, the trial be continued, or any other approach. In his motion to dismiss, Dennison argues that I should have either stricken Duquette's testimony and resumed the presentation of evidence, postponed the resumption of the trial for ten days or more, or arranged for Duquette to testify by video. As I will further explain, however, none of these alternatives were suggested at the trial while the propriety of declaring a mistrial was being considered.

The mistrial declaration was made necessary by the requirements of the Court's General Order 2021-6 regulating the conduct of jury trials in the District of Maine during the COVID-19 pandemic. At the time the mistrial was declared, Duquette's testimony was anticipated to require several additional hours. He had already been present in the courtroom in relatively close proximity to the attorneys and jurors throughout the morning's proceedings. But because Duquette had tested positive for COVID-19, he was prohibited by General Order 2021-6 from entering and, therefore, being in the Courthouse. General Order 2021-6(3)(b) ("A person who has (i) tested positive for COVID-19 within the past 10 days . . . must comply with all requirements of the U.S. Centers for Disease Control and Prevention and may not enter so long as the person is required to quarantine in accordance with CDC

requirements:   https://www.cdc.gov/coronavirus/2019-ncov/your-health/quarantine-isolation.html.").  The declaration was also premised on the possible psychological and emotional effects on the jurors of being informed that they had been in the presence of Duquette throughout the morning, as well as the effects of having to remain in his presence if he were permitted to continue testifying in the courtroom. Relatedly, the prosecutor had expressed concern for "the risk of having jurors who are not at all focusing on the testimony and frankly perhaps holding it against the Government for putting a witness up who could possibly infect them."  ECF No. 128 at 102:18-22.

As previously noted, a mistrial declaration that is objected to by a defendant must be supported by a finding of manifest necessity, and the manifest necessity inquiry is guided by three factors: "(i) whether alternatives to a mistrial were explored and exhausted; (ii) whether counsel had an opportunity to be heard; and (iii) whether the judge's decision was made after sufficient reflection." *Lara-Ramirez*, 519 F.3d at 84-85 (quoting *Toribio-Lugo*, 376 F.3d at 39).  In addition, when the reason for a mistrial is the sudden unavailability of a witness, consideration must be specifically given to whether the witness is in fact essential and whether the Government acted culpably by participating in the empanelment of the jury in the face of a known risk that the witness could become unavailable.  *See Walck v. Edmondson*, 472 F.3d 1227, 1236-38 (10th Cir. 2007); *United States v. Fisher*, 624 F.3d 713, 721-22 (5th Cir. 2010); *Seay v. Cannon*, 927 F.3d 776, 781, 784 (4th Cir. 2019).

1. **Alternatives to a Mistrial Were Explored and Exhausted**

For the reasons that I will explain, alternatives to a mistrial were adequately explored and exhausted before a mistrial was declared in response to Agent Duquette's sudden unavailability.

### a. Agent Duquette Was an Essential Witness

The record establishes that Agent Duquette was an essential witness whose testimony was necessary for the trial to continue. *See United States ex rel. Gibson v. Ziegele*, 479 F.2d 773, 777 (3d Cir. 1973). In his opening statement, the prosecutor explained that Duquette would be the Government's key witness and would testify to events involving statements made by Dennison and his mother when they were interviewed at their residence; the seizure of items from Dennison's home; the discovery of evidence demonstrating Dennison's alleged anti-Semitic views; and the discovery of Dennison's use of the Twitter account on which the threatening message had been posted. Specifically, the prosecutor said: "You will hear from TFO Duquette that during his review of the defendant's phone and computer TFO Duquette found evidence of the defendant's hatred of Jews and how he utilized the Twitter profile @Ma1lus that posted both I'm going to kill Jews with my AR-15 tomorrow and building a pipe bomb." ECF No. 128 at 27:13-17. And at the outset of Duquette's testimony, the prosecutor explained that Duquette "is the witness who will be introducing photographs and then also physical evidence of ammunition and the rifle." ECF No. 128 at 72:16-18. The record reflects that Duquette had obtained three search warrants in connection with the investigation, and that he was the Government's designated case agent. Duquette's testimony would not merely have

been cumulative because he was the only witness for many of those important facts. *See Ziegele*, 479 F.2d at 777.   Although the prosecutor represented that the Government could finish the trial with a different case agent, that alternative was dependent on the Court finding "it acceptable for Mr. Duquette to finish his testimony."   ECF No. 128 at 97:13-14.

