UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| VS. | ) | DOCKET NO. 2:21-cr-00149-JDL |
| | ) | |
| BRIAN DENNISON | ) | |
| | ) | |
| | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

**I.      INTRODUCTION**

The defense requests the Court impose a sentence of time-served followed by a term of supervised release. As of the date of this filing, Brian has served three months and nine days in custody. *See* Final Presentence Investigation Report (hereinafter "PSR") (ECF No. 225) at 1.

**II.     GUIDELINE CALCULATION**

The Revised Presentence Investigation Report, dated February 25, 2024, finds a total offense level of 12. PSR ¶ 23. As Brian has zero criminal history points, he is a criminal history category I. PSR ¶ 26. At level 12 with a criminal history category I, Brian has an advisory sentencing guideline range of 10 to 16 months. PSR 45.

Brian has no objection to USPO's calculation of his advisory guideline sentencing range.[1] The only objection to the guideline calculation in this case comes from the Government. Specifically, the Government argues that Brian should be subject to a two-level enhancement pursuant to § 3C1.1 for concealing "an AR-15 rifle in the woods behind his residence after the FBI

---
[1] Brian's only remaining objections are related to his ability to pay a fine (PSR ¶ 44) and imposition of a special condition requiring that he not incur any new credit charges or open additional lines of credit without the supervising officer's advance approval. PSR ¶64. With respect to the first objection, Brian respectfully submits that while he currently has a job and income, in the event a sentence of incarceration is imposed, he will immediately lose this job and by extension, this only source of income. As to the second objection, Brian understands from the Probation Office that this condition is only appropriate should the Court require he pay a fine.

1

agents visited the residence on September 8, 2021." PSR Addendum at 1. USPO declined to alter the report after reviewing the Government's objection, finding that, until October 21, 2021, when Brian proffered the location of the gun, he was exercising his constitutional rights. PSR Addendum at 2.

The defense respectfully submits that USPO's conclusion that the two-level enhancement pursuant to § 3C1.1 is not appropriate in this case is correct.

**A. A Two-Level Enhancement Pursuant to U.S.S.G. § 3C1.1 Obstruction is Not Appropriately Applied in this Case.**

USSG §3C1.1 provides for a two-point upward adjustment in a guideline range where:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

USSG §3C1.1. Application Note Two explicitly provides that the provision is not intended to punish a defendant to exercise of their constitutional rights. Application Note Four further provides a non-exhaustive list of examples of the type of conduct to which the adjustment is meant to apply, including threatening or intimidating co-defendants or witnesses (§ 3C1.1. n.4 (A)), providing false or altered documents to the Court or law enforcement, committing perjury (n. 4 (B)), and destroying or concealing evidence that is material to an official investigation or judicial proceeding. (N. 4(D)). However, with respect to destruction or concealment of evidence contemporaneous to an arrest, the application notes explicitly that such conduct, standing alone, is not sufficient to warrant an upward adjustment unless it resulted in a material hindrance to the official investigation or prosecution of the offense. *Id*.

i. *The gun was not "material" to the investigation or prosecution, thus §3C1.1 is inapplicable.*

2

Application Note Six of §3C1.1. defines "material evidence" to mean any evidence, fact, statement, or information that, if believed, would tend to influence, or affect the issue under determination. (§ 3C1.1. n.6).

In this case, possession of a weapon or the actual means to carry out a threat is not an element of 18 U.S.C. § 875(c). Pattern Criminal Jury Instructions for the District Courts of the First Circuit 2022 Revisions § 4.18.875. In other words, Brian did not have to own the gun in order to be charged, indicted, arrested, and prosecuted for this offense. This was clearly illustrated by the facts of this case, whereby Brian was charged, indicted, arrested, and incarcerated for over a month prior to the Government's seizure of the gun. Had he not possessed a gun, it would not have been a defense to the charged crime.