As to the question of unavailability, Duquette became unavailable to testify in person once he tested positive for COVID-19.   Under General Order 2021-6, Duquette was not permitted to enter and, therefore, be in the Courthouse once he had tested positive for COVID-19, even if he was masked.   *See* General Order 2021-6(3)(b). Dennison's motion to dismiss does not directly question this conclusion.   In addition, Duquette was required to quarantine for what was, as of May 24, 2022, an undeterminable period of time, pursuant to the CDC's guidance.[2]   *Id.*

### b. Whether the Government was Culpable in Agent Duquette's Unavailability

Dennison argues that the Government cannot claim that there was manifest necessity based on Agent Duquette's unavailability because it was culpable in bringing about his unavailability.   Generally, the Government cannot claim manifest necessity based on a witness's unavailability if it bears responsibility for that unavailability or if it proceeded to trial in the face of a known risk that the witness might be unavailable.   *See Downum v. United States*, 372 U.S. 734, 737 (1963); *United*

---

[2] The period was undeterminable because, under the CDC guidance in effect at the time, Duquette would have had to quarantine for five days if he did not develop symptoms but likely longer if he did. *See* Lauri Hicks, et al., *Quarantine and Isolation*, U.S. Centers for Disease Control and Prevention (Mar. 24, 2022), https://stacks.cdc.gov/view/cdc/115701; CDC Newsroom, *CDC Updates and Shortens Recommended Isolation and Quarantine Period for General Population*, U.S. Centers for Disease Control and Prevention (Dec. 27, 2021), https://www.cdc.gov/media/releases/2021/s1227-isolation-quarantine-guidance.html.

*States v. Stevens*, 177 F.3d 579, 587 (6th Cir. 1999); *Walck*, 472 F.3d at 1239.  In *Walck*, 472 F.3d at 1239, for example, one of the reasons that the Government could not prove manifest necessity was because it had prior knowledge that its key witness was about to give birth and, therefore, it "proceeded in the face of a great risk of unavailability" when it proceeded to trial anyway.

Dennison's attempt to paint the Government as taking an unreasonable risk when it did not test Duquette for COVID-19 prior to trial, but then allowed him to be tested during the trial, is unpersuasive.  The Government did not take a risk in not testing Duquette prior to trial because witnesses were not required to be tested under the General Order and could testify without having been tested so long as they wore a mask.  *See* General Order 2021-6(2)(h)(ii).   And because Duquette was asymptomatic, the Government did not act in the face of a known risk, as was the case in *Walck*, 472 F.3d at 1239, by having Duquette take a test during the morning recess so that he could resume his testimony for the remainder of the day without wearing a mask.  *See United States v. Thrush*, Case No. 1:20-cr-20365, 2022 WL 2373351, at *4 (E.D. Mich. June 30, 2022) (concluding that the Government did not act in the face of a known risk when it proceeded to trial notwithstanding that it had not yet received the results of a pending COVID-19 PCR test because it believed in good faith that the asymptomatic witness would be able to testify), *appeal filed*, No. 22-1588 (6th Cir. July 1, 2022).