Further, while at trial in this case, the Court permitted the Government to introduce evidence of Brian's gun ownership to assist in proving his subjective intent to threaten, it denied the Government's request to admit the actual gun. And while at trial, the Government did include photographs of the gun in the woods, it also proved Brian's gun ownership through use of the ATF form he used to purchase the gun, and witness testimony from the time of purchase of the gun. Moreover, even if the gun had never been recovered, the Government could have had ample evidence at trial to prove that Brian had in fact purchased an AR-15 rifle.

As Brian's ownership of the gun was not material to the investigation or prosecution of his case, and evidence of the actual gun was excluded from evidence at trial, it was not material evidence within the meaning of § 3C1.1. Thus, application of the two-level obstruction enhancement is not appropriately applied in this case.

ii. *As Brian elected to waive his constitutional right to remain silent and voluntarily assist the Government, and as he did so well in advance of trial, the obstruction enhancement should not apply.*

As explained above, Application Note Two explicitly provides that the provision is not meant to penalize defendants for their exercise of their constitutional rights. § 3C1.1. n2. Moreover, application of § 3C1.1. is not appropriate, simply because a defendant has elected not to assist the Government in investigation of a case against them. Further, Note Four specifically instructs that where destruction or concealment of evidence occurred contemporaneously to the arrest, application of the enhancement is only appropriate where the destruction or concealment resulted in a material hindrance to the investigation or prosecution of instant offense. § 3C1.1. n. 4(D)).

In this case, Brian voluntarily elected to waive his constitutional rights and to assist the Government in their investigation through his affirmative disclosure. Furthermore, he provided this information to the Government within less than two months of his arrest, and a full six month prior to the first trial. In other words, the Government cannot prove here that Brian's actions had any adverse impact on their investigation or prosecution, let alone a material hinderance to their case. Thus, even if the Court were to conclude that the physical gun was "material evidence" to the Government's case, as its concealment did not result in a material hindrance to their investigation or prosecution of instant offense, the two-level enhancement pursuant to § 3C1.1 is inapplicable.

    iii. *The Government should be permitted to introduce Brian's immunized statements as evidence against him at sentencing. The Government's use of these statements violates the signed agreement.*

As discussed in the Government's and Defendant's motions in limine (ECF Nos 86-78, 181-82) the Government recovered the gun following a proffer with Brian. Under the signed agreement, Brian provided the Government with their requested information. The Government

agreed not to offer into evidence in its case-in-chief, or in connection with any sentencing proceedings, any statements made by Brian during the meeting. (ECF No. 182) at Exh.1.

As with all upward adjustments, the burden is on the Government to prove by a preponderance of the evidence the applicability of §3C1.1 to the present case. For §3C1.1. to apply, the Government must prove both that the defendant concealed or destroyed material evidence and consciously acted with the purpose of obstructing justice. *United States v. Frazer*, 1993 U.S. App. LEXIS 31690 (1st Cir. 1993); *United States v. Rivera*, 971 F.2d 876, 894 (1st Cir. 1992) ("The adjustment is appropriate only upon a finding that the defendant had the specific intent to obstruct justice, i.e., that the defendant consciously acted with the purpose of obstructing justice.") (Internal citations omitted).

Respectfully, the Government should not be permitted to use any of Brian's statements provided to them pursuant to a proffer agreement to try to meet their burden as to application of the enhancement. The defense respectfully submits use of these immunized statements would plainly be violative of that agreement.

### III. A SENTENCE OF TIME-SERVED FOLLWED BY A TERM OF SUPERVISED RELEASE SATIFIES THE 3553 FACTORS.

As discussed above, Brian has an advisory guideline sentencing range of 10 to 16 months. He has already served over three months. The defense respectfully submits that in consideration of the 3553 factors, a sentence of time served followed by a term of supervised release is a sufficient but not greater than necessary punishment.

**A. Brian's History and Characteristics Support a Downward Variance**

The Supreme Court instructs that a court is unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United*

*States*, 552 U.S. 38, 53 (2007). The defense respectfully submits that Brian's history and characteristics provide important context for the offense.