The prosecutor's misunderstanding of the COVID-19 mask requirement in place at the time does not change this analysis. The Government's actions did not violate any of General Order 2021-6's requirements by having Duquette, who was

wearing a mask, be present in the courtroom and assume the witness stand to testify without being tested.  Further, having Duquette submit to a COVID-19 rapid antigen test so that he would not have to wear a face mask while testifying was permitted by General Order 2021-6(2)(h).  Although it is always possible that an asymptomatic person might test positive for COVID-19 if administered a rapid antigen test, there was no reason for the Government to anticipate that outcome as being anything more than a remote possibility in this instance.  Further, Duquette was expected to testify for most of the rest of the trial day.  By testing him during the morning recess and then unexpectedly obtaining a positive test result, the Government's actions reduced the risk that jurors, trial participants, and court staff present in the courtroom would be exposed to a potentially infectious person.  The Government's conduct was in keeping with the public health aims of the General Order.  Under all of the circumstances, it was not unreasonable for Duquette to submit to a COVID-19 rapid antigen test during the morning recess.

### c.  Reasonable Alternatives to a Mistrial

Because of a defendant's right to have charges tried by a particular tribunal, courts have a duty to ensure that "alternatives to a mistrial were explored and exhausted."  *Toribio-Lugo*, 376 F.3d at 39.  Here, I initially proposed and then considered whether to permit Duquette to continue testifying by having him wear a mask.  Having recessed to research the issue in relation to the Court's General Orders, I concluded that this alternative was not viable because permitting a person for whom there is reason to believe is infected with the COVID-19 virus to enter and remain in the courthouse would violate the Court's General Order and present an

undetermined risk to the public, including jurors.  Neither Dennison nor the Government argued against this interpretation of General Order 2021-6 at the time.

As previously noted, in his motion, Dennison contends that there were reasonable alternatives that should have been explored before a mistrial was declared: that the court should have stricken Duquette's testimony and resumed the presentation of evidence, postponed the resumption of the trial for ten days or more, or arranged for Duquette to testify by video.  However, none of these alternatives were raised by Dennison in support of his objection to a mistrial when the issue was being considered.  "[A] criminal defendant must object to a mistrial at the time the mistrial is declared . . . [and] [i]n so doing, the defendant must provide specific grounds for the objection" because "[j]udges are not expected to be mindreaders." *United States v. McIntosh*, 380 F.3d 548, 555 (1st Cir. 2004) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)); *see also United States v. Brown*, 426 F.3d at 38 ("The argument that the holdout juror should have been questioned was not advanced by Brown before the district court. . . . We thus face an arguable forfeiture of that claim.").[3]

---

[3] Several other courts in this circuit have reached similar conclusions. *See United States v. Martinez-Maldonado*, 792 F. Supp. 2d 197, 202 (D.P.R. 2011) (rejecting the argument that the trial court should have asked the jury to clarify its verdict before declaring a mistrial on the basis of an inconsistent verdict because "the defendant makes no reference to any time where the defendant or the government requested this remedy"), *rev'd on other grounds*, *United States v. Fernandez*, 722 F.3d 1, 6 (1st Cir. 2013); *United States v. Reid*, No. CRIM. 05-CR-057-JD, 2006 WL 1751789, at *3 n.3 (D.N.H. June 21, 2006) ("Although Reid now suggests that the court should have questioned the single hold-out juror to see if he or she were participating in deliberations, he did not request that alternative at the time."); *United States v. Oliveras-González*, No. 05-235 (CCC), 2011 WL 1833087, at *3 (D.P.R. Feb. 25, 2011) (recommendation of magistrate judge) ("Importantly, however, the defendant failed to suggest either of these alternatives to the court at any time before the jury was discharged.  As the First Circuit has noted, 'Judges are not expected to be mind readers.  Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.'" (quoting *McIntosh*, 380 F.3d at 555 (quoting *Zannino*, 895 F.2d at 17)), *accepted in part by United States v. Marrero-Cruz*, Criminal No. 05-035CCC, 2011 WL 1832757, at *3 (D.P.R. May 13, 2011).

Further, this is not a situation in which defense counsel suggested alternatives to the declaration of a mistrial which the court refused to explore. *See Lara-Ramirez,* 519 F.3d at 89. Nor is this a situation in which the court repeatedly silenced defense counsel and "made no effort to ascertain the [defendant's] attitude or wishes with regard to the possibility of a mistrial." *See Toribio-Lugo*, 376 F.3d at 36-37, 39. Here, the parties were expressly invited "to suggest alternatives" in keeping with the requirements of Rule 26.3 of the Federal Rules of Criminal Procedure. Although Dennison clearly stated his opposition to the mistrial declaration and his support for having the trial resume with Duquette wearing a mask while testifying, he did not propose other alternatives for the court to consider by which a mistrial might be avoided. In addition, the three alternatives he now offers were or are not practical or sound.