>  i. *Starting from a young age, Brian struggled with social interaction. As an increasingly isolated young adult during, he turned to social media.*

As documented in his PSR, Brian has struggled with social interaction since he was a young child. PSR ¶ 39. He was a quiet, shy child. PSR ¶ 39. In high school he struggled to make friends. PSR ¶ 39. He was also the victim of bullying. PSR ¶ 39. Brian graduated high school in 2015. PSR ¶ 39. While he started college at Southern Maine Community College, he was forced to drop out when he ran out of money. PSR ¶ 39.

There is little question that the emergence of social media websites has fundamentally changed the free speech, information, and communication landscape. Over the next years, Brian only became more and more isolated. Increasingly he turned to social media as an outlet. What started as following people making inappropriate and offensive jokes through memes led to following and interacting with individuals with increasingly extreme and hateful viewpoints, including antisemitic views.

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas — that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Homes. J., dissenting). While First Amendment jurisprudence has long been rooted in the basic understanding that in a society that allowed for a free and unregulated marketplace of ideas – and speech, truth would prevail; social media has posed a new threat to that principle. Mariella DeVos, *The Echo Chamber Effect: Social Media's Role in Political Bias*, Institute for Youth in Policy, (Jun. 21, 2021)

6

https://yipinstitute.org/article/the-echo-chamber-effect-social-medias-role-in-political-bias.

Rather than fostering discourse between those with differing viewpoints, – critical to a free marketplace - social media instead functions by connecting individuals to others likeminded individuals. *Id*. Once in these fractured and segmented groups, internet echo chambers form – both reinforcing existing beliefs and, in some circumstances, shifting the entire group ideology to a more extreme viewpoint. *Id*.

Brian initially turned to social media as a tool to escape loneliness and isolation. Increasingly he became connected with individuals with more hateful ideology. For Brian, such views became increasingly normalized. As a part of this community, he began to share hateful viewpoints and to lose sight of the potential harm and ramifications of this online.

  ii. *Since his arrest, Brian has changed his views and worked to rehabilitate himself.*

As explained in his PSR, it was while in the Cumberland County Jail that Brian first began reading about Buddhism. PSR ¶ 12. Since that time, Brian has devoted himself to better understanding that practice and using his practice to help him deal with everyday stressors. He also used the time since his arrest to reflect on his past behavior – understanding what drove him to social media, the harm that has flowed from it, and learning healthier coping skills. This has had a positive impact not just on Brian, but as will be discussed further at his sentencing hearing, on his relationship with his family.

**B. Brian Understands the Seriousness of His Offense and is Deeply Remorseful.**

As reflected in his PSR report, Brian is deeply regretful of his actions. Brian is aware that as his case went to trial, he is not going to get a reduction for acceptance of responsibility. Nonetheless, in his interview with USPO, Brian candidly expressed his deep remorse and regret for his actions. *See* PSR ¶ 12 ("I feel terrible about the Tweet. I know it was wrong. I feel terrible

if thing things I posted hurt anyone. Regardless, I know what I wrote was not fulfilling or helpful. I have my own goals in life one of those goals is to build a peaceful life. What I wrote was clearly antithetical to that. I am very sorry. I feel bad. I do not want to hurt anybody or their feelings.").

**C. Brian Can Most Effectively Be Rehabilitated in the Community.**

As discussed above, since his arrest and incarceration, Brian has worked hard to rehabilitate himself. He has engaged in mental health counseling. PSR ¶ 36. He has strengthened his relationship with his family. He is gainfully employed. PSR ¶ 40. He has been compliant with his conditions of release. PSR ¶ 3. He has found support and fulfillment through the practice of Buddhism. PSR ¶ 12.