First, Dennison's suggested alternative of striking Duquette's testimony and proceeding with the trial ignores that Duquette was a key Government witness who had unexpectedly become unavailable. Depriving the Government of the testimony of an essential witness would not have remedied the need for a mistrial. *See Ziegele*, 479 F.2d at 777 (concluding that the Government's need to provide an essential witness's testimony was a sufficient basis for a mistrial).

Second, continuing the trial for an indefinite period fails to account for the fact that it had been scheduled for a specific three-day period in keeping with the limited availability of courtrooms due to the Court's COVID-19 response. As of May 24, 2022, the two useable courtrooms in the Courthouse had been previously scheduled to be available beginning on June 6 for the empanelment of criminal and civil juries and

the holding of trials in connection with the Court's June 2022 criminal and civil jury trial lists.   Due to the exigencies of the pandemic at the time, the Court's usual flexibility to continue and reschedule trials was restricted.   Additionally, given the indefinite nature of Duquette's absence, it was unknown on May 24 when the trial could reasonably be expected to resume.   *See Garske*, 939 F.3d at 334; *see also United States v. Rodriguez*, 746 Fed. App'x 682, 684 (9th Cir. 2018) (concluding that a trial judge did not abuse his discretion "in determining that an indefinite continuance of trial was not a viable alternative to mistrial").

Third, the suggestion that Duquette should have been permitted to continue to testify, but not in person and instead by video, would have required Dennison to voluntarily waive his right to confront and cross-examine Duquette in person.   The right to confront witnesses face-to-face is guaranteed by the Sixth Amendment. *United States v. Cotto-Flores*, 970 F.3d 17, 37 (1st Cir. 2020) (citing *Coy v. Iowa*, 487 U.S. 1012, 1017, 1021 (1988)).   Although Dennison could have relinquished this right, *see United States v. Houlihan*, 92 F.3d 1271, 1279 (1st Cir. 1996); *Carter v. Sowders*, 5 F.3d 975, 980-81 (6th Cir. 1993), there is no evidence that he was willing to do so. The only position voiced by Dennison on May 24 was that he wanted the trial to resume with Duquette testifying in person while wearing a mask, which provided no indication that he was amenable to waiving his right to confront Duquette in person.[4]

---

[4] Also, there was no indication that Dennison would have waived his right under the Federal Rules of Criminal Procedure that "the testimony of witnesses must be taken in open court."  Fed. R. Crim. P. 26; *see United States v. Foster*, 652 F.3d 776, 782 (7th Cir. 2011) ("As the Supreme Court has explained, the provisions of the Federal Rules of Criminal Procedure are 'presumptively waivable.'" (quoting *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995))).

*See Ziegele*, 479 F.2d at 777-78 ("On this appeal, [the appellant's] attorney states that the appellant would have been willing to concede that he had received proper *Miranda* warnings.  However, appellant's counsel did not say this when he argued against the mistrial motion at the first trial, and we do not believe that the trial judge had an obligation to explore this unlikely possibility on his own initiative before declaring a mistrial.").

### 2. The Decision Was Made After Sufficient Reflection

Finally, Dennison contends that my declaration of a mistrial cannot stand because it was not "made after sufficient reflection."  *Lara-Ramirez*, 519 F.3d at 85 (quoting *Toribio-Lugo*, 376 F.3d at 39).  That requirement was met in this case.

After becoming aware of Duquette's positive test for COVID-19, articulating an alternative that might permit the trial to continue unimpeded, and engaging in a colloquy with counsel for both sides, I took a recess and allowed the parties and myself time to consider the issue.  Only after carefully contemplating the declaration of a mistrial did I return to the bench and hear further from counsel.