Even prior to the Covid-19 pandemic, the Bureau of Prisons (BOP) was plagued with overcrowding and understaffing. Emily Widra, *Since You Asked: Just How Overcrowded Were Prisons Before the Pandemic, and At This Time of Social Distancing, How Overcrowded Are They Now?*, Prison Policy Initiative (Dec. 21, 2020); Cecilia Vega, *Inside the Bureau of Prisons, a Federal Agency Plagued by Understaffing, Abuse, Disrepair*, 60 Minutes, (Jan. 28, 2024) (noting among other factors, that the Bureau had six different directors in the past six years). However, the pandemic deepened existing issues to crisis levels, resulting in lockdowns and compromising safety of residents and rehabilitative programming. *Id*. For example, a February 14, 2024, report detailing an evaluation by the Office of the Inspector General on inmate deaths in BOP custody, concluded that managerial and operational deficiencies had created unsafe conditions with BOP facilities at the time of the inmate deaths. Office of the Inspector General, *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions*, Dep't of Just. (Feb. 14, 2024) https://oig.justice.gov/sites/default/files/reports/24-041.pdf. Similarly, a January 2024 investigation by 60 Minutes concluded that the BOP's staffing issues were so severe as to

compromise its ability to fulfil its basic mission: rehabilitating inmates and keeping its prisons safe. Vega, *Inside the Bureau of Prisons, a Federal Agency Plagued by Understaffing, Abuse, Disrepair*, 60 Minutes.

Moreover, 3553(a)(2)(C) and (D) direct sentencing courts to consider both the need to protect the public from future crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. In other words, rehabilitation. Brian is 27 years old. Aside from his three months at the Cumberland County Jail, he has never been incarcerated before. Respectfully, the defense submits that for Brian, any time at the BOP will be focused on protecting his basic safety rather than rehabilitation.

**D. Brian Had No Prior Criminal History. As Such, a Felony Conviction is Especially Impactful.**

Prior to the instant offense, Brian had never been arrested, never been charged with crimes, and had never been incarcerated. Now he is convicted of a federal felony offense. This conviction will permanently change Brian's life. In Maine there are 219 formal collateral consequences flowing from a criminal conviction ranging from employment and licensure disqualifications to ineligibility for public benefits. See Nat'l Inventory of Collateral Consequences of Conviction, *Collateral Consequence Inventory*, https://niccc.nationalreentryresourcecenter.org/consequences (last accessed Apr. 4, 2024). Furthermore, there are additional informal consequences that flow from the stigma of Brian's conviction – some of the impact of which he has already felt. Shortly after his arrest for the instant offense, Brian was fired from his job at On Semi – a position he had held for four years at the time of his termination. However, since his release on bail, Brian has obtained another job at Amato's in Westbrook, working in their bakery. He makes a good wage and enjoys the work.

9

Moreover, due to Brian's lack of prior criminal history, this criminal conviction is particularly impactful. He will carry around his felony conviction for the rest of his life and all the collateral consequences that flow from it.

IV.     CONCLUSION

In sum, Brian respectfully submits that his advisory guideline sentencing range as calculated by USPO in his final PSR report is accurate. Further, in consideration of his personal history and characteristics, remorse, rehabilitation, and the term of incarceration he already served, he respectfully submits a sentence of time served followed by a term of supervised release satisfies the 3553(a) factors.

Dated this 8th day of April 2024, at Portland, Maine.

Respectfully submitted,

*/s/ Tom Hallett*

Thomas Hallet, Esq, Bar No. 3124
Grainne Dunne, Esq, Bar No. 6738
Attorney for Defendant
HALLETT WHIPPLE WEYRENS
6 City Center, Ste. 208
P.O. Box 7508
Portland, ME 04112
PH: 207-775-4255
*gdunne@hww.law*

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CERTIFICATE OF SERVICE

I, **Grainne Dunne**, hereby certify that I have served electronically, a copy of this motion upon **Assistant United States Attorney Craig Wolff, Esq.** and **Assistant United States Attorney Jonathan Nathans, Esq.**, via the ECF System.

Dated: April 8, 2024                                            /s/ *Grainne Dunne*
                                                                Counsel for the Defendant