Dennison's argument that I acted precipitously because the process occurred over a relatively short period of time is unavailing.  The process lasted approximately thirty-five minutes.  This time included a recess which permitted all the participants to reflect on the circumstances, consult General Order 2021-6 and other relevant authority, and consider alternatives to a mistrial.  The process that ensued during the thirty-five-minute period allowed for the exercise of "sound discretion in deciding whether to declare a mistrial."  *United States v. DiPietro*, 741 F. Supp. 293, 296-97 (D. Mass. 1990) (noting that the trial court "devoted the entire luncheon recess to

consideration of the nature and extent of the government's error, the necessity for a mistrial, and other alternatives to a mistrial"), *aff'd*, 926 F.2d 6.

Dennison misconstrues the record in arguing that the mistrial declaration was precipitous because "[c]ounsel for both sides were in the dark about how the court determined that Duquette was in violation of the General Order," and that "[o]riginally the court determined that he was not in violation and that we could continue with his masked testimony." ECF No. 139 at 7. Both assertions are contrary to the record.

Upon resuming the bench, I framed the "question" presented by Duquette's positive test as being "whether under the Court's general orders he's permitted to testify with a mask." ECF No. 128 at 95:3-4. I then acknowledged that, "first of all, the Court's general orders don't anticipate a situation like this," ECF No. 128 at 95:5-6, meaning that the General Orders and, in particular, General Order 2021-6, did not recognize the possibility of a person who had tested positive for COVID-19 being permitted in the courthouse or, more specifically, being permitted to testify as a witness while wearing a mask. And after the hearing resumed, I explicitly stated, that "having the witness testify knowing that he is possibly infected because of a positive test is contrary to the Court's general orders." ECF No. 128 at 100:6-8. When responding to my explanation for declaring a mistrial, Dennison's attorney did not indicate any uncertainty as to the reason for the declaration, stating "We understand what the Court is saying but let me just lodge that objection." ECF No. 128 at 102:10-12.

Nor can Dennison claim that he was unaware of the General Order on which the decision was based.  The two Notices of Hearing issued before the trial directed the attorneys to "review Amended General Order 2021-6 regarding Masks, Courthouse Entrance Protocols, Social Distancing and Testing."  ECF Nos. 57, 90. Thus, the attorneys were on actual notice that the requirements of General Order 2021-6 would govern the trial process.

Finally, although Dennison correctly emphasizes that upon learning of Duquette's positive test, I raised the possibility of permitting Duquette to continue to testify while wearing a mask, I did not—as he also suggests—determine that it would not be a violation of General Order 2021-6.  I expressed no decision regarding the requirements of General Order 2021-6 prior to the recess.  My determination that Duquette's continued in-court testimony would violate General Order 2021-6 occurred only after I examined the General Order and deliberated on the situation during the recess, and then sought the input of the parties following the recess.

## III. CONCLUSION

The power to declare a mistrial "ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Toribio-Lugo*, 376 F.3d at 39 (quoting *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824)). The circumstance presented here—a witness testing positive for COVID-19 while in the midst of testifying—exemplifies the novel challenges presented by the conduct of jury trials during a pandemic.  Once Duquette's positive test result was made known, alternatives to declaring a mistrial were "explored and exhausted," counsel had the opportunity to be heard, and the decision to declare a mistrial was arrived at after

careful reflection. *Lara-Ramirez*, 519 F.3d at 85 (quoting *Toribio-Lugo*, 376 F.3d at 39). This is, therefore, an instance in which a defendant's right to have his or her trial completed before the empaneled jury is properly "subordinated to the public's interest in fair trials designed to end in just judgments." *Toribio-Lugo*, 376 F.3d at 38 (quoting *Wade*, 336 U.S. at 689).

It is **ORDERED** that Dennison's Motion to Dismiss (ECF No. 132) is **DENIED**.

**SO ORDERED.**

Dated: September 9, 2022

_____
        **/s/ JON D. LEVY**
**CHIEF U.S. DISTRICT JUDGE**